```
                    UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF WISCONSIN
------------------------------------------------------------------
 UNITED STATES OF AMERICA,          )
                                    )
                       Plaintiff,   )   Case No. CR 16-00095-WCG-1
                                    )   Milwaukee, Wisconsin
      vs.                           )
                                    )   November 17, 2017
 CHARLES R. SZYMAN,                 )   9:20 a.m.
                                    )
                       Defendant.   )

------------------------------------------------------------------
```

### TRANSCRIPT OF JURY TRIAL EXCERPT
### GOVERNMENT CLOSING & REBUTTAL CLOSING ARGUMENT
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

 For the Plaintiff
 UNITED STATES OF AMERICA:     Office of the US Attorney
                               By: MATTHEW L. JACOBS
                                   LAURA SCHULTEIS KWATERSKI
                               517 E Wisconsin Ave - Rm 530
                               Milwaukee, WI 53202
                               Ph: 414-297-4106
                               Fax: 414-297-1738
                               matthew.jacobs2@usdoj.gov
                               laura_kwaterski@usdoj.gov
 For the Defendant
 CHARLES R. SZYMAN:            Law Offices of Beau B Brindley
 (Present)                     By: BEAU B. BRINDLEY
                                   MICHAEL J. THOMPSON
                               53 W Jackson Blvd - Ste 1410
                               Chicago, IL 60604
                               Ph: 312-765-8878
                               Fax: 312-765-8040
                               bbbrindley@gmail.com
                               mthompson@brindleylaw.com


 U.S. Official Transcriber:    JOHN T. SCHINDHELM, RMR, CRR,
 Transcript Orders:            WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



1

1    TRANSCRIPT OF JURY TRIAL EXCERPT

2    **GOVERNMENT CLOSING & REBUTTAL ARGUMENT**

3    Transcribed From Audio Recording

4    *    *    *

5    9:20 a.m.

6    THE COURT:  So that concludes my beginning

7  instructions and the substantive instructions that are to guide

8  you in your deliberations.  The closing instructions we'll talk

9  about your role as jurors and the selection of a foreperson.

10  Before we get to those, though, you'll hear the arguments from

11  the attorneys.

12       Mr. Jacobs?

13       MR. JACOBS:  Thank you.

14       THE COURT:  Mr. Jacobs, before you begin, let me -- I

15  thought I had -- oh, yeah.  I wonder if our bailiff or court

16  security officer could hand out these copies of the verdicts on

17  the colored paper so they get an idea of what the verdict looks

18  like.  There's not -- every other juror should get one.  Look

19  on.

20       (Brief pause.)

21       THE COURT:  That's just to give you an idea what the

22  verdict is.  We'll give you an original one that will be the

23  verdict that you'll write in your decisions on.  But that's what

24  it looks like.

25       So, with that in mind then, I'd just ask that you put

2

1  it aside unless and until the attorneys refer to them.

2  Go ahead, Mr. Jacobs.

3  GOVERNMENT CLOSING ARGUMENT

4  MR. JACOBS:  May it please the court, Dr. Szyman,

5  counsel, ladies and gentlemen of the jury.

6  "Don't tell me what you want.  Don't tell me what you

7  don't want, tell me what you want.

8  "What strength?  Everybody loves 30s.  It's got a

9  kick.  That's why everybody likes it.  So I don't care, how many

10  would you need though?  They changed that formula and that's how

11  people have come to do heroin because they want that so

12  everybody is doing heroin now.  [Indiscernible] people love this

13  OxyContin."

14  That's the defendant Dr. Szyman.  That's him.  That's

15  his attitude when handing out, when distributing, when

16  dispensing narcotics.

17  Now, I think we all know that if someone confronted us

18  or if we had to testify at trial and was accusing us, we could

19  probably put on a suit, shave, look good, come up with a good

20  story to avoid responsibility for what you had done.  Your job

21  as jurors is to determine what the defendant did, what he did

22  knowingly and intentionally.

23  And so I think the evidence that best identifies what

24  someone knows, what someone does, what someone intended to do,

25  is what they did, how they acted, and what they said when they

1   didn't know they were being watched.  When they were speaking

2   candidly.  Not to a jury to avoid responsibility for their

3   conduct.  These are the words of the defendant Dr. Szyman

4   talking to the undercover agents in this case.

5        Now, again, I know you sat through the evidence in

6   this case, but I'm going to review briefly what the charges are

7   about and then go through the evidence.

8        Dr. Szyman is charged with illegally distributing,

9   dispensing controlled substances.  And as the court has told

10   you, oxycodone, morphine, fentanyl, amphetamine, hydrocodone,

11   methadone, hydromorphone, those are all narcotics.  They're all

12   controlled substances.  They're all opioids I think we've heard.

13        Actually amphetamine is not an opioid.  That's a

14   different controlled substance.  That's the Adderall.  That's an

15   upper.  That's speed.  Part of the prescriptive speedball

16   Dr. King described.

17        But they're all controlled substances.  And as a

18   general matter it's illegal to distribute those controlled

19   substances.  Just flat-out illegal.

20        Now, Dr. Szyman, because he's a physician, a doctor of

21   osteopathic medicine, he has some ability to legally distribute

22   those, but he can only do that if he does it for a legitimate

23   medical purpose within professional practice.  That is, he's

24   charged with distributing them outside of professional practice,

25   not for legitimate purpose.  And that's illegal.

4

1      As I mentioned, he's the doctor of osteopathic

2   medicine.  He's licensed here in Wisconsin.  As part of that he

3   had at least at this time a registration from DEA who gave him

4   very limited authority to an exception from the law that

5   prohibits distributing controlled substances, but only for a

6   legitimate medical purpose within the scope of professional

7   practice.

8      You heard from an expert in this case, Dr. Timothy

9   King.  Well-educated medical doctor.  He's board certified.  Not

10  just in anesthesiology, but in pain medicine and, in effect,

11  addiction medicine.  I think you've heard his background, his

12  work.

13      And he explained to you the practice of medicine.  And

14  in many ways it's common sense.  It's understandable to all of

15  us.  It's -- the practice of medicine in some respects is

16  problem-solving.

17      You know, first you gotta figure out what's the

18  problem.  You make a diagnosis.  Identify what the problem is.

19  And I think Dr. King described how you do that.

20      Well, A, you look at past medical records;

21      B, examine the patient;

22      C, maybe perform some tests and some x-rays, MRIs,

23  other imaging.  Some type of tests to help -- you gotta identify

24  a problem, right?  Because you can't solve a problem unless you

25  can identify a problem.

1    And you have to have things that support your

2 diagnosis.  You can't just be, I don't know, I think today I'm

3 going to diagnose this person with X.  And we have to come up

4 with a treatment plan, right?  That's really what

5 problem-solving is in all forms of life.

6    That is, you identify what the problem is and you say

7 how am I going to solve it.  You know, you have to say how am I

8 going to get from point A, the diagnosis I've established, to

9 point B, a cure?  How am I going to address that?

10    And in doing that, as Dr. King explained, you need to

11 at least take into account some of the risks.  Because as we've

12 seen, there are some risks with the opioids, the narcotics that

13 Dr. Szyman gave people.

14    And so first you have to have the problem;

15    Second, come up with a treatment plan to get to the

16 solution of the problem.

17    And then figure your path.  Is the path you're taking,

18 does it have risks that make that untenable.

19    You know, if getting Heidi Buretta to be able to work

20 kills her, those risks outweigh that treatment plan.  Right?

21 That's a side effect that says, no, no, you can't do that.  You

22 can't just say, hey, this allowed her to work.  She'll be dead.

23    You have to at least take into account those risks.

24 And there are [Indiscernible] other obviously less severe risks.

25 You know, whether it's becoming a zombie.  Whether it's

1    tremendous constipation.  Whether it's nausea.  Whether it's

2    addiction.  Whether it's withdrawal.  Whether it's that, as

3    Dr. Szyman knows, you start on this path and people start -- end

4    up doing heroin.

5         And I'll come around to this again.  But I want you to

6    think about Alex Krizizke.  25-year old kid.  Maybe some of you

7    have kids that age.

8         MR. BRINDLEY:  Objection.  That's an improper comment,

9    Judge.  That's improper.

10        THE COURT:  Some of you have kids that age?

11        MR. BRINDLEY:  Speaking to the jury directly like

12   that's improper.

13        THE COURT:  All right, sustained.

14        MR. JACOBS:  25-year-old kid.  Starts seeing

15   Dr. Szyman at age 16.  Gets on Dr. Szyman's road of escalating

16   opioids.  And where does she end?  With a heroin addiction.

17   With rehab.  [Indiscernible] criminal charges.

18        So those are risks that have to be taken into account.

19   Dr. Szyman has to take those into account if he's going to

20   follow professional -- if he's going to do things within his

21   professional practice.

22        I mean, sure, if he just wants to hand out drugs.  But

23   he's abandoning his job as a professional, as a physician.  And

24   when he does that he loses his exemption.  He can't hand out

25   drugs unless he follows professional practice, because otherwise

1    he's just a drug dealer.  Otherwise he's just hooking people on

2    narcotics.  Which is what he did.  And he's illegally

3    distributing drugs.

4            And as part of the practice of medicine, like we all

5    know, we got to monitor because frankly they're not always the

6    best guessers at the beginning.  You know, maybe I say here's my

7    problem, here's where I want to get to, here's how I think I'm

8    going to get there.  But, you know, you have to keep track.  You

9    have to monitor it.  How are people doing.  What are the risks.

10   Are the risks showing up that I should be aware of.  Am I paying

11   attention to those.  And if so, am I modifying.

12           I have to keep track.  I have to make sure because I'm

13   the professional.  I'm the adult in the room.  You know, it's

14   controlled substances.  It's what we talked about.  You know,

15   it's -- the patient doesn't get to decide.  These aren't just

16   something you pick up in the pharmacy.

17           And there's a reason for that.  Because lay people

18   would choose incorrectly.  Lay people without professional

19   training wouldn't appreciate that these drugs have all these

20   side effects that, you know, if left to our own devices we might

21   pick what seems like the easiest, the cheapest solution.  Not

22   realizing what's going to happen.  It's that we're going to get

23   dependent, have all these side effects, risk death.

24           And so we need the professional, the adult in the room

25   to stand between us and some of these drugs.  That's why they're

1  controlled.

2      And so, Dr. Szyman, if he was going to legitimately

3  hand out narcotics, has to follow these steps.  Otherwise he's

4  abandoning his role and he loses any protection he has as a

5  physician to hand out narcotics.

6      As we say, to support a diagnostic and risk

7  assessment, Dr. King told you -- and, you know, again, many of

8  these things are common sense -- you know, you have to do a

9  clinical history.  Look at medical records.  See what has worked

10  in the past, what has not worked in the past.

11      You know, if narcotics have not worked in the past, I

12  think it's -- someone said it's insanity to repeat the same

13  thing and expect a different result.  Right?  And so we have to

14  have some attention to what worked in the past, what has worked

15  with a particular patient in the past.  Look at their medical

16  records.  You have to examine the patient.  You know, you're the

17  professional.  You can't just guess.  You can't just say, well,

18  and they say they've got pain, how about narcotics?

19      [Indiscernible] there are tests to help.  Again,

20  you're a professional.  Your job as a professional -- if you're

21  going to be able to hand out these narcotics, these addictive,

22  dangerous, life-threatening narcotics, as we've seen, you have

23  to do an assessment that looks at prior records, looks at the

24  patient as they are now, use any appropriate tests, whether it's

25  x-rays, MRIs, other types of imaging.

9

1    Then you have to take into account the patient,

2  whether they have what are called comorbitities.  You know what

3  that is, right?  It's that sometimes some of us have things that

4  would make the treatment harmful to me.

5    But in this case -- you know, the example is, whether

6  it's diabetes, obesity, people had -- were smokers, people had

7  lung problems.  There are physical ailments such that if you

8  give that person narcotics, if you give someone who already has

9  breathing problems a drug that reduces their breathing rate, you

10  know, it's a -- that's what -- that's one of the effects of

11  these narcotics, it's reducing your breathing rate.  And so when

12  you go to sleep and you already have problems breathing, maybe

13  you have sleep problems, you're already breathing very shallow.

14  And when you throw on top of that narcotics, you reduce the

15  breathing so low that the person dies.  So those are physical

16  comorbitities.

17    Then there's mental health comorbitities that you have

18  to take into account.  And we saw it.  We saw a number of

19  patients come in here and talk about bipolar, depression,

20  anxiety.  These mental health issues.  And as Dr. King said and

21  I think Dr. Szyman acknowledged, yes, you give someone

22  narcotics, it's going to make those conditions worse.

23    And so you have to that that into account because,

24  again, when they're going down a path you have to look at what

25  are the countervailing risks.  You can't just give people

1  narcotics and say, well, and because obviously at some point

2  narcotics will make your pain go away because you'll be dead.

3       But that's not an appropriate trade-off.  And if

4  Dr. Szyman isn't taking that into account he's not practicing as

5  a physician.  He's not doing his job.  He doesn't deserve the

6  protection that the law gives a physician because he's not doing

7  his job.  He's just handing out narcotics and he's putting

8  people at risk, risks he's well aware of.  He's well aware of it

9  because he's trained in it.  He's well aware because he's seen

10  it.  He's seen all these risks.

11       And he has to take that into account.  He's not free

12  to just hand out narcotics and ignore the side effects and say,

13  look, I told him it could happen.  That's not practicing

14  medicine, that's drug dealing.

15       [Indiscernible] I say the treatment planning, it has

16  to be defined to address the problem.  You have to look at

17  alternatives to narcotics because, as we've heard, narcotics do

18  not cure what's causing the pain.  It's just a Band-Aid.  It

19  just masks it.

20       So you have to look at those.  You can't just -- the

21  first thing you do cannot be to give people narcotics.  You have

22  to look at other alternatives.  Because there are clear side

23  effects to narcotics we discussed.  Maybe there's physical

24  therapy.  Maybe some people need surgery.  And if they're not

25  willing to take surgery you have to say, I can't give you

1  narcotics.  The appropriate response is this and this.  And if

2  you're not willing to do that, I can't just give you narcotics.

3  It's not going to cure anything.

4         And, you know, we've seen what actually happens.  In

5  Dr. Szyman's world -- it isn't just that you give them

6  narcotics, you give them an ever increasing spiral, a larger

7  amounts of narcotics.  Amounts that were astounding.  By

8  Dr. Szyman's own testimony he's well aware, you give someone

9  more than 10 milligrams of morphine or an equivalent of that a

10 day, the risks to overdose go up 10 times to an individual.

11        The patients here got hundreds, hundreds of morphine

12 doses a day.  And, again, so well in excess of the red light

13 that Dr. King described.  But more than, that some of them got

14 thousands, thousands of doses of morphine.

15        And Ms. Buretta, 11,000 doses of morphine a day, every

16 day, for months, for years.  Treated people for years.  And

17 that's how you know it's not working also, right?  You know, you

18 say to yourself it may be that Dr. Szyman didn't recruit these

19 patients into the hospital, but he sure got them hooked.  He

20 sure got them in there to come to see him to get narcotics.  To

21 come to repeatedly see him.  For years.

22        I mean these are people with pain.  And we know it's

23 not working because they keep seeing him.  They're just in there

24 in the upper escalating spiral.  Dr. Szyman was driving them up

25 this hill.  Driving them up this cliff.  Right?  It kept

1  happening.  He acknowledged himself.  That's what's going to

2  happen.  The body's going to develop tolerance so I gotta give

3  them more and more and more.  And it drove them higher and

4  higher up that cliff.

5        And we saw what happened to some of those patients,

6  right?  They fell off in a variety of different ways.  Some fell

7  off and ended up through withdrawal.  As Ms. Walt said, hell.

8  As Mr. Conway said, I think in tears, going through three --

9  three full weeks of inpatient hell going through withdrawal from

10  the drugs that Dr. Szyman had put him on on his upward spiral

11  road of escalating opioids.

12        Mr. Orth the same thing.  Others ended up in jail,

13  right?  Because they were given all these narcotics.  You know,

14  addiction, psychological problems that they had, they ended up

15  selling the drugs.  They ended up in jail.  Probably also in

16  withdrawal.  Some in rehab.  Or they ended up dead like

17  Ms. Buretta.

18        Dr. King explained to you that a physician doing his

19  job practicing as a doctor, not as a vending machine, has to

20  also worry about combining a variety of medications, you know,

21  this compounding effect.  That is, you give someone sedatives, I

22  think he called them benzodiazepines, and you give them

23  narcotics, then you reduce their breathing with one and reduce

24  it with the other till it becomes potentially fatal.

25        Or, you do the exact opposite then that we saw with

1   some of the patients, right?  What did Dr. Szyman do?  He gave

2   patients not only narcotics to bring them down, he gave them

3   speed or amphetamines or Adderall to bring them up.

4          You know, it's sort of like -- you know, it kind of

5   binds -- if someone [Indiscernible] sleep so I give him more

6   narcotics.  But as Dr. King explained, what's the effect of

7   that?  You get this roller coaster.  You can just picture it.

8   The heart's racing, the heart's racing down, then the heart's

9   racing, the heart's going down, the heart's racing -- and then

10  maybe your timing gets out of whack and either the heart

11  explodes off the top end or drops down to the bottom end.  So

12  you get, as Dr. King, this prescriptive speedball.

13         And because of all these risks that Dr. Szyman

14  acknowledged -- I mean, these are narcotics.  We've seen it.  He

15  acknowledged, this opioid crisis going on.  These are pills

16  being abused, being sold, causing overdoses, causing deaths.

17  He's well aware of it.

18         You gotta follow up.  And it can't just be following

19  up from a path of, hey, I'm watching the show here.  You gotta

20  respond to the information.  Again, that's what monitoring

21  means.  It doesn't mean watching.  You know, it's -- A, is the

22  patient improving?  Is there -- is what you're doing -- okay,

23  you identify a problem, you got a solution you're trying to get

24  to, you got your treatment plan, hey, let's -- is it working?

25         You've got to monitor it.  You have to see is --

14

1  [Indiscernible] or am I putting the person at risk by just

2  giving them narcotics for no reason?  Am I just feeding the

3  narcotics?

4          And again, remember, Dr. Szyman knows this.  He's not

5  just feeding them narcotics, he's feeding them more and more and

6  more.  And it happened in every one of these cases.  You saw it

7  happen.  Until either the person was arrested, going through

8  withdrawal, or dead.  You saw these large quantities of

9  narcotics.

10          You have to monitor it.  If you're not getting any

11 better, you ought to find something else to do.  It's not

12 working.  You can't just keeping handing out narcotics.  You're

13 not being a doctor.  He knows it.  He told us he knew it.

14          You have to look at things that say the patient's

15 abusing their meds.  Because it's a known problem with these

16 narcotics, right?  He -- and Dr. Szyman acknowledged, Dr. King

17 explained it.  The patients, you know, they're calling in.  They

18 got early refills.  All right, and my dog ate my medicine.  It

19 fell down the drain.  I'm going out of town, I'm going to need

20 it sooner.

21          You know, things that someone being a doctor would

22 immediately say this is drug-seeking behavior.  This happens.  I

23 know this happens in this area.  I've seen it happen with my own

24 patients.  I've read about it.  I know about it in the

25 community.  You can't ignore it and be a doctor.

15

1          You do urine drug screens.  And you say, A, are they

2   taking other drugs to say this person's got some addiction

3   problems?  And we've got drug screens with heroin.

4          And also, are they taking the drugs I'm giving them?

5   So you see people like Mr. Peterson.  You know, he's asking for

6   more drugs, but it's not in his urine.  What does that tell you?

7   It tells you he's not taking them.  He's selling them.  He's

8   abusing them.

9          Those are things that a doctor doing his job giving

10  out narcotics for a legitimate purpose has to pay attention to

11  that.  And so, there has to -- not only paying attention, there

12  has to be response.  There has to be, you know, some -- you

13  know, what do you do when you find out the person's abusing

14  their drugs?  You can't just keep giving them more.  You can't

15  keep them on the road of ever-escalating narcotics.

16         And remember that.  I don't know what the patients

17  knew when they first came to see Dr. Szyman.  Got this opioid

18  contract and said, hey, you know there's some risks?  There's

19  some addiction, there's some withdrawal, there's some

20  constipation, there's some problems.  You know, okay.  He says,

21  okay, conceptually I guess I get the idea.

22         But I know Dr. Szyman knew exactly what they were in

23  for.  He knew what he was -- the road he was putting him on.  He

24  put a bunch of people on.  He put all these people on it.  He

25  knew where it was going.  He definitely knew what was going to

16

1    happen to them.  He knew he was putting them on the

2    ever-increasing cycle.  He was driving them up the cliff.  He

3    knew that.  Until they got to some ceiling.  I think he said

4    there might be some ceiling.

5         I can't tell, is he just experimenting with them?  Is

6    he just saying how high can I go?  What's the ceiling?  Well, we

7    know that it's somewhere around 11,000 because that's as high as

8    these patients got to and Ms. Buretta died.

9         But he knows that.  Now, he can sit there and say,

10   well, they assume the risks.  Well, there's a certain amount of

11   that.  Caveat emptor, you know.  But he's the professional.

12   He's the train -- he's the person who's the gatekeeper between

13   you -- patients and then narcotics.  He knows all that.  And he

14   knows where they're going.  And he can say, you know, you have

15   these risks.  Well, he could say, well, you know, actually, let

16   me tell you what the risks actually are.  In nine years you're

17   going to be taking 11,000 doses of morphine.  I know it because

18   I've seen it happen and I've done it.  I've got people and I've

19   got patients that'll tell you about it.  Or you're going to be

20   addicted, maybe go through withdrawal.  You know, you might find

21   yourself on the street selling the stuff because I got patients

22   doing that too, being arrested and going to jail.  He knows

23   that.

24        Now, again, in this case there are 19 counts.  And the

25   counts break down into two categories.  The first nine, which

1  I'll discuss at the end, are those transactions that two

2  undercovers officers, Special Agent Greg Connor and a deputy

3  sheriff -- I think she's a deputy sheriff, a patrol officer for

4  a sheriff's office -- posing as patients.  And we'll talk about.

5  Those are the first nine counts.  Those are the first five and

6  the five visits by Greg Connor posing as Richard Russo.

7          Counts 6, 7, 8 and 9, the next four, are prescriptions

8  Dr. Szyman gave to Kelsey Knaup posing as Anna Kingston.

9          Then 10 through 19 are individual counts based on

10 individual patients.  And in the original indictment -- I'm not

11 sure if the court's going to give you the indictment, but the

12 original indictment just identified those people by a letter.

13 It said "Patient A" to protect their confidentiality because the

14 indictment's a public document.  And I think we prepared a copy

15 of the indictment that actually has the person's name in it.

16 And I think if you looked at the verdict the court's inserted

17 that patient's name in there for each of the counts because,

18 again, I recognize it would be confusing, but was necessary,

19 initially charge him.

20         So patient A is count 10.  First of the individual

21 patients, Marilyn Valdez.  She was a patient the shortest period

22 of time because she got arrested and ended up in jail for

23 selling the drugs Dr. Szyman was giving her.  And in 20 months,

24 in less than two years, Dr. Szyman increased the amount of

25 morphine, the amount of narcotics he was giving her, from 290 to

18

1    1,200.  She was kind of on the fast road up the spiral.

2            And as indicated, she indicated -- she acknowledged

3    she was selling those prescription drugs she got from

4    Dr. Szyman.  And she sold some to an undercover officer and that

5    ended up her in trouble.

6            The specific count with respect to Ms. Valdez is one

7    of the latter prescriptions Dr. Szyman gave her.  It was on May

8    4th of 2012.  And Szyman -- Dr. Szyman gave her prescriptions.

9    Now, not just one, this is a bunch of prescriptions on a single

10   day.  This is what he gives her.

11           Gives her a prescription for 600 -- these are

12   multi-prescriptions -- 600 Oxycodone 30s.  Everybody loves

13   those.

14           480 of the combination of oxycodone and acetaminophen.

15   Which is I think aspirin.  In the ratio of 10 milligrams of

16   oxycodone and 325 milligrams of aspirin.

17           He gave her [Indiscernible] dose -- I guess it's 1,080

18   roughly for the month.  Gave her 180 OxyContin 20 milligrams.

19   120 40-milligram OxyContin.  And another 180 OxyContin 80s.

20   That's one month's prescription that he gave to Ms. Valdez.

21           And then we see Ms. Valdez came to Dr. Szyman.  A

22   referral from the state court system.  I think we saw some of

23   those records.  She just -- she was prosecuted for drug dealing

24   marijuana.  She was selling marijuana.  She had some knee

25   replacement.  But she had a normal physical examination.  She

1  had done -- this was Dr. King's assessment of her.  She had done

2  a normal physical examination.  That's what the records

3  reflected.  Did 20 months of treatment without any improvement.

4  And as much -- her max MEQ says here 1140.  And again, so during

5  that treatment, again, less than two years, goes from getting

6  240 MEQ to 1,140.

7         And Dr. Szyman says and we could tell these drugs

8  aren't being given for a legitimate medical purpose just looking

9  at her patient file.  You can see compliance issues.  She's

10  early out.  She's got early refills.  She's got lost meds.

11         You have to suspect, what's going on there?  You know.

12  She's got potential abuse or she's diverting.  In addition to

13  causing her weight.  As I mentioned, these are comorbitities.

14  You give someone like this who's got weight issues these kind of

15  narcotics, their body is going to risk significant overdose,

16  significant death.  Significant overdose or death.

17         And in there this is just a note reflecting -- and

18  it's in Dr. Szyman's file.  Yes.  So, again, 2012.  So we go

19  back as far as 2012.  This is a patient claiming, oh, no, I

20  needed these.  She gets a message, she's selling the

21  prescriptions.

22         And that's important again because it shows Dr. Szyman

23  knows his patients will lie to him.  They crave these.  And he

24  knows philosophically, he's told us that, these are addictive.

25  People crave them.  People are selling them.  People are

20

1    diverting them.

2        But here's one of his patients right here.  He raced

3    up to the morphine equivalency and she was out there selling.

4    Yes, she lied to him.  This is a known risk that a

5    professional -- that a doctor acting as a doctor would know and

6    would have to take into account.  It can't be, you know, I

7    trusted them, she said she didn't.

8        You go to Patient B.  Excuse Me.  That's Tanya Pivonka

9    Dewane.  She testified here, you may recall.  That's Count 11.

10   She saw Szyman from 2010 to 2014.  Again, look at the length of

11   time.  Again, he's giving them the Band-Aid of narcotics for

12   years.  Getting her hooked.  Getting her coming in.  Just a

13   steady stream of patients coming into his medical clinic.

14       Increases her morphine equivalency doses from 780 to

15   more than 2,500.  And, again, she told us, she was selling the

16   drugs.  I think she said -- testified she made $10,000 a month

17   selling the drugs Dr. Szyman was giving her.

18       And there were numerous inconsistencies in her urine

19   drug screens that Dr. Szyman, if he was practicing as a

20   physician, would have recognized.  You know, he's seen it happen

21   before with Ms. Valdez, but he's still pouring out narcotics to

22   Ms. Pivonka-Dewane.

23       The specific charge, Count 11, is based on a

24   prescription Dr. Szyman gave Ms. Pivonka-Dewane on October 8th

25   of 2013.  And at that point -- and this is -- it's just one

1   month, one set of prescriptions, gave her four prescriptions for

2   420 Oxy-30s.  All of those contained the controlled substance

3   oxycodone.

4           What does Dr. Szyman -- Dr. King tell us?  He goes

5   through that patient file.  And he goes, this is not a

6   legitimate practice of medicine.  This is not -- this is not

7   within professional practice.  Dr. Szyman is not acting as a

8   doctor.  He has abandoned any protection he thinks he has for

9   handing out drugs.  It's six years of treatment without

10  improvement.

11          For max morphine, this is a daily amount of morphine,

12  2,540.  And she has all these mental health comorbitities.

13  She's got admissions throughout -- you know, Dr. King indicated

14  -- throughout there.  And I think she said it herself, the

15  inpatient treatment for various mental health disorders.

16          And throughout then the urine screens, which they find

17  heroin, but, again, Dr. Szyman just continues to give her

18  narcotics.

19          And we find interferon, which means I think Dr. King

20  testified sometimes people put stuff in their urine so you can't

21  detect what they are taking.  Again, that's a red flag.  A

22  physician doing his or her job acting as a legitimate physician

23  would know that's a sign this person's abusing, perhaps

24  diverting their narcotics.

25          But Dr. Szyman also got explicit warnings.  You know,

1  there was -- this is a note -- and this is two years before he

2  quit bringing her I guess since I think it was the 2014 --

3  received a call from Sheboygan Memorial Behavorial Health

4  Unit --

5        Oh, I'm sorry, wrong one.

6        Patient is in inpatient there.  They are questioning

7  her pain med dosage.  She is currently prescribed oxycodone

8  30-milligram 10 tabs every four hours.  They say her pain seems

9  to be controlled with much less.  Apparently she told them she

10 does not always take this many.  "Do you have any idea she's

11 possibly taking much less than prescribed?"

12       So there.  There's a third party -- this is a third

13 party going from a -- one of her inpatient stays because there

14 was psychological issues, the behavorial health issues, and

15 they're saying she doesn't need these drugs.  She says she

16 doesn't take all these drugs.

17       Dr. Szyman is being told that.  Doesn't care.  Just

18 keeps giving her narcotics.  Increasing -- keeps having her come

19 back as a patient.  Keep her on the upward spiral.

20       Then they get a call from Barb at a Manitowoc

21 pharmacy.  And as in here, it indicates:  "Pharmacist also

22 expressed some concern about this patient.  She presents to the

23 pharmacy, has large rolls of cash, and is always with a

24 different young man."

25       And so, again, these are red flags.  You know, imagine

23

1    what it takes before a pharmacy calls a doctor and go, ah, Doc,

2    you know, this person, I think you ought to be suspicious

3    they're diverting.  But what does Dr. Szyman do?  Well, he

4    doesn't do his job.  He doesn't act as a doctor.  He just keeps

5    Ms. Pivonka-Dewane on the upper spiral of more narcotics.  He's

6    actually just feeding her business.  I mean he's allowing her to

7    make $10,000 a month.  And that's not the practice of medicine.

8    That is not a legitimate medical purpose.

9         Patient C, Dabien Peterson.  We saw Mr. Peterson

10   yesterday.  He was a patient with Dr. Szyman from 2007 through

11   2015.  The specific prescription this is based on, back on

12   January 8th of 2014 -- I guess towards the end of Dr. Szyman's

13   dealing with Mr. Peterson -- he gave him prescriptions with 540

14   oxycodone 30-milligram, 240 40-milligram tablets, and 1,800

15   80-milligram tablets of OxyContin.  Just incredible quantities.

16   Those are all drugs containing the controlled substance

17   oxycodone.  That's the basis of Count 12.

18        And you look at Dr. King's assessment of Dabien

19   Peterson.  He had a spinal cord injury.  There's no doubt these

20   people have some medical issues.  But the question isn't whether

21   they have medical issues, the question is whether -- how

22   Dr. Szyman treated them.  Was that a legitimate response to

23   those medical issues, or was he just handing out narcotics?

24   It's seven years of treatment without improvement.  And I mean

25   without improvement.

1    As described by Mr. Peterson, Dabien himself, and

2   Dr. Szyman, when Mr. Peterson started with Dr. Szyman -- this is

3   before he got drugs -- he said his pain level was 4 to 5.  And

4   he was on -- and I don't know what it was, 5 -- 5 milligrams of

5   some type of pain reliever.  That surgeon who dealt with him

6   said, given this guy's family history of alcoholism, he's not

7   recommending opioids because that doctor recognizes that's a

8   problem.  You know, that combination, as Dr. King described,

9   that's a dangerous combination to give someone with a family

10   history and even Mr. Peterson's own personal history of alcohol

11   abuse problems, giving them narcotics is not recommended.

12    But Dr. Szyman gave Mr. Peterson narcotics increasing

13   to 2,910 morphine dosage units a day.  And his pain -- at the

14   end of all that, at the end of those seven years of treatment,

15   his pain level, he says it's 4 to 5 to start, at the end it was

16   5.  It potentially slightly went up.

17    But what did he get for that keeping the pain at the

18   same level?  He got massive amounts of narcotics into his body.

19   Again, there are indications in the file, early refills, early

20   outs, claiming stolen meds, past history of addiction, and

21   inconsistent urine drug screens.

22    And we saw Mr. Peterson testify here.  Would it be

23   understandable why Mr. Peterson would have a certain amount of

24   loyalty, affinity for Dr. Szyman, someone who gave him large

25   amounts of narcotics for long periods of time?  It's not hard to

1   imagine why.  It's not for a legitimate medical reason.  But

2   would someone have an affinity for someone who's been their drug

3   supplier for seven years, constantly giving them all the

4   narcotics they want?

5         And yet Dr. Szyman had indications in his own file

6   that there was a problem with his treatment.  Not just the large

7   quantities without any improvement.  You know, Mr. Peterson

8   comes in here and he says oh, my life was great.  But you look

9   at the medical file, you know, I think we pointed it out to

10  Mr. Peterson, he says now, oh, it's going great, I could cut the

11  lawn, I could build a garden.

12        That's not what his medical file reflects at all.

13  He's complaining of greater levels of pain throughout the time

14  Dr. Szyman is treating him.  At various times, again starting at

15  a pain level of 4 to 5, there were times when seeing Dr. Szyman

16  getting all these narcotics he says my pain level is 7 to 8.

17  And yet the pain level's going up.  And why?  Because he wants

18  more of the narcotics.  Either he's abusing them or he's

19  diverting them.

20        And at least there is some indication in the file.

21  The clinic gets a call.  Again.  There's some suggestion they

22  got a lot of calls like this.  And perhaps the suggestion is,

23  oh, everybody gets a lot of calls that patients are diverting

24  drugs.  Or maybe what they're saying is they got a lot of calls

25  because Dr. Szyman was pushing a lot of narcotics out on the

1    street.  So, yes, they're getting a lot of calls because it's

2    happening.

3              So they receive a call from a female who wishes to

4    remain anonymous.  She reports that this patient, again, it's

5    Mr. Peterson, and his wife, are selling his narcotic medication.

6    He's offering his meds to her son to sell.  She has witnessed

7    this.  She approached this patient, calls the police and reports

8    his meds were stolen.  They were not stolen, they were sold.

9              And, again, that's detail as for some.  But it also

10   talks about how there were reports of stolen.  And that's

11   correct.  That's the kind of detail that rings true.  You know,

12   that's an anonymous caller, but -- but knows that this person is

13   claiming they're stolen, which is independently factually

14   correct, as Mr. Peterson said.

15             Again, those are red flags that Dr. Szyman would know

16   this person is abusing or diverting their narcotics.  This is a

17   common experience.  He's seen it with his prior patients.  He's

18   aware of it because he's aware of the opioid crisis at this

19   point.  He's on these huge doses of narcotics and he knows all

20   these risks are out there, but he just continues to supply

21   Mr. Peterson with more and more.

22             Count 13 is Patient D.  That's Ramona Wolf.  You may

23   call Ms. Wolf.  She was a patient from 2011 to 2015.  She

24   also -- she sold her prescription drugs.

25             The specific charge was based on a May 15, 2014

1  distribution.  I'm sorry, a -- an alleged distribution based on

2  Dr. Szyman giving Ms. Wolf the following prescriptions.  He gave

3  her prescriptions for 240 morphine 100-milligram tablets, and

4  another 240 morphine sulfate 30-milligram tablets.  And again,

5  that's -- those contain obviously the controlled substance

6  morphine.

7        Dr. King looks at Ms. Wolf's file and says -- again,

8  this is -- four years this went on for.  Four years of spiraling

9  narcotics without improvement.  The file doesn't reflect a

10  physical exam.  It reflects that in that four-year period of

11  time Dr. Szyman put Ms. Wolf on the Dr. Szyman road.  Goes from

12  a morphine equivalency of 90 to 740.

13        There were a bunch of opioid risk factors dealing with

14  her past history.  There are third-party warnings.  And there's

15  inconsistent urine drug screens.

16        And in particular -- again, picture this.  The clinic.

17  Received call from Manitowoc Metro Drug Unit detective that they

18  received information from another detective through a

19  confidential informant that patient is selling her Morphine ER

20  100-milligram -- hundred-milligram [Indiscernible].

21        Now, we know that's true.  She's told us that's true.

22  And the police called the clinic to let Dr. Szyman know.  "Hey,

23  this patient's selling."

24        They were reporting that she sells them for $4,000 a

25  month.  Again, tons of signals.  He's got them before with

1  Ms. Valdez.  He's gotten warnings of other third parties.  But

2  this is the law enforcement.  It's not just even an anonymous

3  call saying, hey, she's selling.  But, Dr. Szyman writes a note:

4  "Several weeks ago we received a call informing us that Ramona

5  was selling her medication.  I have no confirmation of this from

6  any indisputable source."

7  So, as I understand it, here's how Dr. Szyman treats

8  law enforcement.  I need an indisputable source.  My patients,

9  hey, you're telling me you need it, you're telling me you're not

10  distributing it, I'm all in.  More narcotics.

11  And so, again, he's not doing his job.  Dr. King has

12  told you to do -- to be a physician, to actually practice

13  medicine, to actually give people drugs for a legitimate medical

14  purpose, you have to pay attention to this.  When law

15  enforcement calls and tells you your patient is selling, and

16  you've seen it before with other patients, you cannot ignore it.

17  You abandon your role as a doctor.  You're just handing out

18  narcotics.

19  Sean Conway.  Patient E.  Base of Count 14.  Was a

20  patient from 2008 to 2015.  The specific charge for Mr. Conway

21  is June 23 of 2014.

22  On that date, Dr. Szyman gave Mr. Conway the following

23  prescriptions:  30 fentanyl patches.  360 morphine sulfate

24  60-milligram.  900 morphine sulfate 100-milligram.  A thousand

25  Oxy-15s.  720 30-milligram.  450 Oxy-60 milligrams.  450

1  80 milligrams.  That's a month's supply.  Those are all

2  containing controlled substances of fentanyl, morphine and

3  oxycodone.

4       Again, Dr. King looks at Mr. Conway, says that's six

5  years of treatment.  Got him up to 7,460 morphine doses a day.

6  That's 94 pills a day.

7       There's indications of early abuse -- early refills,

8  early out.  And there's no improvement until Mr. Conway

9  himself -- you remember Mr. Conway, he drags himself into rehab.

10 He's gotta get off all this stuff.  He goes three, four weeks

11 getting himself off all these drugs that Dr. Szyman, he knew and

12 he knows because he's doing it, he's writing the prescriptions

13 and he's done it before.  Right?  He's done it to all these

14 other patients.

15      And in the file though you see things like notes in

16 the middle of this from a pharmacy.  Mr. Szyman -- I'm sorry,

17 Mr. Conway apparently goes to a pharmacy.  The pharmacy tells

18 the clinic she does not want to fill med this early.  She fears

19 her license.

20      Imagine that, a pharmacist telling a doctor, I'm

21 afraid about losing my license, especially if something should

22 happen to this patient.  She is concerned that he's abusing his

23 meds.  Okay?

24      Again, that's a red flag.  That's some third party.

25 Now, I admit it's not as reliable as law enforcement.  But a

pharmacy -- a pharmacist calls in and says I'm afraid about

losing my license because of the quantities, I think this guy's

abusing it.  And he was.  He told you he was.  Look at the large

quantities he was taking and how he ended up in rehab.

A layperson, a nonphysician, a pharmacist at least

recognized what the problem was and told Dr. Szyman.  He didn't

care.  They were on his road.

May 9th, 2013.  Received a call from someone at

another pharmacy in [Indiscernible].  All pharmacists there have

concerns about this patient.  He comes in, they cannot -- they

cannot -- now, this is not at the beginning.  You may recall

Mr. Conway.  From early on he had a problem.  [Indiscernible]

early on he had withdrawals.

So that should have been a clue to Dr. Szyman early

on, this guy's in trouble.  I'm -- I've hardly started him on

the path I'm going to send him down and already he's got

withdrawal problems.

And at the beginning Dr. Szyman knows this guy's in

trouble with small quantities.  I think even -- [Indiscernible]

I think he's testified about his wife even.  60 days she knows

she's got withdrawal.  Mr. Conway had to go into the hospital

because he was having such problems.

So Dr. Szyman [Indiscernible] at the beginning.  Years

later pharmacy calls.  Who is this?  They cannot understand what

he is saying.  He falls asleep while waiting for his meds to be

31

1    filled.  He walks around like he is obtunded.  Now, again, a

2    word I did not know, but I think Dr. King said he's a zombie.

3            They are at the point where they no longer want to

4    fill his prescriptions.  And they do not want to be liable for

5    what may happen with meds and doses he is on.  Here's a

6    pharmacy.  Imagine what it takes for a pharmacy to call up a

7    clinic and challenge a doctor and say we're not filling this

8    guy's prescription.  He's in a zombie state.  We can't

9    understand what he's saying.

10           And how does Dr. Szyman respond to this?  Does he

11   practice medicine?  Does he legitimately prescribe more drugs?

12   No, he just gives him more narcotics.  Someone who is a zombie

13   who falls asleep who can't be understood.  Because he's got one

14   road.  He's got -- it's a one-way road, it goes up and up and

15   up.  And so he just keeps feeding Mr. Conway more narcotics.

16           That's not practicing medicine.  He has abandoned any

17   protection he thinks he has.  He knows it.  He just doesn't

18   care.

19           Patient F, Heidi Buretta.  Again, I guess testing for

20   what the ceiling is, Heidi Buretta, patient for Dr. Szyman, 2004

21   to 2014.  December 5th, 2014, died of an overdose of mixed drug

22   toxicity.

23           And I think Dr. Szyman said he knows her toxicity.

24   She had 4,000 units of morphine in her system when the

25   therapeutic dose is -- I think he said less than a thousand.  So

1   it's morphine.  And where is she getting all this morphine?

2        Well, three weeks before she died, on November 13,

3   2014, Dr. Szyman provided Ms. Buretta with the following

4   prescriptions:  1200 morphine 200-milligram tablets.

5        That's -- what is that?  That's 40 a day.  40

6   200-milligram tablets of morphine.  Wow.

7        A thousand eighty morphine sulfate tablets

8   30-milligram.  I can't quickly do the math.  36 of those.  So

9   that's 40 plus 36.  30-milligram tablets.

10       60 Adderall.  Now, this is good.  The Adderall.  Cause

11  you could imagine, that's gotta be [Indiscernible] so we gotta

12  give her some amphetamines.  We gotta give her the Adderall.

13       Again, there's the speedball.  Gives her 20

14  Adderalls -- I'm sorry, 60 Adderalls, 20-milligram tablet.  So

15  there's two of those.  Two 20-milligram tablets of Adderall a

16  day.  And 270 -- I guess that's nine more of the hydrocodone,

17  10-milligram with some aspirin.

18       That's every day.  I couldn't in my head.  Let's see,

19  what is that, 40, 36, two more, 38, and 9 -- 47?  I don't know.

20  I lost track now.  40, 36, 76, 78 -- 87 tablets a day.  Could

21  you do it?  He's giving it to her.  Those are all drugs -- all

22  of those contain controlled substances, morphine, amphetamine,

23  hydrocodone.  And she's dead.  Just massive amounts.

24       Now, Dr. King was not told that.  Didn't want to

25  prejudice him.  Didn't want to bias him and say, oh, she died,

1    you know, and tell you the end of the story.  Gave him solely

2    her patient file which apparently doesn't indicate in there that

3    she died, Ms. Buretta.  But still Dr. King says this is not a

4    doctor practicing medicine.

5         This is 10 years of treatment with no improvement.

6    Pain levels are the same.  You know, it's, again, apparently as

7    documented in this patient file, no improvement.  I guess at

8    some point the pills were up to 124 pills per day.  Now, some of

9    those could have been non-narcotics.  This would have only been

10   narcotics she got on that prescription.

11        And as I say, on a daily basis she's getting 11,570

12   doses of morphine.  Again, Dr. Szyman knows, you give someone

13   more than a hundred you're increasing the chance of overdose by

14   10 times.  11,000, that's a hundred times that.  And he's still

15   prescribing it.

16        Dr. King testified end-of-life cancer patients with

17   terminal cancer, in the last few weeks or months of their life,

18   get maybe hundreds of morphine doses to deal with their pain.

19   This woman got 11,000.

20        And, as I described, the opioid/amphetamine speedball,

21   the ups, the downs, the racing, the high, the low.  And what do

22   we see?  What do they find when they find her dead?  They find

23   these were all prescriptions found at her house.  That's only a

24   portion of them I think Mr. Green testified.

25        But there's a summary in there that says -- because,

34

1    again, he gave her so much, again, she ultimately dies, but she

2    still just had tons -- I think there were just thousands,

3    thousands of pills in these bottles, unopened pills of morphine,

4    that Dr. Szyman, he's not doing his job.  He's not practicing

5    medicine.  He's just handing out narcotics.  And there's a big

6    stash here.

7            This is not the practice of medicine.  This is not

8    professional practice.  This is just riding the Dr. Szyman

9    opioid train to the top of the cliff.

10           Patient G is the base of Count 6, Deborah Ramirez.

11   You recall Ms. Ramirez.  She was a patient of Dr. Szyman for at

12   least 2005 through 2015.  And again, another patient, lo and

13   behold, selling the prescriptions Dr. Szyman -- the prescription

14   drugs, the narcotics he's prescribing to law enforcement, gets

15   herself in trouble.

16           The specific prescription, the base of Count 16, is a

17   January 13, 2015 prescription.  And this is a prescription --

18   this is what Dr. Szyman gives her for the month.  Gives her 120

19   morphine 200-milligram tablets, 120 100-milligram tablets, 180

20   15-milligram tablets, 480 hydrocodone/acetaminophen tablets, and

21   120 30-milligram tablets that everybody wants.  All those

22   contained controlled substances, morphine, hydrocodone and

23   oxycodone.

24           Dr. King reviewed that.  Says there's nine years of

25   treatment.  And again, but there is no indication of

1    improvement.  There's just narcotics.  Narcotics to the point

2    where after that period of time Ms. Ramirez was getting 2,880

3    morphine doses a day.  And she's got multiple prescriptions of

4    opioids of different strengths.  And then she's got urinalysis

5    that shows the presence of heroin and the absence of prescribed

6    medication.

7         Now, if someone is in such pain that they need these

8    massive quantities, they are going to have the medicine in their

9    urine, right?  Unless they're not using it.  I mean it's one

10   thing I think Dr. Szyman said, you know, maybe the undercover,

11   well, if they only use it now and again so maybe it wouldn't be

12   in their urine.

13        Okay.  But this is someone who he's giving -- you saw

14   that list of narcotics he was giving her.  It was currently in

15   her system.  What does that tell any reasonable person let alone

16   any professional who's completely aware of the dangers, the

17   risks of narcotics?  What does that tell anyone?  She's

18   diverting.

19        You know, [Indiscernible] warned about -- I guess per

20   se warning, not warning -- but what does he do?  Again, there's

21   a notice from the jail when she gets picked up.  The detective

22   told Sarah, someone on the clinic staff, that the patient's

23   house looks like a pharmacy.

24        Patient told Sarah this morning during her assessment

25   that she has not taken any pain medications since 6:00 a.m.

1  yesterday morning.

2      Stated, patient does not appear to be in withdrawal at

3  this time, but they have her on some detox med if she needs it.

4      Patient is not guarding her eyes from bright lights.

5  Alert and oriented.  Pupils reactive.  [Indiscernible] what that

6  says.

7      They're not taking narcotics.  You know, they're

8  telling Dr. Szyman this.

9      Count 17 is patient agents.  Nancy Walt.  You may

10 recall we had both Ms. Walt and her husband Terry testify.

11 Again, she was a patient for Dr. Szyman for 2004 to 2015.

12     The specific charge was based on a prescription

13 Dr. Szyman provided Ms. Walt on February 10th of 2015.  Again,

14 towards the end of these years of treatment.

15     It's prescriptions with 480 10-milligram methadone

16 tablets, 400 morphine sulfate 10-milligram, 60 Oxy-40s, 180

17 Oxy-60s, and a thousand eighty Oxy-80s.

18     Again, so what did he say that was?  36 Oxy-80s a day.

19     Each one of those Oxy-80s I think Dr. Szyman said that

20 the conversion of oxycodone to morphine is 1.5.  So each one of

21 those tablets actually is an MEQ of 120.  Each one of them is

22 over the red threshold that increases someone's risks of

23 overdose by 10 times.  Each one.  And he gave her 36 a day,

24 every day, every month.

25     You know, this wasn't a short-term.  This wasn't 60

1    days after some surgery.  This was every day.  And, again, I

2    asked Dr. Szyman, what's -- when is the end?  Right?  What's the

3    end on this Szyman opioid road?  What is it?

4         Dr. King looked at her file and said, you know,

5    there's more than 11 years of treatment for arthritis without

6    improvement.

7         Again, within the file there are incidents of

8    suspected opioid overdoses and withdrawals.  I think Ms. Walt

9    talked about it.  She had pill count inconsistencies.  And, in

10   fact, in the file Ms. Walt contacted -- or was dealing with the

11   clinic and said she's lying about her use.  Not taking them as

12   prescribed.

13        And as mentioned, the morphine equivalency at the max

14   was over -- over 3700.  3,720.

15        And, again, I think Dr. King -- I explained how people

16   on those large levels of narcotics might not fully appreciate or

17   might not fully recall how they were behaving or how these drugs

18   were affecting them.  Maybe they were not proud of it, maybe

19   they're not happy about it.

20        But her husband, you saw Terry Walt testify, you can

21   assess his credibility, came in here, and what does he say about

22   his wife?  How was she behaving under these massive amounts of

23   narcotics?  She was walking around like she was drunk in a

24   zombie state.  Very moody.

25        You saw what the narcotics were doing to Ms. Walt.

1  Dr. Szyman, if he was acting as a doctor, would know that.  You

2  can't give someone these large amounts of narcotics without

3  having as a consequence these side effects, these -- what is it,

4  umdurated (phonetic)?  Obturated?  You know that she's -- she's

5  stuffed.  She's full of narcotics.  She's sleeping hours at a

6  time during the day.  But what does Dr. Szyman do?  Gives her

7  more narcotics.

8          Patient -- Count 18 is Patient I, a Chad Wenzel.

9  Remember, Mr. Wenzel didn't testify.  I think he was a patient

10  of Dr. Szyman's from 2006 to 2015.  The specific charge is

11  February 11th of 2015.

12          At that time Dr. Szyman provides Mr. Wenzel with

13  prescriptions for 150 fentanyl patches, various strength, 360

14  8-milligram hydromorphone, 180 20-milligram oxycodone, 360

15  30-milligram oxycodone, and 90 80-milligram tablets.  All of

16  those contained controlled substances.

17          Dr. King talked about that file again.  That's more

18  than five years of treatment without any improvement.  And the

19  file reflected that he already had been treated with heroic

20  doses of methadone.  He had a history of substance abuse and

21  there were warnings from the pharmacy, from Mr. Wenzel's mother.

22  These are warnings to Dr. Szyman.  His mother, insurance

23  company.  He's got urine drug screens that show cocaine.  He's

24  got comorbitities that show mental health issues.

25          And as indicated, again, at his peak with Dr. Szyman

39

1  he was at almost 2,900 morphine doses a day, every day.  And

2  then you look in the file and you see in the middle of that

3  treatment the clinic gets a call from the patient's mother.  She

4  reports that Chad is slowly getting, "eaten up by the drugs.

5  He's addicted."  He told her the pain pump is doing nothing for

6  him.  He told her he would buy drugs off the street.  She feels

7  he's doing this.  He totally does not care about anything

8  anymore.  The mother is very upset, feels she needs to go for

9  counseling due to her son's issues.  She's worried about his

10 welfare as well as the two grandsons that are living with Chad.

11        Again, all these warnings.  Third parties.  You know,

12 whether it's hospitals calling because the patient doesn't

13 appear to be using their drugs.  Pharmacies calling because the

14 patient's coming in and can't be understood.  Police calling

15 because this person is selling their drugs.  Family members

16 calling because this person is getting eaten up by the drugs.

17 And how does Dr. Szyman respond?  He gives out more narcotics.

18 He just continues to give it out.

19        Count 19 is based on Todd Orth.  He's referred to as

20 Patient J.

21        Remember, Mr. Orth came in here.  I think he injured

22 himself moving something off a truck or something.  A neck

23 injury I guess.  Saw Dr. Szyman from 2010 to 2015.

24        The specific count is based on a prescription February

25 16th of -- I'm sorry, February 16th.  That shouldn't say 1985.

1    February 16th.  It should say 2015, not 1985.  February 16th of

2    2015, Szyman provides Orth with the following prescriptions:

3    480 Oxycodone-15s, 120 Oxy-40s, 240 Oxy-60s.  All of which

4    contain a controlled substance, oxycodone.

5            Dr. King says he reviewed that file.  Again for four

6    years there is no improvement.  The maximum MEQ is 2,400.  And

7    Dr. Szyman is giving him or he's being prescribed this speedball

8    because he's got both Adderall and he's got these narcotics.

9            And the patient file reflects early refills, early

10   outs, lost meds.  There is urine drug screens reflecting

11   repeated use of marijuana.

12           Again, you can't just keep giving someone narcotics if

13   it's not improving them.  There's side effects to be had.

14   There's risks to be had.  But in Dr. Szyman's world it's just

15   keep the patient churning, keep them coming in, keep feeding

16   them narcotics.  And that's what happens with Todd Orth.  This

17   is -- that is not the practice of medicine.  That is drug

18   dealing.

19           And then there's Alexandria Krizizke.  She's not the

20   basis of a specific charge.  This was a -- I think a 16-year-old

21   girl when she first started seeing Dr. Szyman.  She had some

22   opioid prescriptions before because of some head surgery.  Brain

23   surgery I think she said.  But as Dr. Szyman acknowledged, she

24   hadn't had the opioid treatment that Dr. Szyman was going to

25   give her.  She hadn't got that ever-escalating spiral of

41

1    narcotics that Dr. Szyman was going to give her.

2          As Dr. King says, what she got was four years of

3    treatment.  And I think the patient records didn't start till

4    she was 18.  It may be that the records he was given didn't

5    start till she was an adult.  But I think Dr. King said I think

6    he started treating her when she was 16.

7          Four years of treatment without improvement.  In the

8    patient file was a September 9, 2013 documented drug-seeking

9    behavior.  She got inconsistent urinalysis.  I think Dr. Szyman

10   said he thought she was using heroin while he was treating her.

11   But I know she said at some point she turned to heroin.  Ended

12   up in that period of time with a MEQ of more than 650.

13         And so you take Miss Krizizke, and what do you have?

14   You have a 16-year-old girl who comes in because of some pain,

15   some headache pain.  I think she said she was looking for some

16   short-term pain relief.  And what did she get?  She got years of

17   narcotics.  Years of greater-increasing amounts of narcotics

18   that ultimately, when those got cut off, she ends up

19   substituting heroin for that.  She ends up with a heroin

20   addiction.  She ends up with arrest records.  I think she said

21   -- was it shopping lifting?  Maybe some alleged drug selling I

22   think as well.

23         So that's what she got from Dr. Szyman.  Again, I know

24   she assumed all those risks because she must have seen all that

25   coming.  She must have known that.  Well, I think it's unlikely

1   she saw it coming.  I think it's fair to say Dr. Szyman, if he'd

2   have cared to pay attention, would have seen it coming, right?

3   It's completely predictable.  You've seen it.  You've seen case

4   after case after case.  These people getting massive amounts and

5   the terrible consequences that happen.  Completely predictable

6   to anyone paying attention.

7           Okay.  So that's -- you know, that's sort of where the

8   case started.  You know, law enforcement had this information.

9   These -- several people selling narcotics, selling prescription

10  drugs.

11          And so what happened next?  Well, law enforcement

12  didn't just jump, didn't just say, oh, he must be guilty, these

13  people say they got all their drugs, their prescription drugs

14  from Dr. Szyman, he must be guilty.  No.  They did a test.  And

15  maybe some of you don't like the idea of an undercover case,

16  sending people in to pose as patients.  But it's a fair way to

17  see, well, is Dr. Szyman dispensing drugs?  Is he handing out

18  narcotics?  Or are these patients, are they the problem?  Who is

19  the problem here?

20          So it's a test.  Let's see.  We'll send in some

21  undercover people.  They'll pose as patients, strangers.  No

22  medical records.  They'll say they have some pain intermittently

23  at some time, but I'm feeling fine now.  And there's a test.

24          There's some suggestion that, well, they could have

25  been drug seeking because they said they had no pain.  Well, if

1   they said they had had pain then Dr. Szyman would say -- I mean

2   if they reported they currently are in some pain and came with

3   medical records, well, he'd say, well, I was just properly

4   treating them.

5         So it's a test.  It's a fair test.  Let's assess.  Is

6   Dr. Szyman practicing medicine or is he handing out drugs?

7         So first Greg Connor, posing as Richard Russo, he goes

8   in five times.  And that's the basis, as I say, of Counts 1

9   through 5.  You met Mr. Connor.  He's a mid 50s DEA agent.  I

10  think he's a supervisor now.  I think he said he posed as a

11  patient.  Said he saw Szyman at five appointments between

12  November of 2013 and September of 2014.

13        He comes in there, complete stranger, right?  Bogus

14  name.  Made-up date of birth.  Bogus address.  He doesn't live

15  there.  Just made up a background and employment.  He comes in

16  with no medical records.  Zero.  And as he said, he never

17  exhibited nor complained of any pain when seeing Dr. Szyman.

18  Okay?

19        His first appointment is Count 1, November 21, 2013.

20  You'll remember this.  He comes in.  Now, remember, no medical

21  records.  He's got no x-ray.  He's got no MRI.  Says he's got no

22  job, bogus address, got no insurance, I live in the area.  Just

23  looking to get some narcotics.  Right?

24        He fills out the form saying "current pain level,

25  zero."  Apparently he told the nurse that at its worst, whenever

1    that is, it's a 5.

2              His quality of life, though, said was not affected by

3    the pain.  And so he's not claiming he's got any problems with

4    his life.  He just says at worst it's a 5.  Doesn't affect my

5    life.  So there's no functionality problem.

6              "Are you having any pain today?

7              "No.

8              "Rate your pain scale.

9              "0 to 10.

10             "0."

11             So it's a test.  Will Dr. Szyman give this person

12   narcotics.

13             What's Szyman's response to no pain, quality of life

14   not affected, no assistance needed?  No problem.  You want

15   narcotics?  Here's 90 Percocets, 5 milligrams.  It's a

16   relatively low dose.  22.5 MEQ.  Three a day.

17             Okay.  Again, no basis, but low-level narcotics, here

18   you go.  Again, the drug that Dr. Szyman knows at this point --

19   I mean, God, he's got at this point patients who have been

20   arrested, are going to jail, Ms. Buretta's overdosed and died.

21   Repeatedly patients have been lying to him and selling the

22   pills.  He knows that.  But he knows -- he knows generally

23   there's this opioid crisis, but and the stranger comes in, makes

24   up a name, makes up a story, here's some narcotics.

25             Gives him this prescription.  Here it is.  Percocet,

1   5 milligrams.  Signs off.  There you go.

2           And, you know -- so, Mr. Connor comes back a few

3   months later, February 5th, 2014.  It's the basis of Count 2.

4   Again, Richard Russo, again, no pain.  0 on a 1 to 10 scale.

5   And how does Dr. Szyman respond?  Again, you've seen the

6   recording.  It's here.  Is there any physical exam?  Dr. Szyman

7   even ask him about his pain levels?  He said it was

8   intermittent.  Did he inquire at all how often he's been having

9   it?  Did he do anything?  Did he even -- I think he said he

10  didn't even touch him.  Maybe he looked at him.  He said maybe I

11  could watch -- [Indiscernible] he didn't watch him walk in the

12  room because I think the special agent was already in the room

13  when Dr. Szyman came in.

14          But none of that.  Nothing at all.  And what does

15  Dr. Szyman do?  He increases the strength of the narcotics

16  because the undercover says, "Well, I don't know, how about

17  tens?"

18          You know, it's like on the street corner.  What do you

19  got?  Well, I don't know, you got tens?

20          So he says, "I want tens."

21          So what does Dr. Szyman do?  He says, "Yeah, I can

22  give you tens."

23          And he goes, "Great."

24          I think -- he says, "How many?"

25          And, you know, [Indiscernible] trying to be a little

1    coy, let's not be too obvious here.

2              "I don't know, two?

3              "Well, I can give you four."

4         Fine.  This is a great deal.  Twofer.  He gives him a

5    four-a-day.  And he gives him two prescriptions.  Increased

6    dose, more pills and two prescriptions.  Zero indications.

7              You know, you look at the medical chart.  Look at

8    this.  This is the medical chart that Dr. Szyman had when he

9    decided to hand out narcotics to Special Agent Connor/Richard

10   Russo.

11             Functional assessment.  Right?  But, again, the idea,

12   everyone says, what's the job of a pain management doctor?

13   Improve your functionality, right?

14             Okay.  Let's see.  Can we improve this functionality?

15             Pain intensity at the moment?  No pain.

16             Personal care.  Normal routine without any pain.

17             Lifting.  Can lift heavy weights without pain.

18             Walking.  Able to walk any distance.  We ought to test

19   him on that.  Any distance?

20             Sits in the chair without pain.

21             Can stand without pain.

22             Sleep is rarely disturbed by pain.

23             Social life, normal.  No extra pain.

24             There is absolutely no legitimate reason to hand out

25   narcotics.  And based on that review, based on that

1    representation, Dr. Szyman hands out not just narcotics, but a

2    stronger narcotic and more of them.

3          Richard Russo said -- are you having pain today?  No.

4          Rate pain scale.  Zero.

5          How does Dr. Szyman respond?  Boom.  You get

6    four-a-day 10 Percs, 10 Percocets.  10-milligram Percocets I

7    should say.  Sorry.  And it's Dr. Szyman.  It's two of those.

8          All right.  So couple months later.  Well, let's

9    check.  You know, was it just a bad day?  Maybe he wasn't paying

10   attention.  Maybe he was busy.

11         Is this -- you know, is this his practice or is this

12   aberrant behavior?  Let's try it a third time.

13         Richard Russo shows up.  Again, April 16, 2014 is the

14   basis of Count 3.  Again, it's a test.  Right?  It's a fair

15   test.  People were saying they're getting narcotics from

16   Dr. Szyman.  Right?  Law enforcement has to look into that.

17   They called, they told him, hey, some of your patients are

18   selling narcotics, and he's continued to prescribe them for

19   these people.  Right?  It's a fair test.

20         Law enforcement, you know, when they called and they

21   said -- I think it was Ms. Wolf -- she's selling her drugs and

22   he continued to prescribe, it's fair that law enforcement say is

23   this guy a doctor?  I mean he's got this ability if he's a

24   doctor to hand out narcotics to people.  These abusive,

25   addictive drugs that people are buying and selling and getting

48

1    high on.

2        So they send in Mr. Russo.  Again, send him in.

3        Third visit.  No pain.  Zero on the 1-to-10 scale.

4        What does Dr. Szyman do?  He increases the strength of

5    narcotics to 30 milligrams.  The oxycodones.  You know, the

6    immediate release.  30 of those.  Gives him three a day.  Gives

7    him 90 Oxys, immediate release.  And his MEQ is already above

8    the threshold that would increase someone's likelihood of

9    overdose by 10 times.

10        This is a stranger who's made up a story, who's walked

11    in saying I got no pain.  And imagine if he said he had pain.  I

12    don't even know what he would have gotten at that point.

13    Imagine if he said, you know, I've got a sharp acute pain, I'm

14    really suffering right now.

15        I mean, so, it doesn't matter.  You know, any

16    suggestion that, you know, Dr. Szyman was misled because these

17    patients lied to him, they said they had pain -- no.  He doesn't

18    care.  [Indiscernible] you have no pain you get drugs.  He

19    knows.

20        I think back on Tanya Pivonka Dewane.  You know, you

21    can tell people when they -- they've gone through rehab and

22    stuff.  You know, they're trying to own up to their

23    responsibility.  Not Dr. Szyman.  Dr. Szyman, it's all known,

24    they lied to me, that's why he gave it to them.  No.

25        And these -- I love when defense counsel says these

1  liars, oh, my God, they lied, these lies.  Do you know what they

2  lied?  They said they had no pain.  Oh, my gosh.  They really

3  fooled him [Indiscernible] -- pain by saying you had no pain,

4  those big liars.

5          No.  No.  They gave him every chance to demonstrate

6  that he had good faith.  And [Indiscernible].  No.  He doesn't

7  care whether the patients had tests.  He doesn't care whether

8  they have pain or they complain or don't.  He just gives them

9  drugs.  That's what he did here.

10          Don't be fooled.  Again, it's easy to take the witness

11  stand and put on a suit and say I'm [Indiscernible] doctor and I

12  have great faith and believe them.  Look how he behaved when he

13  didn't know we were watching?  When he didn't know it was being

14  recorded.  And listen to what he did.  Look how he behaved.

15          Your job is like in life.  We've all been lied to.

16  We've all been told stories to.  We've all told stories.  Your

17  job is to look at somebody and figure out are they telling you

18  the truth.  That's a hard thing to do.

19          But I think we all remember the best ways is to look

20  at people's actions, especially actions when they don't know

21  that they're being observed.  That's an accurate way to

22  determine how someone really is acting.  What they know, what

23  they're doing, what they intend.  Hear what people say in

24  private, then you know what they're doing.

25          So what does he do here?  He gives them more drugs.

1    He gives them more narcotics.  He gives them the Oxy-30s.

2            What had Mr. Russo done to deserve an increase in his

3    medication?  What did he deserve to get the Oxy-30s?

4            Well, he did say he had no pain.  He's got a point

5    there.  Or he did say, well, my normal routine is without extra

6    pain.  He did say he could lift heavy objects without pain.  He

7    did say he could walk any distance.  Well, that could be painful

8    if you walk any distance.  He says he sits in the chair without

9    pain, he can stand without pain.  I can't do these things.  He

10   says his sleep is never disturbed by pain.  He's got social life

11   is normal, no extra pain.

12           Oh, okay.  Well, now it all makes sense to me.  So

13   what does he get from Dr. Szyman?  He gets prescriptions for 30

14   -- these 90 oxycodone 30 milligram tabs to Richard Russo, a man

15   who doesn't exist, at an address he doesn't live at, with a date

16   of birth that is just made up, with no medical records, no

17   tests.  And he gets two of them.

18           I think Dr. Szyman said they're worth about 30 bucks

19   apiece.  $2,700 worth of drugs just like that.  Cha-ching.

20           And there's Dr. Szyman.  He's just giving him drugs.

21   Getting the Oxy-30s.

22           Okay.  Mr. Russo again.  He tries again, just to make

23   sure.  You know, again it's a fair test.  It's -- you know --

24   you know, be suspicious but verify.  You can't rely on -- you

25   know, it's fair.  Bunch of patients who have been selling drugs

1    tell you Dr. Szyman's been providing them, you know, you gotta

2    test that.  Law enforcement legitimately should test that.

3          And so, again, they send in Richard Russo again on

4    June 13, 2014, the basis of Count 4.  He comes in again.  He

5    continues to report no pain, zero pain on a 1 to 10 scale.  And

6    then, as part of the investigation, he says, well, let's see if

7    we introduce another patient, see if the same thing will happen.

8    Again, maybe it's one off.  Maybe, I don't know, Dr. Szyman for

9    whatever has some simpatico with Mr. Russo and feels some need

10   to help a person in no pain.  You know, I'm helping people with

11   pain, I might as well start helping people with no pain,

12   [Indiscernible] left out.

13         So decides to go -- so they decide to introduce a new

14   person, Anna Kingston.  Let's try a different patient.  And sets

15   up sort of this really non -- you know, there's this 55-year-old

16   guy with his 22-year-old girl friend.  Who [Indiscernible] in my

17   30s before.

18         So they start with the introduction of her and she

19   says, well, I don't have any pain right now.  But -- but it's

20   just an introduction, let's get some face time with Dr. Szyman.

21         And Szyman still provides two prescriptions to

22   Mr. Russo.  Again, more of these -- 90 of the 30 milligrams.

23   $2,700 each they're worth on the street apparently.

24         And, again, how does Mr. Russo get them?  Just says

25   he's having no problems.

1       There's no physical exam at any of this, right?  I

2  mean, you saw the tapes.  I'm not even sure that Richard Russo

3  on that tape ever even stood up out of his chair.  You know,

4  Szyman came in, he's up at his little podium.  You know, some of

5  the other patients described it.  And then you can see it, that

6  little podium with the desk.  And it's all pleasant, it's all

7  jovial.  You know, he's just typing away.

8       But there's no -- there's not even a question about

9  how's your pain been, is it returning.  You know, anything we

10  can do?  No, there's just the narcotics road.  We're just on the

11  narcotics road.

12       And, again, Russo says no pain.  The whole thing.

13  Just completely -- healthier than I'm sure he actually is.  55.

14  No way.  But, I mean, you read this.  No pain.  Lift heavy

15  weights.  Walk any distance.  I mean, all these things.  Zero

16  pain.  More prescriptions.

17       Fifth visit.  Same thing.  September 10th, 2014.

18  Russo comes back in.  This is the basis of Count 5.

19       Again, continues to claim no pain.  Zero on a 10

20  scale.  Again, brings Ms. Kingston in because they're trying

21  again to see if -- what Dr. -- how Dr. Szyman would treat a

22  different patient, to see if it's more than -- you know, more

23  than just repeated times but do other patients get treated the

24  same way or no.

25       And, again, at this point Russo had provided a drug

1   screen that proves negative, right?  It doesn't have any of the

2   oxycodone in it.  But I think it was provided in June.  And at

3   that point he was getting oxycodone.  He was getting, you know,

4   a month's supply.  He was getting to take four a day.  And yet

5   there's none in there.  Doesn't come up.  Dr. Szyman just

6   keeps --

7          Because it doesn't mean anything.  You know, as much

8   as, you know, defense counsel says, oh, they lie, they deceive

9   him with their urine drug screens or they try to manipulate him

10  and they told him they had pain.  Again, it's clear.  It doesn't

11  matter what you say, you're getting your narcotics.

12         And it gets increased throughout this time.  And,

13  again, Russo says, you know, zero on a ten scale.  No pain

14  today.  But what does he get?  You know, he gets prescription,

15  prescription, prescription.  More prescriptions.  Three more

16  prescriptions for Oxy-30s.

17         And at that point we transition to the second

18  undercover.  Again, this is a thorough test.  This isn't just

19  one person multiple times, this is a second person multiple

20  times.

21         Anna Kingston comes in.  And, again, you'll recall how

22  that happens is -- one second.

23         Anna, on the fifth meeting with Russo, brings up the

24  fact, hey, they won't let me in.  They won't sign me in.  And so

25  Szyman says, okay, just put your name and number, say what your

1  problem is, and when the stars align he'll call and get him --
2  get him in.

3          Again, she says she doesn't really have any pain then.
4  And the front desk is probably doing what they can.  People like
5  Nurse Kramer who testified -- I think she was gone by then, but
6  conceptually the same.

7          Trying to keep patients away from Dr. Szyman because
8  we know what happens.

9          But Dr. Szyman says, here, just write the number.  And
10 I think Russo says, yeah, Szyman called me because they gave
11 Russo's phone number and said, yeah, have Anna call me directly.
12 Right?  Because he's going to get her in.  I think he said, you
13 know, it wouldn't be politically correct to do it at the time,
14 but just -- and so they do and he does.  Sets up an appointment.

15         And so, again, Anna Kingston, again, it's recorded,
16 you can hear exactly what Dr. Szyman is saying.

17         Kelsey Knaup is the undercover officer, she posed with
18 Russo.  Introduced earlier.  Again, she has no medical records.
19 Remember this.  This is a stranger.  This is someone Dr. Szyman
20 doesn't know at all.  Never seen before.  She's got no medical
21 records, no x-rays, no MRIs.  She gives Russo's phone number.
22 Just a bogus address.  Says she has no current pain.  On her
23 first visit she reports no current pain.  Zero on the 10 scale.

24         And, again, despite all those things — no medical
25 records, just no -- displaying no pain, Szyman, right out of the

1    box, gives her a prescription for 90 30-milligram oxys.  135

2    MEQ.  Right out of the box.  Right off jump street.

3         Right?  An MEQ of 135.  Already above the dose that

4    says you're gonna increase your likelihood of overdose by 10

5    times.

6         And you look at -- what do the patient files say?

7    Again, it reflects a zero that day.  That it -- that at

8    worst whenever happens is five, but she's got none that day.

9    What does she get?  Prescription for oxycodone.

10        And then Anna, Kelsey Knaup, after she's got those,

11   again, by saying she has no pain, has no records, she just calls

12   in and says -- and sees, can I get a -- can I just get a refill

13   of those oxys?

14        And so how does Szyman respond to that?  Does he say

15   come in?  You have to come in.  Have to get a physical exam.

16   You have no support for any of this.  I thought you weren't

17   going to get this much.

18        But, no.  He just signs a prescription for her.

19   Right?  Gives her another prescription for 90 30-milligram oxy

20   tabs.

21        Okay.  Kingston, again, calls again.  This is the

22   previous one I should say.  The December 27, 2014, that's

23   Count 7 where she just calls in.  Doesn't even have to show up

24   and Dr. Szyman will give her narcotics.  So, you know, it's --

25   let's see.  No pain.  No medical records.  No tests.  No show

1    up.  Narcotics, no problem.  So she just calls in.

2          Next on January 14 at 2015, the basis of Count 8, she

3    does the exact same thing.  Again, the question is, are

4    narcotics -- is Szyman just giving out narcotics?  Yes.  Because

5    she calls in, hey, can I get some more?  Yes.  There you are.

6    Another prescription.  90 30-milligram oxy tabs by Dr. Szyman.

7    Signs it.

8          You know, he has the ability to sign these

9    prescriptions to give people these narcotics, but it's not

10   legal.  It's not for a legitimate medical purpose.  He can't

11   hide behind his medical license.  He's not practicing medicine.

12   He's just giving out narcotics.

13          And then, finally, Anna Kingston/Kelsey Knaup shows up

14   for a second appointment with Szyman.  She again reports no

15   pain.  And the basis of Count 9 are two prescriptions that

16   Dr. Szyman gives her for 30-milligram tabs, 90 again, again, 135

17   MEQ.

18          And, again, the patient file reflects how does Anna

19   indicate her situation is, her functionality?  She says she has

20   no pain at the moment.  Her personal care.  She has normal

21   routine without extra pain.  Can lift heavy weights without

22   pain.  Able to walk any distance.  Sits in any chair without

23   pain.  Can occasionally -- can stand without pain and

24   occasionally her sleep can be disturbed by pain.  Social life,

25   normal.  No extra pain.  And having pain today, no.

1        Now,  you may recall Dr. Szyman testified that on the

2   second visit he just hadn't been paying attention and had been

3   writing those prescriptions, the second and third packages of

4   prescriptions, Counts 7 and 8.  And it is a mistake I think is

5   what he said.  And he's handing out narcotics to this person who

6   had no pain because he originally thought she was just going to

7   use some Oxy-30s once in a while.  You know, what's a little oxy

8   between friends, here are some Oxy-30s.  Thought maybe 90 would

9   last her three months.

10       He says, oh, then I -- I suddenly realized.  I became

11  suspicious, I became worried.  You know, maybe something else

12  was going on.

13       Again, you determine credibility, but use your common

14  sense.  He says now because, of course, it's I guess it seems

15  like a little smarter thing to have done.  I got suspicious

16  because I suddenly realized she was using these pills a lot more

17  than she should have.

18       But how does he respond to his suspicion?  Does he

19  say, you know, I can't write you any more of this.  You should

20  go see somebody else.  Or we gotta find lower dose things.  We

21  gotta find something else.

22       How does he respond?  Does he in any way cut her down,

23  cut her off, say no, no, that's not what I'm in for?  You can't

24  just come -- we're not just gonna hand out these Oxy-30s that

25  can be sold on the street for $2,700.  There's all these risks

1  of abuse and addiction and people getting high.  People

2  overdosing.

3          No.  How does he respond?  Is he suspicious?  You

4  know, his -- what is he -- you know, each of us I guess respond

5  to anxiety and stress and suspicion differently.  What he does

6  is, he gives her more.  He gives her enough drugs to be 90 a

7  month.

8          At first I didn't think that's what she wanted.  I

9  didn't think that's what kind of patient she was.  And then when

10  she was I became suspicious so I gave her the drugs.  And, in

11  fact, as reflected, she reflected no additional pain.  But he in

12  his own mind is giving her an increased level in dosage and

13  quantity of drugs.

14          So, you know, I know, again, he said, I only gave

15  people more drugs when they told me they had more pain.  That is

16  just a flat out lie.  Because Kelsey Knaup did not tell

17  Dr. Szyman she had any more pain.  She just said she had been

18  using the pills.  That doesn't -- and she, in fact, reported she

19  had zero problem.

20          And so what he decides to do is give her more drugs.

21  And so on that Dr. Szyman opioid spiral, the way that works is,

22  I give you so much drugs, if you use them up faster I'll give

23  you more.  And then if you use those up I'll give you more.

24          So you get to -- you don't even have to -- you don't

25  even have to represent any increase in pain.  Imagine, as I say,

1    eventually if she said, well, I've really got some pain, who

2    knows what she would have gotten.

3            But what he puts in the chart is, as highlighted here,

4    talking about Kelsey, Anna Kingston:

5            "However, she is now indicating that her pain is

6    increased and she would like to increase the amount of

7    medication she's receiving."

8            That's just a lie.  That's just him explaining why

9    he's handing out narcotics.  He's covering his ass.  That's what

10   that is.  That's not practicing medicine.  That's just handing

11   out narcotics to anybody who comes in who says anything.  I

12   mean, literally.

13           Think how little -- you saw the tapes, you've seen the

14   records -- how little it took to get Dr. Szyman to hand out

15   narcotics to these people.  And there they are.  Here's some

16   90s.  Dr. Szyman.

17           As I say, it's a hard thing to determine truth.  You

18   know, I don't know how we do it.  You know, you try to look at

19   big picture things, little things.  How do you determine when

20   someone's telling the truth or not?

21           But, as I say, look at someone's own statements when

22   they don't know that they're being recorded.  How do they talk?

23   How do they behave when they don't know that people are

24   listening?

25           You listen to his own statements.  His first

1   appointment with Richard Russo.

2       "So rumor has it you have no pain.  What do we do

3   about that?"

4       Do you know what Dr. Szyman did about that?  He handed

5   out narcotics.

6       And who makes the decision?  You know, is he being a

7   doctor?  Is he practicing medicine?

8       "So what are you looking for?"

9       That's Dr. Szyman.

10       "Do you have something in mind?"

11       He's asking the patient, tell me, what are you looking

12   for.  He's not practicing medicine.

13       "Don't tell me what you don't want, tell me what you

14   want."

15       Now, tell me that isn't somebody on the street corner

16   handing out narcotics.

17       "What strength?"

18       And so who is deciding what drugs, how many, how

19   strong?  Dr. Szyman is letting the patient decide and he's just

20   signing off on it.  And he tells them:

21       "Random urine drug screens or pill counts,

22   unfortunately that's just the way it is.  It's just a damper on

23   everything."

24       Yeah.  It's just a damper on all the narcotic

25   distributing Dr. Szyman wants to do.

1          Next appointment -- or the appointment on February

2     5th, 2014.

3          "Russo reports he has no current pain and no

4     functional problems."

5          Szyman says:  "Any changes you want to make?"

6          And I think Russo says:  "The fives aren't working.

7          "Why don't you use tens?"

8          You know, no indication -- you know, no physical exam.

9     Just they're not working out.  Not, well, how often is your pain

10    coming?  You know, no discussion of pain, no physical exam.

11         Szyman says:  "So how many of those do you think you'd

12    need?"

13         Russo says:  "Two per day."

14         "I'll make it four a day."

15         And then he says:  "I'll give you two prescriptions.

16    You know the scripts are only good for 60 days.  So even if you

17    don't need the second script right away, you can get it filled

18    and you'll have it."

19         Again, he's just trying to give him a stockpile of

20    narcotics.  He's telling him how to get the narcotics.  Whether

21    you need it or don't need it, he's telling him.

22         The next appointment, the third appointment.  Again,

23    remember, undercover, it's completely fabricated.  Russo reports

24    no pain, no functional issues, but says he ran out early.  So,

25    again, he's using him.  He's running out early.  And borrowed a

1   couple of 30s from his girlfriend.

2          Again, what does Dr. Szyman say?  "Everybody loves

3   30s.  It's got a kick.  That's why everybody likes it.  So I

4   don't care.  How many would you need though?"

5          Russo asks for 30 or 60.  Szyman gives Russo three

6   prescriptions for 90.  So 90 a month.

7          And, again, is that someone practicing medicine?  Is

8   that someone within a professional practice?  Is that for a

9   legitimate medical purpose?  No.  That's cause he knows

10  everybody loves 30s, it's got a kick.  That's why everybody

11  likes it.  He knows that.  He's been handing them out to

12  patients forever.  He knows they've been selling them.  This guy

13  comes in so he's giving them to him.

14          He goes:  Yeah.

15          This is Dr. Szyman.

16          Yeah, because people love these OxyContin, the 30

17  milligram.  [Indiscernible] it's not a good thing actually

18  because it's just be something else that'll cause a big social

19  hoopla.  Yeah, the old OxyContin is the one, you know, that

20  started all this.  Yeah, they changed the formula and that's how

21  people have come to do heroin, because they wanted that so

22  everybody is doing heroin now.  Except some individuals realized

23  [Indiscernible] three milligram of oxycodone.

24          He's completely aware that these are a desired item on

25  the street.  That some of the possibilities are you're gonna get

1  heroin, addicted to heroin, that you'll start using heroin.  But

2  people love the OxyContins.  You know, this isn't serious pain

3  relief, this is handing out narcotics for no legitimate medical

4  purpose and not within a professional practice.

5          So Dr. Szyman's spiraling road of narcotics.  You

6  know, you had people who did have some actual pain.  You had

7  people though, as Dr. Szyman knows, what happened to them, as

8  Dr. Szyman well knew, because he had done it before, he's

9  apparently educated about it, had seen it happen to his own

10  patients, you get this long spiraling road of higher doses of

11  narcotics.  You get long-term dependencies, withdrawals.  You

12  see people like Todd Orth, the withdrawal that he had to go

13  through.  Sean Conway, inpatient.  Miss Krizizke, she talks

14  about having to move to heroin.  In rehab now.  I think she says

15  she's been clean for some period of time.

16          You got patients who didn't need all the medications.

17  You know, maybe they needed something, but they sure didn't need

18  all the stuff Dr. Szyman was going to just hand out.  Like Tanya

19  Pivonka-Dewane, Marilyn Valdez, Ramona Wolf, Deborah Ramirez.

20  How do you know?  Because they're selling it.  You know they

21  don't need it.  Or Nancy Walt at least it was being stolen.

22  It's going somewhere.  Her son was stealing it for some other

23  purpose.

24          You have people who got so much that their way out of

25  the Dr. Szyman spiraling road of narcotics was dying of the

64

1    excessive amounts of narcotics.

2            And then you have people who don't even have any pain

3    at all, right?  You have these undercovers.  They don't complain

4    of pain, they never said they had pain.  They said no functional

5    problems at all.  And they get narcotics.

6            Ladies and gentlemen, that is the evidence that

7    establishes Dr. Szyman is guilty of each and every one of these

8    counts of illegally distributing narcotics, not for a legitimate

9    medical purpose and not within professional practice.  He was

10   just dealing narcotics, giving it to anyone.  Whether they said

11   they had pain or didn't have pain.  Whether the urine screen

12   said they were clean or wasn't screened -- clean.  Whether they

13   had medical records or didn't.

14           And as those undercovers demonstrated, it didn't

15   matter.  And to the extent Dr. Szyman represents that he did,

16   look at the evidence.  It's easy to tell you, oh, yeah, yeah, I

17   really meant in good faith to help these people.

18           Look at the evidence.  Look at his conduct.  Look at

19   what he said.  That's independent objective evidence of what he

20   did, what he said, and, therefore, what he knew and what he

21   intended.  And I ask that your verdict reflect his guilt on each

22   and every one of those counts.

23           Thank you very much.

24           THE COURT:  Thank you, Mr. Jacobs.

25           Ladies and gentlemen, we'll take a morning recess.

1          (Recess taken at 10:54 a.m.)

2                              *    *    *

3          (See separate volume for Defendant closing argument

4     presented at 11:12 a.m, until 12:53 p.m.)

5                              *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    TRANSCRIPT OF JURY TRIAL EXCERPT

2    **GOVERNMENT REBUTTAL ARGUMENT**

3    Transcribed From Audio Recording

4    12:54 p.m.

5    *    *    *

6    THE COURT:  Go ahead, Mr. Jacobs.  You have a brief

7    rebuttal?

8    REBUTTAL CLOSING ARGUMENT

9    MR. JACOBS:  Ladies and gentlemen, this is the last

10   opportunity for the parties to address you.  I won't take long.

11   It's your job to remember what the evidence was, to

12   remember people's testimony, the records that were introduced,

13   Dr. King's testimony, Dr. Szyman's testimony, various patients.

14   Part of what you need to decide is what someone knew

15   and what they intended.  And how you decide that is based on

16   your review of that evidence.

17   And I recommend if you look back on the recordings of

18   Dr. Szyman with Mr. Russo and Ms. Knaup, hear what his words

19   were there, look at the records from that, look at how they

20   behaved to Dr. Szyman, that will reflect what his intent was,

21   what his knowledge was.  And it's from that that you can discern

22   someone's real intent and what they were doing.

23   And I suggest to you that when you review that

24   evidence, it's from that that you can determine whether someone

25   really did act in good faith or whether they abrogated their

1  role as a physician providing drugs for a legitimate medical

2  purpose.  And that a review of that evidence and Dr. Szyman's

3  actions, words, behavior in those, will establish that he did

4  not distribute narcotics for a legitimate medical purpose.

5  　　　　That's what Dr. King said, that these narcotics were

6  not distributed as part of professional practice, and that

7  therefore they were illegally distributed by the writing of

8  those prescriptions.  And when you review that evidence it will

9  support a verdict of guilty on all counts.

10  　　　　Thank you.

11  　　　　THE COURT:  Thank you, Mr. Jacobs.

12  　　　　　　　　　　*　　　*　　　*

C E R T I F I C A T E

I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified December 28, 2017.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM

