UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------
UNITED STATES OF AMERICA,      )
                                )
                Plaintiff,   )   Case No. CR 16-00095-WCG-1
                                )   Milwaukee, Wisconsin
   vs.                      )
                                )   November 17, 2017
CHARLES R. SZYMAN,        )   11:12 a.m.
                                )
               Defendant.   )

----------------------------------------------------------------

**TRANSCRIPT OF JURY TRIAL EXCERPT**
**DEFENDANT CLOSING ARGUMENT**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff
  UNITED STATES OF AMERICA:   Office of the US Attorney
                            By: MATTHEW L. JACOBS
                               LAURA SCHULTEIS KWATERSKI
                          517 E Wisconsin Ave - Rm 530
                          Milwaukee, WI 53202
                          Ph: 414-297-4106
                          Fax: 414-297-1738
                          matthew.jacobs2@usdoj.gov
                          laura_kwaterski@usdoj.gov
  For the Defendant
  CHARLES R. SZYMAN:        Law Offices of Beau B Brindley
  (Present)                By: BEAU B. BRINDLEY
                             MICHAEL J. THOMPSON
                          53 W Jackson Blvd - Ste 1410
                          Chicago, IL 60604
                          Ph: 312-765-8878
                          Fax: 312-765-8040
                          bbbrindley@gmail.com
                          mthompson@brindleylaw.com

  U.S. Official Transcriber:   JOHN T. SCHINDHELM, RMR, CRR,
  Transcript Orders:        WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



1

1      TRANSCRIPT OF JURY TRIAL EXCERPT

2      **DEFENDANT CLOSING ARGUMENT**

3      Transcribed From Audio Recording

4                    *    *    *

5      THE COURT:  Okay.  Please be seated, ladies and

6  gentlemen.

7           (Jury in at 11:12 a.m.)

8      THE COURT:  Okay.  Please be seated, ladies and

9  gentlemen.

10         Mr. Brindley, you may proceed with your closing

11  argument.

12         MR. BRINDLEY:  Thank you, Your Honor.

13                  DEFENSE CLOSING ARGUMENT

14         MR. BRINDLEY:  Ladies and gentlemen, after listening

15  to what we just heard from the government I think it's important

16  to start out with talking about what this case is not.

17         This case is not a medical malpractice case.

18         This case is not about whether Dr. Charles Szyman was

19  negligent or whether he should have or could have done more in

20  some particular case.

21         This case is not an ethical inquiry about whether

22  Dr. Charles Szyman acted as a doctor.  We heard him say over and

23  over again acted as a doctor, but that's not in the instructions

24  you just heard from the court.

25         This is a criminal case.  They are calling Dr. Charles

1    Szyman, a medical doctor, they're calling him a criminal.  And

2    maybe there should be a lawsuit some day, maybe there should be

3    some other kind of inquiry from a medical board, whatever the

4    case may be, but they're calling a doctor a criminal.

5          And when we take a step back and we look at the big

6    picture, thinking about it that way, the resident question is

7    what are we doing here with this case?  What are we doing with a

8    criminal case?

9          We know big-picture facts about Dr. Szyman is that

10   Charles Szyman is a doctor.  We know from all the testifying

11   patients -- not from Dr. Szyman sitting up here on the witness

12   stand but from all the testifying patients -- that Dr. Szyman

13   always tried to help them.  They all said it, "He was trying to

14   help me."

15         Setting aside all the things they might have done to

16   mislead him, he was trying to help.  All of them said that.  All

17   of them said he listened to their descriptions of pain and he

18   reacted to them.  All of them said that.  Every one.

19         And all of them said, setting aside whatever they lied

20   and all the extra things they did, they said, each of them, that

21   the medications he provided, they made their pains better.  All

22   of them did.

23         So we've got a doctor where all the patients say he

24   always tried to help.  We got a doctor where all the patients

25   say he improved my pain.  He's a pain doc.  So what are we doing

1    here in a criminal case?

2         All of these dosing errors we're talking about, people

3    had too much medication, all of them that we've heard about in

4    this case are caused by people lying to the doctor.  All of

5    them.  People lying to the doctor.

6         They've admitted -- the witnesses admitted lying.  I

7    made it impossible by lying for him to evaluate my problem.  I

8    made it impossible by lying for him to evaluate my degree of

9    pain because I lied to him.

10         They chose to lie.  And by lying they chose to then go

11    on and sell medications.  They made that decision to put him in

12    a place where he had the wrong impression of what their

13    situation was.  They did that, not him.

14         They caused him to prescribe medications they didn't

15    use.  Who caused that?  They did.  No prescriptions that people

16    didn't need would ever have happened if these folks would have

17    simply told the truth to their doctor.

18         Who in the world goes to the doctor with the intent

19    I'm going to lie and mislead the doctor and then think after the

20    fact the doctor is going to get blamed?  Who did that ever make

21    sense to?  It doesn't make sense at all.

22         They chose to manipulate a doctor who always tried to

23    believe them.  They chose to take advantage of his compassion.

24    And you don't have to take it from him, they said that.  He was

25    very compassionate, he was very concerned, and they chose to

1    take advantage of that fact.  They chose to take advantage of

2    the fact he trusted them.  They made those decisions.  They

3    admitted.  They sound pretty apologetic about it really for the

4    most part.  They did it and Dr. Szyman is here on trial.

5         Ladies and gentlemen, the question becomes what was

6    Dr. Szyman's terrible crime?  What was the fundamental thing

7    that he did wrong that brings him to this court?

8         Why does he end up in here?  And it comes down to

9    really just one thing — he trusted these people too much.  When

10   they told him things he accepted them.  He trusted them too

11   much.

12        For God sake, trusting too much is not a crime.  It's

13   an admirable quality, it's a hopeful quality.  It's something

14   that's good for people to have, particularly doctors who we need

15   to be compassionate and looking out for the interests of the

16   patients who talk to them.  Trusting too much, believing too

17   much, that's why he's here.  And that is a sad and terrible fact

18   about this case.

19        But it is true that everybody from the patients who

20   chose to lie to him about either the side effects of the

21   medicine or what they were taking, how much they were taking,

22   how much they were keeping, if they just chose to tell the

23   truth, if these undercover agents had gone in there and just

24   chose to tell the truth, I don't really have any pain, I'm

25   trying to get pills, they wouldn't have gotten any pills.

1       If everybody told the truth he wouldn't be here.  He's

2  here because other people lied.  And that's not right from a

3  fundamental standpoint.  We hear the phrase that lady justice is

4  supposed to be blind, but nobody ever said she was supposed to

5  be stupid.  This is stupid.  Other people lie and they put him

6  in a position where he's got a wrong impression and we call a

7  doctor a criminal?  It's too much.  And it shouldn't happen.

8       Dr. Szyman and Linda Kramer.  Think about their

9  combined testimony together.  And when you think about their

10  testimony, think about how they were, how they seemed, their

11  demeanor, their descriptions, their language in talking about

12  what they did.  These are not underhanded people who are out

13  there trying to hustle drugs.  For one reason is because they

14  had no reason to.  They weren't being paid for it.

15       These guys are not drug dealers.  They're not drug

16  dealers who hustle drugs on the corner, you know, they can take

17  the cash and put it in their pocket.  He didn't get that.  He

18  got nothing for these drugs being prescribed.

19       These were people.  These aren't underhanded

20  characters trying to do something wrong, trying to give people

21  medicine that they don't need.  Does he really think, is it

22  really his position that Dr. Charles Szyman was out there trying

23  to give people medicine because he wants them to get sold out on

24  the streets?  There's no indication of that.  That's a joke.

25       Do you think Linda Kramer, this lady that worked with

6

1    him for years, if he was some rogue doctor out there hustling

2    medications, not caring about the patients, do you think that

3    woman that you heard from would speak so well of him?

4         Linda Kramer's an honest lady.  Dr. Szyman was an

5    honest doctor who worked for years to try to come up with

6    philosophies and treatments that worked.  He's serious.  He's

7    thoughtful.  You heard him explain it.  They wanted to trust

8    people.  That's what Linda Kramer said, we wanted to trust them.

9    We hoped we could trust them.  And they wanted to make people

10   better.  And by heavens, isn't that what we want in a doctor?

11   Certainly.  It is not a reason why he should end up in the

12   criminal court.

13        And if you take it right from there, from the

14   beginning, he's only in court because other people lied and he

15   wouldn't be here otherwise?  Then we should be convicting him of

16   a crime.

17        It's -- not only the instructions the judge gave you

18   do not allow and I'm going to talk about that -- but the simple

19   fact -- simple common sense, simple fairness and morality says

20   that's black law.  If other people lie then somebody else

21   shouldn't have to pay the penalty.

22        But that's what's happening to Dr. Charles Szyman in

23   every instance, from undercover agents that chose to lie to

24   patients that chose to lie.  That's what happened to Dr. Charles

25   Szyman and that's not right.  Too much trust is not today nor

7

1   has it ever been a crime.

2        And so when we get back to the big picture we are

3   indeed, after we've seen all of the evidence, left with two

4   truths.  Dr. Charles Szyman is a doctor.  And Dr. Charles Szyman

5   did his best to do his job with very difficult circumstances.

6   These patients were coming to him from other doctors and these

7   were patients who had -- everybody had tried everything and it

8   was failing.

9        He got the most difficult patients.  He tried to work

10  with them.  He tried to trust them.  And then when they lie he

11  has to come to court and have prosecutors say you, Dr. Szyman,

12  you worked your whole life to be a doctor, you're a criminal,

13  you're a drug dealer?  Is that right?  Does anybody think that's

14  right?  No.

15       But luckily for Dr. Szyman the legal instructions will

16  make it clear that it's not right and it can't be.  Because for

17  all Mr. Jacobs -- he's not acting as a doctor, he's a drug

18  dealer, all of this, I want to talk about what the

19  law/instructions say.  I want to talk about what you have to do

20  under the law.

21       But the legal instructions say and what Mr. Jacobs did

22  not mention was that the government must prove beyond a

23  reasonable doubt that Dr. Szyman knew that his prescriptions of

24  controlled substance at issue was outside the usual course of

25  medical practice and not for a legitimate medical purpose.  They

1   had to prove beyond a reasonable doubt that he knew it and that

2   he intended to give people medication for something other than a

3   legitimate medical purpose.

4          That's an extraordinarily difficult thing for them to

5   prove in this case.  Because where you're gonna be instructed

6   and -- is, you have to look at the entirety of the evidence.

7          Well, if you look at Dr. Szyman's demeanor while

8   testifying, his explanation of what he was doing and his

9   philosophy and the things that he had come to believe and all of

10  the work that he had done to come to his opinions about how to

11  treat people in this terrible situation with the most difficult

12  patients, if you're gonna say, well, he was providing medication

13  and he knew it, he knowingly provided medication for something

14  other than a legitimate medical purpose, then do you know what

15  you've gotta do?  You've gotta tell us why.  Why would he do it?

16  What is the other purpose?

17         See, because you can't say we've proved beyond a

18  reasonable doubt that a doctor was providing medications and he

19  knew he was giving them for some purpose other than a legitimate

20  one unless you can then turn around and say, by common sense,

21  here's the purpose why he was doing it.

22         MR. JACOBS:  Judge, that's not a correct statement of

23  the law.

24         MR. BRINDLEY:  That's a common sense argument, Judge.

25         THE COURT:  Overruled.

9

 1          MR. BRINDLEY:  Think about it.  If they have to prove

 2    beyond a reasonable doubt that he knew that he was giving these

 3    medications for something other than a legitimate medical

 4    purpose, so they can do that beyond a reasonable doubt, then

 5    what's the other purpose they're talking about?  They haven't

 6    gotten one because there isn't one because he didn't do that.

 7          This is not one of the cases -- this case is not the

 8    one that the statute is meant for.  This statute is meant for

 9    the doctors that are doing cash money.  People want drugs that

10    they don't need and they come in and they give the doctor a

11    bunch of cash to put in his pocket, he gives them their

12    medicine.  Okay?  That's not what happened in this case.

13          He told you doctors get kickbacks, cash kickbacks from

14    these pharmaceutical companies to push their drugs to people

15    they know don't need them.  That's not what happened in this

16    case.  If they wanted to prove beyond a reasonable doubt

17    Dr. Szyman had some other purpose, then they should have sent

18    their undercovers in there in a legitimate way to check for

19    that.  They should have sent them in there not making up this

20    intermittent pain story -- I'm going to talk about that plenty

21    later on -- not making up that story, they should have sent them

22    in there to look at Dr. Szyman and say, Doctor, I need to get

23    some pills, I don't have any pain, let me pay you for them.  If

24    they think he's gonna do it for some other purpose, there you

25    go.

1    Did they do that?  No.  Why?  Because they knew, they

2  knew darned well that he wouldn't do it.  Why?  Because he

3  wouldn't knowingly give them medicine for some nonmedical

4  purpose.  If you don't have a purpose you can't prove it, it

5  doesn't make sense.  The people this statute is after, the

6  kickbacks doctors and the cash doctors, he wasn't one.

7    There is no way, there is no way the government can

8  possibly prove that he knew and intended people to get medicine

9  for something other than a medical purpose because there's no

10  explanation whatsoever why he would do it or what that would be

11  and that's the end of the case.  It's not that hard of a case.

12  It's an interesting one, but it's not that hard.

13    The only thing even hinted at was Mr. Jacobs yesterday

14  when he said, well, you have your salary.  And he's making

15  $350,000 a year.  He had a good salary.  He's been working for

16  years, he was a good doctor.  Makes a good salary.  And he said,

17  well, you get a bonus for new patients.  Or something like that.

18  He said, yeah.

19    But the truth, the truth is that every patient's a

20  referral.  Every one is a referral.  Other doctors are sending

21  them all.  So he has nothing to do with the numbers.  The

22  numbers are coming in from other people.  There's no reason for

23  him to do it.

24    And think about that a little bit more.  Because it's

25  so important when you look at what the law really asks for.

1  This is a man who spent his life on being a doctor.  This isn't

2  some quack that barely got his degree.  This is a man who spent

3  his life, who's board certified, who's recognized by his peers

4  as an expert, who worked so hard for decades.  Why in the world

5  would he risk all of that to give people medication they didn't

6  need for some nonmedical purpose when he had no reason to do it?

7  Why?

8          And when you can't answer that question, because there

9  is no answer, then you have to say no to the government in this

10  case.  This is a case for a lawsuit someplace.  This is not a

11  criminal case, because there's no way they can prove this.

12  There is no reason whatsoever they can identify for why he would

13  ever, ever do it.  They've had every opportunity and they've

14  given you nothing.

15          Dr. Szyman explained his philosophy and his beliefs on

16  treating patients, about giving them the benefit of the doubt,

17  about the doctor/patient privilege, and about how he developed

18  his philosophy on high-dose opioids.  Talking to other experts.

19          And it wasn't some whacky, crazy thing that sounded

20  like somebody made up.  It was well thought out, it was

21  sensible.  It cited medical information and medical literature.

22  It's something he believed.  And if he's acting based on that

23  philosophy, then there's no way anyone could say they proved by

24  any standard, certainly not beyond a reasonable doubt, that he

25  was prescribing medicine intending and knowing it to be for some

1    purpose other than medical.  Especially when we can't even

2    say -- and I'm going to be repeating this -- where we can't say

3    or figure out what the other purpose is, because there isn't

4    one.

5          You're gonna need -- one of the things you were

6    instructed on by the judge is that in making a medical judgment

7    concerning the right treatment for an individual patient,

8    physicians have discretion to choose among a wide range of

9    available options.  Therefore, in determining whether Dr. Szyman

10   acted knowingly without a legitimate medical purpose, you should

11   examine all of his actions in the totality of the circumstances

12   surrounding his actions.

13         Well, if you look at the top of this, according to law

14   physicians have discretion -- that's what you're told -- under

15   the law they have discretion to choose between a wide range of

16   options.  High-dose opiates are one option.

17         Dr. King -- although he didn't like to admit it and it

18   took a long struggle between he and I to get there -- but

19   Dr. King ultimately admitted there were a whole school of people

20   that believed in high-dose opiates.  [Indiscernible].  And he

21   admitted that.

22         So when we're talking about that, that's an option.

23   And Dr. Szyman, the evidence tells you that he used discretion

24   to utilize them with a small group of patients, what he

25   considered to be truly high-dose opiates.  And you know that

13

1    because he had 350 to 400 patients and there was just a tiny

2    percentage that we're talking about here high dose.  What is

3    that?  That is a doctor exercising his discretion to choose an

4    option for certain patients.

5           And the ones -- we'll talk about the undercovers

6    later.  They did not get truly high-dose opiates according to

7    Dr. Szyman's opinion about what that was.

8           Setting them aside, you look at the other people who

9    really did and he really does say got high-dose opiates, and who

10   were they?  They were patients who have been failed by every

11   other doctor.  Every one of them said I went to this one, went

12   to that one, tried everything, I got nothing, my pain was -- all

13   I could do was go to Dr. Szyman because the other doctors said

14   you gotta go to Dr. Szyman, he's the only one that might be able

15   to help you.

16          And so he has a class of patients that are that

17   difficult that everything else has failed for that are

18   suffering.  And he says for this small suffering group I will

19   exercise my discretion and I will offer high-dose opiates and

20   give them the choice and the chance to make that choice.

21          That's exactly what the law says he can do, use his

22   discretion to choose amongst a wide range of options.  And the

23   fact that he was limiting it to this small group of patients

24   that we're talking about here, that tells you he was doing what

25   the law says.  That tells you that he cannot be guilty of acting

14

1   knowingly without a legitimate medical purpose.

2           And on top of the fact that they cannot possibly prove

3   that he knowingly believed that he was giving people medicine

4   for no legitimate medical purpose, you also have been instructed

5   about good faith.  If you find that Dr. Szyman acted in good

6   faith, that would be a complete defense for his charge -- this

7   charge because good faith on the part of Dr. Szyman would be

8   inconsistent with his acting knowingly and intentionally.

9           Now, ladies and gentlemen, has the government proven

10  that Dr. Szyman didn't act in good faith?  Without bad faith

11  from him somehow he's not guilty, so where is the bad faith?

12  Where is the bad-faith action by Dr. Charles Szyman?

13          I'm not talking about he should have asked more

14  questions.  I'm not talking he should have done a little bit

15  more, he should have been more skeptical.  Not the should-haves

16  and the could-haves.  Actual bad faith where he shows he's got a

17  bad intention, where is that?

18          You are instructed a person acts in good faith when he

19  or she has an honestly-held belief of the truth of the

20  statements being given to him even though the belief turns out

21  to be inaccurate or incorrect.  That is the law.

22          And isn't that exactly our case?  People lied to him

23  and he believed them.  He's testified that he believed them.

24  His actions suggest that he believed them.  Because there's no

25  reason for him to prescribe the medication if he didn't believe

1    them.  He had nothing to gain.  That is this case.  You act in

2    good faith if you honestly believe somebody's telling you the

3    truth and that belief turns out to be wrong.  That's what

4    happened to Dr. Charles Szyman.  In every one of these instances

5    that's what happened to Dr. Charles Szyman.

6           The government could not bring you a patient, the

7    government could not bring you an undercover agent that actively

8    went in there, that actually went in there and told Dr. Charles

9    Szyman the truth and still got prescribed some wrong dosage that

10   wouldn't work for them.  They couldn't bring you that patient.

11   After looking through all these records.

12          Do you wonder why?  Why?  Because Dr. Charles Szyman

13   believed his patients.  And the only time there was a problem

14   was when these patients made the decision to lie about what was

15   going on.  He acted in good faith and that means he can't be

16   guilty.  You must find that he is innocent, not guilty of this

17   charge, because Dr. Charles Szyman believed these people and

18   they lied.  The law directly addresses our case and our

19   situation.  The government didn't in argument, but the law does.

20          Now, good faith in this context means good intentions

21   and the honest exercise of professional judgment as to patients'

22   medical needs.

23          Ladies and gentlemen, we've already said, where's the

24   evidence of bad intention?  There isn't any.  In every case

25   we've heard from patient upon patient, [Indiscernible] people

1    that did lie to him, all of them said he was trying to help.

2              That's a good intention when the patients years later

3    all say he was trying to help.  I did what I did, but he was

4    trying to help.

5              Undercover agents coming in without insurance, there's

6    no reason for him to prescribe them a medication other than he's

7    trying to help people that are telling him they've got a

8    problem.

9              And maybe his threshold's too low for trusting them,

10   but there's no other reason for him to prescribe that medicine.

11   Dr. Szyman was prescribing medication based on his philosophy,

12   philosophy that he explained to you and that he obviously

13   honestly believes.  The government can't prove with any evidence

14   he doesn't believe in it.  There's no such evidence here.

15   Everything we have suggested he does.

16             And so that means when he has an intellectual and

17   moral belief that he can explain to you in detail and they

18   cannot disprove and they cannot even begin to challenge, then

19   he's honestly exercising his professional judgment and that's

20   acting in good faith.

21             Good faith connotes an observance of conduct in

22   accordance with what the physician should reasonably believe to

23   be proper medical practice.  And just like we just said, he has

24   this philosophy he believes in for good reasons.  That means he

25   reasonably believes that he's acting with proper medical

1    practice.  It's plain.

2        He talks about his policy of giving patients the

3    benefit of the doubt.  And it doesn't come out of thin air.

4        He talks about how he has always believed that there's

5    something special about the doctor/patient relationship and the

6    degree of trust that you need to have.  It's a loyalty, a duty

7    of loyalty to that patient that he tried to uphold.

8        And maybe he was wrong.  He was wrong.  He was mislead

9    in a lot of instances.  But he reasonably believed this was a

10   good policy.

11       And if you think about it, it is a good policy.  We

12   hope doctors will do that, don't we?  Believe that there's a

13   duty of loyalty that's important between them and the patient?

14   Certainly we would hope so.  And if we do, then we know he

15   reasonably believed his conduct was proper, he acted in good

16   faith, this case is done, he's not guilty of any of it.

17       And he does not have to prove that he acted in good

18   faith.  He doesn't have to prove that.  It's a defense because

19   it is inconsistent with the requirement that he acted knowingly

20   and intentionally.

21       The government must prove Dr. Szyman's mental state

22   beyond a reasonable doubt.  Meaning they have to prove that he

23   knowingly and intentionally prescribed medication for some

24   nonmedical purpose that apparently they can't identify.

25       And deciding whether they proved that Szyman acted

1  knowingly and intentionally or instead in good faith, you should

2  consider all of the evidence that may bear on his state of mind.

3  And that includes:

4         The way the patients described his practice;

5         Listening to -- all of them saying he listened;

6         He was compassionate;

7         He took what I said and he followed what I said;

8         He responded to what I said.

9         All of that together says he's acting in good faith.

10 And the facts about Dr. Szyman that we know support this.

11        I've already mentioned that he's board certified.

12 Most doctors don't have that.  That means he was willing to go

13 through extraordinary study to become an expert and recognized

14 an expert by all these people in his field.  It's extraordinary.

15        He was the chief of staff of a hospital.  He was the

16 chair of the anesthesiology department for years.

17        He was a founder of the sleep clinic.  He was the

18 founder of the pain clinic.  He did all of this.  He had an

19 extraordinarily compelling career.  Impressive.

20        That is not consistent with what they're saying.

21 Someone would knowingly provide medication to patients that for

22 some purpose other than medical?  The person who's become board

23 certified, the person who's made this career, gotten to be the

24 chief of staff at a hospital, that person isn't going to do

25 that.  The person that does that is somebody out there trying to

1    make cash, somebody that's not reputable.  Dr. Szyman was

2    demonstrably reputable.  And that means they can't prove this

3    beyond a reasonable doubt because he simply didn't to it.  He

4    did not intend anybody to have medicine for some nonmedical

5    purpose.

6            The other part of this.  The government cannot prove

7    that he ever provided medication to somebody without the medical

8    purpose or some other purpose.  They can't.  It's impossible.

9    It's crazy in this case.

10           But the other part of it is the usual course of

11   medical practice.  They have to prove both.  They have to prove

12   that he knew that he was acting outside the usual course of

13   medical practice; that he knew he was wrong and still kept

14   acting in this way and intended to.  That's ridiculous.

15           You could say there's a difference of opinion.

16   Dr. King can say, hey, he doesn't agree with me.  There are a

17   lot of other people that do agree with me.  Fine.  But that

18   doesn't mean that he believed and he knew he was acting in some

19   way outside of medical practice.  Why would he do that?  What

20   would be the point?  There isn't one.

21           It doesn't make any sense when we look at what the law

22   actually requires for a criminal case.  This is not about the

23   difference between what Dr. King thinks or what Mr. Jacobs

24   thinks and what Dr. Szyman thinks.  It's not about that.  It's

25   about whether he knew he was wrong, outside medical practice,

1    and was doing it anyway.

2         And why would he?  He's talked about how hard he

3    worked with these patients.  The patients talked about how hard

4    he worked with them, working with them for hours and meeting

5    with them, telling them when they needed more medicine.  And

6    they had to meet them at the hospital.  All of these things.

7    Why?  If he believed he was wrong and not acting for a medical

8    purpose, why work so hard?  It doesn't make any sense.

9         Dr. King admitted that there's two philosophies on

10   high-dose opiates, his and another school of thought.  He

11   admitted.  He didn't like it, but he admitted it was true.

12   Doctors prescribing high-dose opiates, he admitted that was a

13   trend that only started to go down in the last year.

14        So there's all kinds of people out there, a whole

15   school of thought.  Dr. King admitted that there are lectures

16   out there that are lecturing people in symposiums where there's

17   hundreds of doctors sitting listening to this philosophy and

18   belief.  This is a real thing.  It's not some rogue

19   [Indiscernible], this is a real big thing that existed and does

20   exist in a disagreement between different people in the medical

21   community.

22        Dr. Szyman identified that and he explained why he

23   believed in the high-dose opiate philosophy after being able to

24   talk to Dr. Passik, one of the leading experts in this field,

25   and reading the literature.

1    Dr. Forest Tennant, another one of the leading experts

2    in this field, he said the idea is there is not an upper

3    boundary.  You prescribe enough medication to reach

4    functionality or until the patient reports side effects that

5    can't be managed.

6    That makes sense.  That's not crazy.  And he said that

7    it made sense to him.  And he explained why it made sense to

8    him.

9    And so, ladies and gentlemen, he's gone through all

10   that.  And he can articulate specific reasons why he adopted

11   this philosophy which was believed by a whole bunch of other

12   people in the same community.  And no one could possibly say we

13   proved beyond a reasonable doubt he thought he was outside of

14   medical practice, he believed and intended to act outside of

15   medical practice.  He didn't.  He thought this was legitimate.

16   And there's more than one good reason for him to think

17   that.  Yes, there's a school of thought.  Yes, there were

18   experts that he talked to in person.  He believed it was proper.

19   But Dr. King maybe made the most important admission

20   at the end of his cross-examination testimony.  Dr. King said

21   that a doctor could act in good faith, believe in the high-dose

22   opiate philosophy espoused by these experts, and could act in

23   good faith even if he was wrong.  Dr. King said he could act in

24   good faith even if he was wrong.

25   If you act in good faith -- what Dr. King didn't know

1    is this was a part of the case under the law.  But if you could

2    act in good faith using this methodology the law says you're not

3    guilty of the crime.  Dr. King admitted what the law requires,

4    that Dr. Szyman be found not guilty.  Because the law is what it

5    is and you are required to follow it.

6              Dr. King talked a whole lot about the standard of

7    care.  He and I had an endless fight about the standard of care.

8    And he had rendered his opinion as the only one, whether anyone

9    could ever disagree with him and he clearly thinks most people

10   don't.

11             But what you're gonna find out when you're instructed

12   by Judge Griesbach is that some of you may have heard the

13   medical malpractice -- heard of medical malpractice or the

14   standard of care, language Dr. King kept using.  This is not a

15   medical malpractice case.  Those are terms used in civil cases

16   when a patient is seeking damages.  Medical malpractice is the

17   unwarranted departure from generally accepted standard of

18   medical practice allegedly resulting in injury to a patient.

19             This, however, is a criminal case.  So all this

20   standard of care stuff Dr. King was talking about, that's not

21   what our case is about.  And what Dr. King accidentally admitted

22   when he said you can act in good faith and believe in high-dose

23   opiates, was that Dr. Szyman isn't guilty of this crime.  Maybe

24   if somebody sues him Dr. King can come and testify then, but his

25   testimony is not that helpful to us here.

1          Now, Dr. Szyman basically said that in his view and

2     why he accepted this philosophy was because it is a fact that

3     some people tolerate opiates better than others.  Some people

4     can tolerate a lot more.  Some people can tolerate a small

5     amount, some people can tolerate a very large amount.  And

6     Dr. King said you can't go higher than 100 MEQ.  Dr. Szyman

7     said, well, that's a box.  That puts a ceiling on it and people

8     get left out.

9          And we've seen evidence of that in this case.  You've

10    seen it with your own eyes.  As you -- cause you saw Dabien

11    Peterson when he's not taking high-dose opiates.  Now, I -- I

12    don't think there's any doubt Dabien Peterson has a serious pain

13    problem.  The man can barely move.  That's what he's like

14    without high-dose opiates.

15         And if we follow Dr. King's philosophy then

16    Mr. Peterson never gets to functionality.  He would deny

17    Mr. Peterson all of those years that Mr. Peterson says he could

18    move around, he could get out of his house.

19         And I don't know, Mr. Jacobs suggested I guess that

20    Mr. Peterson is lying, that his condition didn't improve?  That

21    he wasn't able to do all of these?  Why?  Mr. Peterson can get

22    nothing from Dr. Szyman now.  He has no -- this is years past.

23    Totally gone.

24         The only reason for him to want to come down -- and do

25    you know how hard it was for him to come down here?  You saw.  I

24

1    mean it took three marshals just to help him get up on the stand

2    and out the door.  And [Indiscernible] all the way down.  It

3    took the man an hour, he said, to get out of here, just to get

4    to his car right outside in the front.  You think, why would he

5    do that?  Why would he go through all of that?  Other than if

6    what he said was true, that Dr. Charles Szyman saved his life

7    and gave him his life back for a period of time.  If someone has

8    done that for you, yes, you will go to the courthouse and you'll

9    take an hour to get in there.  You will.

10         But if somebody just gave you drugs when you wanted

11   drugs, no, you wouldn't do it for that.  There's no evidence --

12   the government can't prove Dabien Peterson is lying when he said

13   the dysfunction improved.  And his example shows us that

14   Dr. King's philosophy leaves people out.

15         Not only that, Mr. Peterson's example validate

16   Dr. Szyman's philosophy.  But so do all these patient witnesses.

17   Look, the other patient witnesses had all said at different

18   times that they were abusing the medicine.  Most of them did

19   anyway.  They abused it.  They took too much and they lied and

20   they sold and they did all these things.

21         But what they also said is there was a point for each

22   of them in their treatment where the dose of medication that

23   they got made them better.  Improved their pain.  And every one

24   of them was on more than 100 MEQ.  So that means that every one

25   of these examples is a person that Dr. King's philosophy would

1  have left out.  And that's evidence that Dr. Szyman had reason,

2  reason from his own practice, reason from what he was seeing

3  from these patients to believe that, yes, this philosophy is

4  good; yes, we should be following this philosophy cause I'm not

5  willing to leave Mr. Peterson out.  I'm not gonna leave him to

6  suffer in pain if I can do something.

7         Believing that is not, not a situation where the

8  government can prove that he knew he was acting outside of

9  medical norms and was doing it anyway.  No.  Believing that is

10  believing in a philosophy and trying to act in good faith to

11  help people like Dabien Peterson who says he helped him.  They

12  all said that he helped them.

13         Now, various ones abused it.  Various ones ended up

14  having problems with withdrawal at different points.  That's a

15  risk that goes along with this.  But all of them said that he

16  helped them.

17         So this philosophy isn't crazy.  Going over 100 MEQ

18  doesn't -- doesn't -- everybody doesn't drop dead.  Everybody

19  doesn't have these terrible side effects so they can't function.

20  All these people said that there's -- they did.  That validates

21  Dr. Szyman's philosophy.

22         And it wasn't just from the patients.  He told you --

23  the government can't disprove this.  They can't say it's not

24  true.  It is true.  Dr. Szyman was reviewed by Medistar, which

25  is a Medicaid program, to determine whether they should be

1  paying for his high-dose treatments.  He was.  He told you that.

2  Six doctors validated high-dose opioid therapy by Dr. Szyman and

3  that [Indiscernible] to Dr. Szyman, that told Dr. Szyman that,

4  yes, my philosophy is valid.

5       Other doctors are saying this is what -- this is

6  within the standard of care that Dr. King was talking about.

7  This is within the medical practice norms.  I've got proof of

8  it.  I'm doing good.

9       When that's the case and they can't deny, then how can

10  they say we proved beyond a reasonable doubt he knew and

11  intended and thought he was acting outside of medical practice?

12  They can't.

13       What do they do about this?  What about these six

14  doctors that impacted Dr. Szyman's thinking?  Are they all

15  criminals too?  All the people that believed in this philosophy,

16  Dr. Passik and all the people that went to those seminars,

17  Dr. Tennant, are they all criminals too?  All the patients that

18  they treat using more than a hundred MEQ?  No.  They're just

19  people that disagree with Dr. King, the government's doctor, the

20  government's expert.

21       That's the reality.  His philosophy is accepted.  He

22  had evidence of that, objective evidence from other doctors.  So

23  they can't prove that he was knowingly acting outside the usual

24  course of medical practice.  They just can't.  The law is what

25  it is.  They cannot prove it.

 1          And the difficulty here is, it's so easy to get caught

 2     up in thinking, well, they sure are big numbers and people did

 3     get withdrawal and there are these big risks and somebody died.

 4     Yeah.  All of that is difficult.  And maybe all of that could be

 5     addressed by any one of these patients who decides to have it

 6     addressed and evaluated at a civil lawsuit for medical

 7     malpractice to see, to see whether the doctors that agree with

 8     Dr. Szyman would prevail or the doctors that agreed with

 9     Dr. King.

10          Maybe that's [Indiscernible], but it's not this,

11     folks.  And the government, they push this issue like, well, he

12     should have done more, he could have done this and he -- you

13     know, these numbers are so big and they call him a drug dealer

14     and all this nonsense.  And they make it so easy to lose what

15     the law demands — proof beyond a reasonable doubt that he knew

16     he was outside the norm; beyond a reasonable doubt that he knew

17     this was for some purpose other than medicine when they can't

18     identify the purpose?

19          They can't prove that.  This isn't a criminal case.

20     [Indiscernible].  He's not guilty.  The law says it and the law

21     decides how you have to judge it.  You have to judge the

22     evidence based on that law.

23          And whatever he does when he gets back up to give his

24     rebuttal argument, Mr. Jacobs isn't going to be able to change

25     what those legal instructions say.  He isn't going to be able to

                                                                      28

1    change that he has to prove beyond a reasonable doubt that he

2    knew he was outside the course of medical practice and that he

3    knew he was giving medicine for some purpose other than

4    medical -- when he can't tell us what that purpose was.   He

5    can't change that.  He can't change that.  And he can't change

6    what the law demands — the acquittal, the finding of not guilty

7    for Dr. Charles Szyman.

8            Let's talk about these undercover agents for a minute

9    because that's -- the gory part of the government's argument is

10   about these folks.  And basically what they're saying is, well,

11   he should have asked them more questions.  He didn't -- he

12   didn't pay enough attention.  He didn't confirm their pain.

13   They gave him explanations of this intermittent pain problem and

14   they gave some relatively detailed claims to the nurses and all

15   of this.

16           But the government's argument really boils down to he

17   made a mistake not being more skeptical.  He made a mistake not

18   asking more questions.  He should have done more.  But the law

19   Judge Griesbach read to you addresses this problem too.

20           "A person acts knowingly and intentionally if he

21   realizes what he's been doing and is aware of the nature of his

22   conduct and does not act through ignorance, mistake or

23   accident."

24           So the argument really boils down to he was mistaken

25   in not asking more questions, he was mistaken in trusting these

1  people and listening to their recommendations on what they said

2  would work for them.  He was mistaken.  The law says in a

3  criminal case mistaken?  You're not acting knowingly.  He's not

4  guilty for that.  That's the law talking.  Not Mr. Jacobs, not

5  Dr. Szyman, that's what the law says.

6       Now, what are the government's criticisms of

7  Dr. Szyman in general?  Well, the government criticizes

8  Dr. Szyman for prescribing medications above 100 milligram

9  equivalency units according to Dr. King's opinion.

10      But, ladies and gentlemen, there's nothing about

11 that -- he's given a philosophy that explains why he did that.

12 He's given the explanation for how it impacted in the health of

13 these patients.  These patients have testified how doses above

14 100 MEQ did make them better.  Some of them testifying it made

15 them better than others, but all of them testifying it made them

16 better at some point.

17      So doing that, ladies and gentlemen, the fact that he

18 did that, that does not prove that he knew that he was giving

19 patients medicine for something other than a medical purpose.

20 It doesn't even scratch the surface of that.  And it doesn't

21 prove that he was acting in bad faith.

22      Everything says he was trying his best to act in good

23 faith.  Allegations about patients.  He gets these he said/she

24 said situations where a police officer would call and say an

25 informant told me this, or I've got a gut feeling about this

1   person, or somebody's mom would call and say I think the drugs

2   are eating him up or whatever it was that she said about

3   Mr. Wenzel.

4           And Dr. Szyman, he met with the patients.  He talked

5   to them about the -- he didn't ignore them.  All the patients

6   said when one of these issues came up they sat down, they had a

7   discourse.  And Dr. Szyman said it was my philosophy to trust

8   and believe the patients unless I had some proof beyond a

9   he-said/she-said.

10          And what's wrong with that?  They were his patients.

11  He had a duty of loyalty to them.  These alternative people, he

12  didn't know who they were.  He couldn't verify what they were

13  saying if the patient gave an alternative explanation.

14          Does that mean that he was intending to give people

15  medicine, that he knew they had some purpose other than medical?

16  No, it does not.  Does that tell us anything about whether he's

17  acting in bad faith, bad faith having bad intentions for his

18  patients?  No, he did not.  This does nothing for the

19  government.  This is [Indiscernible] medical malpractice

20  information.  Is this a better practice or is some other

21  practice is better?  Let's have a competition of experts.  No.

22  Do that in a civil court, this is a criminal case.

23          They say, well, he didn't do enough physical exams or

24  MRIs.  But the truth of the matter is the patients came with

25  these records from their referral doctors.  The patients all

1  said that.

2        You know, [Indiscernible] we went over them with

3  Dr. Szyman.  He looked at them.  He talked to us about them.

4  All of this was done.  Dr. King didn't get the records from any

5  of the other doctors so the government didn't give them to him.

6  Fine.  But that doesn't mean they didn't exist and they didn't

7  inform Dr. Szyman.

8        Does this prove he's trying to give people medicine

9  that -- for some purpose other than medical?  No.  Does it prove

10  that he had bad faith and that he had bad intentions for his

11  patients?  No, it does not.  It doesn't even come close to that.

12  The things that they're talking about don't even come close to

13  what the law demands that they prove.

14        Risky side effects.  Yes, opiates have risky side

15  effects.  Some of these combinations [Indiscernible] the

16  prescriptive speedball that Dr. King was talking about.  Yes,

17  there's risks to using it.  There are.  There are increased

18  risks of overdose.  Yes, there is.  Dr. Szyman knew the risks.

19  He talked to the patients about the risks.

20        But here's what the government's leaving out of all of

21  this.  He talked to them about the risks and those risks

22  existed, but so existed the patients' state of debilitation and

23  pain.  That existed too.  And those patients had every right to

24  make a decision to say I want to take these risks and have a

25  chance to live a better life without this pain that gives me no

1   life at all.  They had a choice.  Dr. Szyman gave them a choice,

2   a choice that patients ought to have who have to suffer like

3   that.  He gave them a choice.

4         And so risky side effects, does that mean he was

5   giving them medicine that he knew there was no medical purpose

6   for?  No.  He was giving them medicine that he knew how to risk

7   and that he told them how to risk; that the medical purpose was

8   to get a man like Mr. Peterson up out of his chair.  And that's

9   worth something.  It's worth something to Mr. Peterson.  It's

10  worth the risk to him.

11        What the government forgets in all of their argument

12  is they forget what these people were like when they came to

13  Dr. Szyman.  They remember all about the addiction.  They

14  remember all about the problems when somebody would take too

15  much or they'd become too tired.  They remember all the problems

16  but then don't remember what every one of them admitted at the

17  beginning, their quality of life was crippled.  And he gave them

18  a choice to try to not have that crippled anymore.

19        But does that mean he's acting in bad faith?  No.  It

20  means he's doing the opposite.  He's doing the best he can in a

21  terrible situation with patients nobody else could help and

22  nobody else wanted.  Dr. Szyman wasn't gonna throw away Dabien

23  Peterson.  Do whatever he could that Mr. Peterson agreed he

24  wanted to try.  That doesn't mean he's trying to give people

25  medicine without a medical purpose.  He's trying to give

1    medicine with a medical purpose, specifically to get them out of

2    that state when nobody else could and everything else failed.

3            The risks can be acceptable to the patients.  And

4    that's a fact.  And they were and they tried.  He tried.  It's

5    the best he could do.

6            He also knew that these combinations of drugs, the

7    government focuses on a few instances of, well, what do you

8    think it takes for a pharmacist to call and say there's a

9    problem?  Yeah, sometimes pharmacists called and said there's a

10   problem.  But that's a handful of times.

11           These people are getting the medications routinely,

12   these dosages and these combinations.  Pharmacists are filling.

13   Pharmacists who Dr. King admitted they've got a duty.  If this

14   thing is inherently terribly dangerous, is not -- and you can't

15   have it, it's outside of medical norms, they can't fill it.  And

16   they did over and over and over again, validating Dr. Szyman's

17   view that, yes, there is a legitimate medical purpose.

18           And this is not outlawed as improper.  Insurance

19   companies paid for this.  You can see it in the records.  They

20   paid over and over again.  BadgerCare, Wisconsin, they paid.

21   Insurance companies don't pay for outlandish treatments.  If you

22   want any treatments that is outside the scope of what is within

23   medical norms, you've gotta get down on your knees, crawl and

24   beg to get the insurance companies to pay for that.

25           Anybody that's got or had a serious medical problem

1  knows that.  But they paid on this.  What does that tell

2  Dr. Szyman?  It tells him that this is within medical norms.

3       Look at all these referral doctors that knew him, that

4  send patients to him, the patients that have the most problems,

5  the patients that have the most difficulty.  They can't help

6  them.  Why did they pick Dr. Szyman?  Do you think they picked

7  him because they thought he was a rogue [Indiscernible] who had

8  some other than medical purpose and was gonna push that on their

9  patients?  Do you think he'd be getting all those referrals

10  from --

11       These people aren't coming in off the street.  This

12  isn't a walk-in clinic.  It's not a drug dealers' corner where

13  anybody can walk up there.  Doctors sent all these people.  Why

14  would he do that if he was some sort of a nut who was

15  intentionally giving people medicine for something other than a

16  medical purpose?  Are all these other doctors criminals too?

17  Are they going to be next?  It's absurd.

18       If he was acting well outside the scope of medical

19  purpose -- practice and if he was intentionally and knowingly

20  giving people medicine for some purpose other than medical,

21  there is no way that over for years and years where this is

22  going on referrals would keep coming in from these doctors who

23  know him.  From all over the place.  Because these doctors could

24  be risking their own reputation.  They would be risking their

25  own future.  Why would they do that?  They wouldn't do it.  They

1  sent them to him because they knew that he was a doctor who

2  would try to help and wouldn't throw people away.  No matter how

3  bad it was, he'd look for an answer.  That's why they sent him

4  the worst patients.

5      When you're talking about doctors at pain clinics,

6  other pain clinics failed and then they referred them to

7  Dr. Szyman.  Why?  Because he was willing to try something else.

8  And that doesn't mean he's acting in bad faith.  That means he's

9  acting in good faith, otherwise that would have never happened.

10      There's a risk of abuse.  Of course there is.  But

11  they tried to modify that.  They tried to mitigate that I should

12  say.  They used the opioid agreements.  They used drug screens.

13  They used pill counts.  They used observed medication

14  consumption when there was a big question.

15      If you're giving the medicine for no legitimate

16  medical purpose and you're intentionally doing it and knowingly

17  doing it, why would you bother with all this?  Why?  No

18  legitimate medical purpose, forget it.  Just keep giving it out.

19  Who cares?  It's a candy machine, it's a drugstore, right?

20  Right?  Just come on in.

21      Well, why do we fool around with all this?  Why do we

22  have situations where these folks get dismissed from the clinic?

23  Why?  It doesn't work.  The government's criticism doesn't

24  really make sense when you dig into it because there would be no

25  reason to do these.

1            If he knows he's acting outside of medical norms, he's

2    doing it on purpose, he's -- he has bad intention and bad faith,

3    he's not gonna bother with this.  There is no ethical

4    requirements that say you have to do drug screens and pill

5    counts.  Dr. King admitted there's no requirements of any kind

6    they're demanding on doctors on this.  He has to choose to do

7    these things.  And if he's doing it for some other purpose than

8    medical and he knows he is, he'd never make that choice.

9            This doesn't help the government.

10            And then the increasing pain score.  Mr. Peterson

11    actually did a decent job yesterday of explaining why this is

12    just flat stupid because you're saying, oh, well, there were

13    times when the pain went up while being treated by Dr. Szyman.

14    Well, pain is -- I don't understand what's wrong with the

15    government, pain is not static, it is dynamic.  It doesn't stay

16    the same every single day.  One day it might be a 5, but

17    Mr. Peterson said sometimes in the winter when it was cold when

18    there was snow it would go up.  Or because I was on the

19    medication and I was able to be more active I might have more

20    pain on some days but I was doing more.  My life was better so

21    it mattered to me, I was still doing better.

22            Okay.  So the fact that on one day a pain score

23    increases, that doesn't prove that Dr. Szyman knew that he was

24    giving them medicine for no medical purpose because he was there

25    looking at them, he was there evaluating him, he was there

1    listening to their feedback.  So all of this, it's nonsense.

2    The pain score.

3          And the government seemed to want to have it both --

4    that's how you know that their argument isn't very good.  That's

5    how you know that their evidence isn't very good, because they

6    want to have it both ways.  They want to say on the one hand,

7    well, the pain score goes up so Dr. Szyman, he's guilty, he was

8    wrong, he must have known there was a problem, pain score goes

9    up.

10          Or, when -- when the -- the undercovers come in and

11    they say, well, we have intermittent pain so today the score is

12    zero.  Well, they said it's a zero, the pain score is at a zero,

13    so it's a problem.  They want to have it both ways.

14          You can't have it both ways.  And the problem in both

15    instances is the failure to understand the common-sense

16    principle that pain is different on different days.

17          Intermittent pain that comes and goes is a zero on the

18    days when it's not there and it's a 5 on the days that it's bad.

19    It's not that hard to understand.  But they want to make a big

20    deal out of it.  If they want to make a big deal out of that it

21    means they don't have any real evidence that he actually had a

22    bad intention.  Because they wouldn't be messing around with

23    these pain scores like this if they did.  It just doesn't

24    indicate and cannot indicate that he was knowingly prescribing

25    medicine for some purpose other than medical.

1          The abnormalities.  He tolerated certain abnormalities

2     and didn't take the people off the medicine.  Okay?  But what

3     did we learn from that?  The patients all said when I had a

4     problem or a problem with a drug screen, pill count, whatever,

5     he would come and address it with me.  I had to talk to him.

6          Well, if he knows that they're getting the medicine

7     for no medical purpose, why bother messing with them?  Why go

8     through all this nonsense?  Why bring them in and have these

9     conversations?  What's the point?  Doesn't have to.  Why do it?

10    You only do it if you're trying to help them.  You only do it if

11    you believe the medicine is for a legitimate medical purpose and

12    you're trying to make sure that the treatment can continue

13    effectively.

14         Dr. Szyman's problem and the government's problem with

15    Dr. Szyman is that he didn't want to kick people out.  He didn't

16    want to throw them away.  He wanted to find a way to make it

17    work.  And what is so wrong with that?  It's mystifying to me.

18    He believes them and works with them and if they lie, okay, he

19    might be wrong in a handful of instances.

20         Where are all the patients he was right for?  The

21    patients that he believed and out of 350 to 400 whose lives he

22    made -- what about all those folks?  No, it doesn't mean he knew

23    and knowingly was giving people medicine for a nonmedical

24    purpose.  It doesn't mean anything like that.  It doesn't say

25    anything about that.  It isn't helpful to that -- with that

1    issue.  It doesn't get the government anywhere.

2          Linda Kramer talked about this.  She said, well,

3    Dr. Szyman had a way, he could be stern but he could still be

4    nice with these people.  That's when they would have these

5    problems and he would go to them.  He was trying.  And if he was

6    trying he's not acting in bad faith.  That means he's not guilty

7    under the law.

8          He said that people come in with mental health issues.

9    They had addiction histories, they have criminal histories.  She

10   sold marijuana.  She had a record from the courts.  Do we throw

11   them away then?

12         See, that's the problem with this whole theory.  You

13   don't want to give them the high-dose opiates.  These people

14   don't -- they admit, they were crippled in terms of their

15   quality of life.  So what are you going to do?  You say you have

16   a criminal history and mental health problems, you're not gonna

17   get the one form of treatment that nobody's tried that might

18   work?  I'm not going to give it to you, I'm sorry.  So if you've

19   got a few coming from jail, too bad, I'm throwing you away.

20         Charles Szyman didn't throw anybody away.  And that's

21   a benefit to who he is and the kind of person he is.  These

22   people had a right to be treated.  They had a right to try a new

23   form of treatment, the only one that might work because

24   everything else failed.  They had a right.  And he was a doctor

25   that would help them actualize that and try to work with them,

1  even though they had problems in their background.  Because if

2  he didn't, what's the alternative?  They suffer and are

3  miserable every day.  What's the alternative?

4       Well, there is bad possibilities [Indiscernible] yeah,

5  there's bad possibilities that could happen.  But what's the

6  alternative?  You just forget about these people.  The

7  government and Dr. King would sweep these people under the rug

8  and throw them away.  Dr. King would put them through a litany

9  of treatments they've already tried and that already failed and

10  let them suffer and have no chance.

11      Well, I don't like that.  Dr. King is wrong.  These

12  people deserve to be treated too and there's nothing wrong with

13  the fact that he was willing to do it.  That's why the referral

14  doctors would go to him because they knew he would try.  That

15  means he's acting in good faith.  That means he doesn't have bad

16  intentions and he's not giving people medicine knowing that

17  there's some purpose other than medical.

18      Ladies and gentlemen, that's the big picture.  That's

19  what the [Indiscernible] demands.  He's not guilty, period.  He

20  can't be.  They can't possibly prove it.

21      If you follow what the law actually says, and you're

22  demanded to, and don't get caught up in, well, it sounds like a

23  lot to me and I don't like opiates and I don't like these

24  results, I don't like them selling on the street.  Nobody does.

25  But the law says he had to know that it was for a bad purpose.

1    He didn't know.  He had to act with bad intent, he didn't do

2    that.  He's not that kind of a person.  He doesn't have that

3    kind of a history.

4         It's the end of the case.  This case closed.  But we

5    need to look at, as Mr. Jacobs did, at the actual charged counts

6    and see how these principles apply, these big-picture principles

7    apply here.

8         And let's begin with Russo.  Because is there evidence

9    of what the nonmedical purpose was with Russo?  I've said this

10   before.  But if they want to really get a doctor and say, well,

11   he'll give you medicine for a nonmedical purpose, well, go in

12   there and tell him you haven't got one and see what happens.

13        Russo knew well that if he went in there -- and he

14   admitted, well, I had to go in there and tell him something, I

15   had a pain problem, or I wouldn't get anything.  Do you know

16   what that means?  He wouldn't knowingly give it to you without a

17   medical purpose.  Period.  He's not guilty.  Russo basically

18   admitted it.

19        This entire episode with Russo was a lie and the

20   government says, well, I don't know why they say it was a lie,

21   he said his pain was zero.  No, no, I'm not talking about his

22   pain score.  I'm looking at something more than just a pain

23   score.

24        They seem a little bit obsessed with the number.  I'm

25   looking at what they did overall with this thing.  This was an

1  insidious and despicable way to treat this doctor.  What do they

2  do?  The guy goes in there and he's engineering [Indiscernible]

3  to manipulate him from the beginning.  Well, I don't have any

4  money.  I have no medical insurance.  Okay.  So there's a

5  limitation of what treatment he could possibly get because he's

6  got no medical insurance.

7          And they know by this time from the investigation in

8  talking to these patients Dr. Szyman tries to help low-income

9  people.  We've heard that from the witnesses.  So they're gonna

10  take advantage of that because they know there's going to be a

11  limit on what he'll try to do because he knows there's a limit

12  on their insurance.

13          They take advantage of his compassion.  The government

14  does this.  And then the guy comes in and tells them a lie, I

15  went to a pain clinic before.  Well, if you were going to get

16  him because he gives out medicine like a candy machine -- right?

17  -- then why would you go through this whole deal with the pain

18  clinic before?  That seems unnecessary.  If he's just going to

19  give them out for no medical purpose, [Indiscernible] -- he said

20  they were going to have a test.  Why didn't we have a real test?

21  No, because a real test would be if they had told him, hey, I

22  really don't have a medical -- I don't have a pain problem, I

23  want to get some pills, they would have kicked his ass out.

24  That's the reality.

25          And so they gotta make up a lie.  They gotta make up a

43

1    lie.  And so whether they -- what's the lie?  Well, first of

2    all, you've been to a pain clinic before and you got Percocets.

3    And he tells the nurse.  And you can listen to his -- the dialog

4    with the nurse.  The part that the government left out, I think

5    everybody probably remembers that little episode.  Defense

6    Exhibit 1002.  You can listen to this.  It's at the beginning.

7            And he tells the nurse -- and he admitted this

8    eventually -- "Percocets work fantastic."  So he leads him to

9    believe he's been to a clinic, he leads him to believe he's had

10   this medication and it works for him, and then he tells the

11   nurse that he gets limited motion from his pain.

12           So the whole thing is, well, it doesn't -- they go all

13   on this medical chart that's filled out and says, oh, well,

14   these medical charts are perfect, all we can look at is them.

15   And it says he doesn't improve his [Indiscernible] his

16   functionality, doesn't do this, he doesn't do that.

17           Listen to the recording that he admitted says it

18   affects my -- it limits my motion.  So I don't care what the

19   medical records say, we know what he said in person.  And he

20   said this was the problem that limited him.  All right.

21           So this idea that it was no big deal, that's not what

22   he told the nurse.  It's just not.  He lied and made this up so

23   there was a whole thing.  And then there was this part and this

24   part is the most insidious.  They give him this, oh, you can

25   call the clinic and verify.  Well, that seems like a legitimate

1    thing to do.  A doctor's gonna try to follow up.  And then

2    [Indiscernible] clinic informed he's a patient but he doesn't

3    have -- but they can't get his records.

4            Why would you go [Indiscernible] at this?  You are --

5    you are requiring so much.  The doctor is trying to follow up.

6    You know what it is when you call up and say, hey, we need to

7    verify this guy's -- [Indiscernible] a patient.  Do you know

8    what that is?  That's acting in good faith.  That's not guilty,

9    folks.  That's not guilty.  Why else do you call?  They tried to

10   do the right thing and these people created this lying ruse to

11   screw it up.  And then so they can say, gotcha, buddy.  We

12   gotcha.

13           We have a fake doctor's office?  Give me a break.  You

14   don't need to make up a fake doctor's office for a doctor who is

15   really prescribing without a medical purpose.  You don't need no

16   fake doctor's office.  You'd go in there, you ask him for the

17   pills, you get the pills, you don't have to screw around with

18   that.  If you're going to have to go to great lengths to say,

19   well, we're going to have to have a fake doctor's office in

20   place to take the call, then you know very well that he would

21   never knowingly give it to you without medical purpose.  Their

22   whole scheme proved that.

23           The office, they did all they could to verify him.

24   They led [Indiscernible] him -- this leads Dr. Szyman to believe

25   this guy's legit and it causes him not to really challenge it

45

1    very much and they give a lot of credence to what he says.

2         Maybe he puts too much respect in the fact that there

3    was another clinic.  Maybe.  But they led him to believe that.

4    And him putting too much respect in that and maybe that being a

5    mistake, that's not enough here.  That doesn't prove that he

6    wasn't acting in good faith.  If they want to find out and prove

7    that he was acting in bad faith they needed to do something

8    different.

9         He believed he had Percocet before.  The guy asked for

10   the lowest dosage of Percocet.  He didn't come in there and ask

11   for some giant dose that was crazy.  "I want 80s."  No, he

12   didn't do that, hand him Morphine 80s or something

13   extraordinary.  He didn't do that.

14        So we didn't get to see that one.  If they would have

15   come in and asked for something that's truly out of the

16   ordinary, see if he can get that.  He didn't do that because he

17   wouldn't knowingly give it to them and they knew it.  They knew

18   it.  This whole thing, they knew it.  They knew from the

19   beginning he would never give anybody anything without believing

20   there was a legitimate problem.  They knew he was going to act

21   in good faith and they tried to twist around and weasel him into

22   making a mistake.  Well, you don't have to do that if

23   somebody's -- you can prove beyond a reasonable doubt that

24   somebody's giving people medicine without a legitimate purpose.

25        They should have -- well, he -- they should have

1    expected he's drug-seeking because he comes in and asks for

2    these drugs.  Look, this thing about the pain score of zero,

3    nobody that says they've got a zero is a drug seeker.  Drug

4    seekers are trying to get drugs.  If you go into the pain clinic

5    and you say, Doctor, I [Indiscernible] I need to get drugs and

6    I'm a fake.  You're gonna say, oh, my God, my elbow, I got

7    debilitating elbow, you gotta help me.  My pain's an 8.  My

8    pain's a 9.  [Indiscernible].

9         If you're gonna try and get the drugs [Indiscernible]

10   in a big lump, you gotta feign something.  They didn't do that.

11   And so by not doing that they lead him to believe this isn't a

12   drug-seeking risk.  They got the pain clinic.  They got the zero

13   score.  He's not put in the mindset of thinking this is a risk.

14        So they trap him.  And they know they had to do it and

15   they do it.  And then Mr. Jacobs said, well, if he had said a

16   higher score then he would just be treating him properly.  Sure,

17   that's fine.  He would be.  But they didn't want to give him the

18   chance to try to treat somebody properly, they wanted to create

19   some fraud so they could get him to make a mistake and trust

20   somebody improperly.  And that's what they did by using this

21   zero score and this intermittent pain that this man was

22   describing, that he said I know it's going to come back, I've

23   had it before for years, it's intermittent chronic pain.

24        Now, with respect to the Percocets.  He comes back the

25   second time after Dr. Szyman now has in his background that, oh,

47

1  there was another clinic and I -- that he talked to, has

2  verified that he was at the clinic.  He's indicated he was on

3  Percocets.  I believe in him.  I don't have any reason to think

4  he's drug-seeking at this point.

5       And then he says, well, I don't know if the two

6  Percocets are doing very good.  Well, you start out from the

7  perspective that you're going to trust this guy and you're the

8  doctor, what does that mean to you?  I got pain and the

9  Percocets aren't treating it.  What else would it mean?  I don't

10  think the Percocets are doing very -- do you really think that

11  he's been [Indiscernible] and the Percocets are doing very good

12  and Dr. Szyman interpreted that, oh, they're not getting you

13  high enough?  Well, let's help you out.

14       That's nonsense.  If you start from trusting this guy,

15  which Dr. Szyman mistakenly did, then this statement says it's

16  not working, you need something else and he offers something

17  else, the next step, the 10s and 20s.  He's not acting in bad

18  faith.

19       And that's -- they have to prove bad faith; that he

20  was intending to give them to him for some other purpose.  And

21  we don't even know what that purpose would be.  He wasn't

22  getting anything from Russo.  It's nonsense.  No.  He acted in

23  good faith.  They manipulated him purposely and carefully.

24       He said he was going to take it for pain.  And he said

25  the only purpose for the higher dose was because it wasn't

1    working.  That's what the man said.  Could he have asked him

2    more questions?  Sure.  Should he have asked him more questions?

3    Maybe.  But none of that gets us to proof beyond a reasonable

4    doubt that he was giving him medicine knowing it was not for a

5    good purpose.

6         The last other interaction here is where he says the

7    Oxy-30s, "I ran out and I tried my girlfriend's."  Well, when he

8    says "I ran out," what does that tell him?  He's had pain, he's

9    using the medicine.  If you start from trusting him, that's what

10   you believe.

11        Now, the only way that you don't, the only way -- if

12   you start out believing Russo is lying -- and Dr. Szyman didn't

13   do that and Russo made it unlikely for him to do that with his

14   fake doctor's office.  So prescribes him the 30s.  He thinks

15   he's going to take them for the pain.  He said that they worked

16   when he took his girlfriend's.  He believed the guy.  Should he

17   have done more?  Maybe.  But he believed the guy.

18        That doesn't mean he's acting in bad faith.  It

19   doesn't mean they've proved beyond a reasonable doubt what they

20   gotta prove under the law.  It's not even close.  It's not bad

21   faith unless he believes he's lying and there's no evidence he

22   believed that he was lying.  Why would he?

23        [Indiscernible] the doctor's office and all of the

24   rest, no.

25        There's a reasonable doubt about [Indiscernible].  The

49

1   offhanded comments about the oxy, oh, people like the 30s, okay.

2   What's the government's theory?  That he was trying to give him

3   the medicine so he could go out and sell it?  Really?  A doctor

4   who for all these years, decades of -- that's what he wants and

5   he's not getting anything out of it?  That's dumb.  That doesn't

6   make any sense and there is no proof of it.  You can't just say

7   it.  You'd have to have proof of it and they don't.

8           The urine drug screen that came back clean Mr. Jacobs

9   admits, well, it was supposed to be on and off taking the

10  medicine so maybe that didn't mean anything.  So there's no

11  proof of bad faith and there's certainly no proof beyond a

12  reasonable doubt of him prescribing for some nonmedical purpose.

13          Now, it may be a mistake to come out to question him

14  and it may be a mistake to trust him.  Those things are true.

15  And it was, in fact.  But the law says, and we went through this

16  before and we'll probably end up repeating it again, that if he

17  makes a mistake he's not acting knowingly and he can't be

18  guilty.

19          Russo's evidence that they used here in court I think

20  also sheds light on the fact that they do not have proof beyond

21  a reasonable doubt this doctor was prescribing medicine for no

22  legitimate medical purpose.  Because Russo says -- on the way to

23  the stand, all this stuff in the medical, the maximum pain of 5,

24  yes -- x-rays, yes, response to [Indiscernible] -- I don't -- I

25  don't know, I never said that to anyone on the medical side.  I

1    don't know where that came from.

2         And then we have to sit through until the next day and

3    hear a recording where his voice says it all.  They were trying

4    to give the impression that Dr. Szyman falsified the records

5    when this guy did it all.  He gave -- you don't do that in a

6    case where the evidence is legitimate and beyond a reasonable

7    doubt.  4 to 6 out of 10 over and over and over again.  Where

8    did the 5 come -- it came from him.  It wasn't made up.  You

9    don't have to suggest those things if you have a good case.

10   That doesn't happen.

11        Dr. Szyman is not guilty of Counts 1 to 5.  The law

12   demands it.  There's no way around it.  The scheme they created

13   won't allow it.

14        Counts 6 to 9 are all about the other undercover.

15   Ms. Kingston was the name that she went by.  When she talked to

16   Dr. Szyman she gives a detailed description of her pain and then

17   she comes in with medical records from Dr. Augustine.  And these

18   records from Dr. Augustine are important.  Dr. Szyman reviews

19   those.

20        What did Dr. Augustine say?  This is Dr. Augustine

21   talking now.  That she was on Percocet 7.5 and 10 in the past,

22   was seen by a pain specialist, and she has exacerbation of

23   shoulder pain intermittently.  So she has convinced

24   Dr. Augustine that this is accurate.  He doesn't know any

25   suspicion.

51

1    So that leaves Dr. Szyman to believe, okay, she's

2   legit.  Dr. Augustine sees no problem.  But that's not all.  You

3   gotta look a little bit closer at the Augustine records to see

4   something else.  Augustine's impression:  No pain today.  Her

5   left handgrip is a little bit stronger than her right so she

6   probably had some deconditioning of the right shoulder.

7    That means that Dr. Augustine through his physical

8   manipulation of Ms. Kingston reports to Dr. Szyman in the record

9   that there's evidence that this is legitimate.  There's a grip

10  problem.  So Dr. Szyman has every reason not to distrust this

11  person coming from Dr. Augustine, connected to Mr. Russo who

12  hands the phone call that he believes is legitimate.  There's no

13  proof of bad faith.  And there's no proof that he's prescribing

14  this medicine for no medical purpose.  It's just -- no.  He's

15  not guilty of Count 6.

16    Now, Counts 7 and 8 he admits it was a mistake.  And

17  you know it was because all of the witnesses said whenever

18  they -- they had to come in regularly to get these

19  prescriptions.  He made a mistake.  She -- he signed the

20  prescriptions and didn't realize.  And he just made a mistake.

21  He admits it.  And it's consistent with the evidence because

22  everybody else always had to come in.  It's a mistake.  On this

23  incident he didn't catch it and it was a mistake.

24    And when she comes in what he says to her, if you look

25  at the transcript, he says, well, I thought it was just going to

52

1    be one every other -- you know, every day or so.  He confronts

2    her and says, hey, I thought this was different than it is.

3    Which suggests that, yes, it was a mistake.  She has to tell him

4    how it happened.

5            And what do we know about mistake?  If it's a mistake

6    he's not guilty because it's not knowing.  You can't knowingly

7    give someone medicine for a bad purpose if you're doing it by

8    mistake, if you're too carelessness.  If it's carelessness he's

9    not guilty.

10            So that means he's not guilty of Counts 7 and 8.

11            The last count, Count 9.  She's taken all these extra

12   pills, these 90 pills, per month, and so he knows there's

13   something.

14            Now, he trusts her.  The doctor is trusting her.  He

15   believes she's taking the pills for the pain.  And he says that

16   he did.  He wanted to believe her.

17            But he takes other steps.  He says get insurance.  And

18   he orders a urine drug screen and he orders a pill count in

19   succession because he's suspicious.  He is.  He's suspicious.

20            And what does he do?  He says I wanted to believe her.

21   Yes, he gives her the prescription because he wanted to believe

22   her.  He knew that she had a financial situation problem.  He

23   talked to her about trying to help her get a job.  He talked to

24   her about the fact she didn't have a car.

25            All of those were lying statements meant to play on

1   his compassion.  And he says I wanted to believe her but he was

2   going to test it.  And then he does the pill count and she

3   dismisses her when she doesn't come in.  Why?  If he's just

4   giving her the medicine for no legitimate medical purpose and he

5   knows it all along, why discharge Anna Kingston?  Why not keep

6   letting her call in the prescriptions?  If you don't care, if

7   you're doing it knowingly you never would.  His own conduct

8   proves he was acting in good faith.  He believed this person,

9   even though he shouldn't have.  He's not guilty of Count 9.

10          The next count is Ms. Valdez.  And Ms. Valdez had, by

11  her own admission, terrible knee pain.  By her own admission she

12  wasn't able to function.  And by own her admission the medicine

13  he prescribed improved the pain.  The only reason she didn't get

14  the right dose is because she didn't tell him when the side

15  effects were strong and she lied to him about -- she lied to him

16  about what pills she was taking.

17          There was a legitimate medical reason.  We know that

18  because she had a legitimate pain, and it worked.  If there was

19  no legitimate medical reason that he should shut down the --

20  [Indiscernible] it's over.

21          She lied about what she was taking.  She lied about

22  the degree of pain.  The dosage gets artificially increased by

23  lies, not by anything --

24          He's acting in good faith, she's getting better.  She

25  admits he was trying to help.  It's not because he did anything

1    wrong.  She had a prior marijuana conviction.  Government brings

2    that up.  She says he talked to her about it and they worked --

3    and tried to work with her so she'd be able to take the medicine

4    anyway.

5         He's trying to help.  That's a doctor acting in good

6    faith.  Everybody else had failed.  That's what Ms. Valdez says.

7    The other treatments all failed.  But Dr. Szyman was able to

8    observe an increased mobility and Ms. Valdez is one of the

9    patients that makes it clear:  I had -- my life was so much

10   better, I felt so much better with Dr. Szyman than I feel now.

11        That says Dr. Szyman had a legitimate medical purpose.

12   He was trying to pursue a course that would work for a very

13   difficult patient.  There's no proof of bad faith.  He's not

14   guilty of Count 10.

15        Ms. Pivonka-Dewane, she says I had a legitimate

16   debilitating back pain.  It was real she said.  And she says, I

17   wasn't able to function, and medicine improved the pain.

18        Now, she lied after that.  But the medicine improved

19   the pain.  There's a legitimate pain.  That's a legitimate

20   medical purpose.  That's the end of the -- again, he's not

21   guilty.  He's trying to help.  She lied about what she was

22   taking.  She lied about her degree of pain.  She manipulated her

23   drug screens.  But she says and admits:  I took advantage of

24   him.  He was always trying to help.  Any incorrect increase was

25   because of me.

1    There's a pharmacy call.  She discusses it with Szyman

2  where she has too much money.  Szyman can't prove that she was

3  doing anything wrong.  He believes her because that's his policy

4  with his patients.

5    There's a complaint from Ms. Wolf about

6  Ms. Pivonka-Dewane.  Again, there's a discussion with her.  They

7  work on it.  But he can't prove that Wolf is telling the truth.

8  He didn't believe it.  He didn't want to believe it.  He wanted

9  to believe his patient.  He gives her the benefit of the doubt.

10  But she fails a pill count down the road.  He dismisses her.

11    Again, there's no proof of bad faith.  He's trying to

12  do the best he can with a terribly difficult patient.  And when

13  he can't, when it's absolutely undeniable that there's a problem

14  he kicks her out.  That's not what somebody does if they're

15  knowingly giving the medicine for a non-legitimate medical

16  purpose.  You don't bother kicking them out.  Why would you?  He

17  is not guilty of Count 11.

18    [Indiscernible] with Mr. Peterson.  Mr. Peterson's

19  condition is obvious to everyone.  He cannot function.  He said

20  he was like that before he went to Dr. Szyman.  All kinds of

21  other treatments were tried including now.  They've all failed.

22  His prescription helped with the pain.

23    So there was -- he could walk, he could mow his lawn,

24  he could work on his house.  He told you all of that.  There's a

25  legitimate medical purpose.  Dr. Szyman can see the

1   improvements.

2         But there's a phone call about selling pills.  He

3   discusses it with Dr. Szyman.  Again, every one of these

4   instances when the patient gives an explanation there is no

5   proof to say the other side is telling the truth and the

6   patient's lying.  He gives them the benefit of the doubt.  That

7   doesn't mean he's acting in bad faith.  That means he's trying

8   to trust his patients.

9         There were urine drug screen issues and Mr. Peterson

10  didn't remember them all but said whenever there would be an

11  issue with that he would talk to Dr. Szyman like he did about

12  the marijuana and they would work together.  Dr. Szyman was a

13  good doctor to him.  Dr. Szyman always tried to help him.

14  That's what he said.  And changed his life.  And it was better

15  for once.  The only time since his accident.  And Dr. Szyman

16  could see the improvement.

17        So did he act in bad faith?  No.  Can they prove he

18  was prescribed medicine knowingly thinking it was for some bad,

19  a nonmedical purpose to Mr. Peterson?  No.  Dr. Szyman is not

20  guilty of Count 12.

21        Ms. Wolf was Count 13.  She says she's got

22  debilitating leg pain.  And she admits the medication improved

23  the pain, but she lied about -- but that means there was a

24  legitimate medical purpose to improve that pain and it worked.

25  But she lies about the effect.  She doesn't tell him that it's

1    too strong.  She lies about what she's taking.  She lies about

2    increased pain to try to get more medicine.

3         And either Ms. Wolf or Ms. Valdez, one of them said --

4    and the government's wrong about this -- one of them said, well,

5    I would lie about my pain and try to get an increase and

6    sometimes he would give and sometimes he wouldn't.  So you had

7    the [Indiscernible] tried to figure out what to say.

8         But that's what they say.  It wasn't like he did it

9    every time.  Sometimes he would, sometimes he wouldn't,

10   depending on the dosage they were on.  But the only problem with

11   Wolf's incorrect dosage is lying.  The medicine works.  The

12   treatment works.  Her lies are the only thing that creates a

13   problem.

14        There's a report of her selling drugs.  What does

15   Dr. Szyman do?  He reacts immediately.  He orders a urine drug

16   screen.  She passes that.  Now, yes, she says she manipulated

17   it, but she passes.  He orders a pill count.  She passes the

18   pill down.  He had to witness consumption of her medication at

19   the hospital.  She gets sick but she hides that fact.  Hospital

20   staff [Indiscernible] she took it without incident, which means

21   her tolerance is the right level, she's taking her meds.

22        What more does Mr. Jacobs want him to do?  He got a

23   report that he felt was serious.  He did everything he could and

24   on every score it looked like she was taking her medicine.  If

25   you're knowingly doing this, if you're knowingly giving them

58

1   medicine for a non-legitimate purpose, you're not gonna bother

2   with this, you're not going to have your staff watching somebody

3   taking the medicine, you know it's for a non-legitimate medical

4   purpose.  There would be no reason to do a witness consumption.

5   You would know it wouldn't work.

6          What non -- either -- are they saying that he knew

7   they were going to go sell it and he wanted them to?  Well, if

8   that's the case then he's not going to do this consumption.

9   [Indiscernible].

10          But he does order it.  He's acting in good faith.

11  They cannot prove beyond a reasonable doubt he had anything

12  other than a medical purpose.  He's not guilty of Count 13.

13          Mr. Conway admits that he suffered from significant

14  back pain and all the other treatments had failed.  He admits

15  that they tried the spinal cord stimulator, they tried the pump

16  therapy, they tried physical therapy.  Nothing worked.

17          But the opiates did.  Over 100 MEQ, high-dose opiates

18  worked.  The problem for Mr. Conway is that -- well, first of

19  all, Mr. Conway says that Dr. Szyman always tried to help him.

20  He went out of his way to be a good doctor, to be available when

21  he needed more medication or he had a problem.  He met him at

22  the hospital.  When he took too many pills early on he brought

23  him in the office, he had his parents come with him.  They

24  worked together to get him so he could take his medicine.

25          That's not what you do if you're acting in bad faith.

 1   That's not what you do if you're intending somebody and knowing

 2   they're taking medicine for a non-legitimate purpose.  That's

 3   what you do if you care.  And Mr. Conway's description of

 4   Dr. Szyman, he's a doctor that cares.  At every level.

 5        Now, Conway admits that he had reported improvement

 6   and compliance with a prescription.  And he did have

 7   improvement.  The pain did improve.  But his compliance with the

 8   prescription, no, he was lying about that.  But his wife was

 9   with him when he reported it so Dr. Szyman had another objective

10   person in there verifying, yes, things are going great.  So he's

11   acting in good faith.

12        He abused the medication and lying to Dr. Szyman, he

13   too took much when he wanted to, and he lied about the effects.

14   It was worse -- it was stronger and he was having a worse

15   reaction than he was saying.

16        But all of that doesn't change the fact Dr. Szyman

17   doesn't know any of it.  He knows he says he's better, his wife

18   says he's better, and Conway admits he was better.  So, you

19   know, he's not acting in bad faith.  He's lying, but that

20   doesn't mean the doctor's acting in bad faith.

21        The pharmacy calls and the nurses' notes that he --

22   he's -- seems to be overly fatigued -- "obtunded" is the word

23   that we use, zombie-like.  But Dr. Szyman responded to that too.

24   He ordered the sleep study because he thought there might be a

25   problem there.  After the sleep study he doesn't see any other

1  problems with Mr. Conway in terms of being tired like that

2  again.

3        He's trying to make it work.  So he's not acting in

4  bad faith and he's not trying to give Mr. Conway medicine for

5  some other than legitimate medical reason.  It just doesn't make

6  sense for him to care that much and work so hard if that's what

7  he would do.  He's not guilty of Count 14.

8        Count 15 is Heidi Buretta.  By all accounts every

9  other doctor had failed in their treatment of Heidi.  Physical

10  therapy failed.  Pump trial failed.  Spinal cord stimulator

11  failed.  Everything failed.  Everything was tried.  High-dose

12  opioids was all that worked.

13        Dr. Szyman, he observed improvement.  She was able to

14  work as a nurse.  She was able to drive.  She was able to buy a

15  house.  She was doing great.  That's what he observed.  There's

16  an obvious legitimate medical purpose.

17        Dr. King said that at the dosage she would have died

18  from the medicine.  But at that dosage she was hospitalized at

19  Holy Family, she received IV, a prescribed dosage through IV at

20  Holy Family, and she could talk, she could communicate.  She

21  asked for more with the button if you remember Dr. Szyman's

22  testimony.

23        Nobody's saying that's not true.  Nobody's saying

24  that's wrong.  It's right.  It's true.  She had no negative

25  medical reaction.  What does that mean?  Her tolerance was where

1    it was supposed to be.  It looked to Dr. Szyman that she was

2    taking her medicine.  And there's no way for him to know she's

3    holding these pills if she's not telling him.  If she can look

4    like she has that tolerance who knows what she's doing.  But

5    there's no way to show -- there's no way he could have known.

6          And what amount of drugs she took, whether she took

7    the wrong amount or the wrong combination, whatever she did when

8    she died, no one knows that.  But there's nothing about any of

9    that that proves he was doing anything but acting in good faith.

10   There was a tragedy that happened, but it doesn't change what he

11   did and what he saw.

12         And the government can't say he saw anything else.

13   They can't say he did anything different.  He tried.  And that

14   means he's not acting in bad faith and that means he's not

15   guilty of Count 15.

16         Count 16 is Debra Ramirez who had the chronic

17   headaches.  She testified that she had been treated by all kinds

18   of doctors and they all failed.  They tried all kinds of other

19   alternatives, including a pump therapy which was successful for

20   a while.  And that suggested she wasn't selling her pills

21   because she was getting less pills through the pump therapy.

22   She wanted to do it.  She said Szyman treatment helped her

23   immensely.

24         She said he -- she came in with her son often,

25   Dr. Szyman said.  And her improvement was noted by everybody.

1   She lied about the degree of pain.  Yes, she lied about what she

2   was taking.  And the incorrect dosage was created by her lying.

3          Just like these other people.  It's always the same.

4   The lying causes the problem, but the medicine works.  When she

5   was reported as selling her pills Dr. Szyman assembled a group

6   of people to listen to her story and got a consensus before he

7   let her get more medication.

8          Then she sells pills to an undercover and she gets

9   dismissed from the clinic.  Or sells pills to her neighbor who I

10  guess was the undercover.  But whatever the case may be, then

11  she gets dismissed from the clinic.

12         So when he has proof that he can't deny, he dismisses

13  them.  When he doesn't, he tries to work with them to make them

14  better.  And she said, just like Mr. Peterson, that was the only

15  time in her life that she was good.  She's taking 900 pills a

16  month now and it does nothing.  He acted in good faith.  He's

17  not guilty of Count 16.

18         Nancy Walt is exactly the same story.  She had

19  orthopedists.  Everybody tried these -- on these knees.

20  Orthopedist says go to Dr. Szyman, we can't help you.  So what's

21  Nancy supposed to do?  She had been through every kind of

22  therapy imaginable.  What's she supposed to do?  She suffers

23  with this knee pain that debilitates her.  Or she works -- tries

24  to work with Dr. Szyman and tries something that might help.

25  And she says he's the only doctor that ever helped her.

63

1    And so she had a legitimate medical purpose.  Her

2    report of her progress said his medication was working.  That's

3    what she says.  Not what he says, that's what she says.  But she

4    again lied about the degree of pain, lied about what she was

5    taking so she could have a store of pills.  Lying is the problem

6    again.

7    Now, she says he helped her substantially.  She said

8    he was a great doctor.  Years later, when she can't get anything

9    from him.  Just like lots of these other people, he was always

10   trying to help.  That's somebody that's acting in good faith.

11   Now, the husband complained when Dr. Szyman talked to

12   him.  When he discussed it with Nancy after the fact, she said

13   it was better and the husband never called again.

14   So what's he supposed to do?  He believes that it's

15   better.  They cannot prove that he acted in bad faith.  That was

16   the only time Nancy Walt said that her pain was under control.

17   He's not guilty of Count 17.

18   Count 18 is Chad Wenzel.  He's no different.  Wenzel

19   went to doctors all over the country.  All of the treatment

20   failed.  Nobody denies that he's referred to Dr. Szyman.  And

21   Dr. Szyman puts him on high-dose opiates because it's the only

22   thing left available.  Mr. Wenzel reports improvement.

23   Dr. Szyman observes improvement.  There's no evidence to say he

24   does not.  Mr. Wenzel didn't testify for the government.

25   There's no evidence saying that Mr. Wenzel in any respect was

1   not getting better.  So there was a legitimate medical purpose.

2        There's a phone call from the mother and Dr. Szyman

3   explains Mr. Wenzel said that they were estranged and there was

4   a problem.  There's no way for him to prove that Mr. Wenzel is

5   lying.  He believes and takes his word for it.  He's acting in

6   good faith.  These charges are all the same.  He's not guilty of

7   Count 18.

8        And finally, Todd Orth.  Mr. Orth is a little

9   different.  He had had multiple failures of therapy on

10  significant neck pain.  He needed a surgery.  And he said

11  Dr. Szyman's treatment lessened the pain.  So there's a

12  legitimate medical purpose, period.

13       He used marijuana but he said Dr. Szyman discussed it,

14  told him he should stop, and they resolved it.  He had a

15  difficulty keeping track of his doses.  Dr. Szyman works with a

16  pharmacist to get it packaged for him.

17       Why?  This -- over and over does he state he's going

18  out of his way to try to help these people.  Why?  That means

19  he's acting in good faith.  If you're acting in bad faith and

20  you don't care and all you're trying to do is give them medicine

21  knowing it's not for a legitimate purpose, what is the point?

22  What is the point of going to all this trouble?  There isn't

23  any.

24       He was acting in good faith.  Mr. Orth plainly said he

25  was acting in good faith.  Even when Mr. Orth suffered from

1    addiction, which was a result of some of this, Mr. Orth says he

2    didn't blame Dr. Szyman, he blamed the drug company because

3    Dr. Szyman was always trying to help.

4        After he had the surgery and the pain was eventually

5    more under control, Dr. Szyman worked with Mr. Orth to try to

6    help reduce the medication.  And then Mr. Orth said Dr. Szyman,

7    because of this investigation, when he's no longer available,

8    then he starts struggling from withdrawal.

9        This isn't evidence Dr. Szyman was acting in bad

10   faith.  He just wasn't.  He saw Mr. Orth working at the tire

11   shop.  Mr. Orth said I can work on the medication, I was doing

12   good.

13       There's no proof of bad faith.  Yes, Mr. Orth had

14   withdrawal problems eventually, but that doesn't mean he acted

15   in bad faith.  And it doesn't mean he was given the medicine for

16   some nonmedical reason.  He's not guilty of Count 19.

17       So that's all of the evidence.  You have seen the

18   charges, you've seen the law, and the law is clear.  He's not

19   guilty on any count.  He can't be if you follow the letter of

20   that law.  He just can't be.

21       Out of 350 though 400 patients the government has

22   selected a tiny, tiny fraction and said that there were

23   problems.  But think about this.  Dr. Szyman's practicing pain

24   management with opiates, treating with opiates for years, he

25   started with the philosophy of high-dose opiates back in

1    the '90s.  So in all that time, in the 350 to 400 patients in

2    just one year, consider all that time, if there is just this

3    tiny few where there's a problem -- which the evidence we have

4    is that he's doing a great job managing this situation with

5    these very difficult patients -- that's what the patients say,

6    that he was doing a great job -- their bad actions do not make a

7    doctor guilty.

8         Now, we have an opioid crisis that we are in the midst

9    of and we've heard Dr. King talk about it.  And people are using

10   heroin.  People are using -- lacing it with fentanyl.  People

11   are overdosing.  People are dying.  It's a big problem.  And

12   there is a obvious and logical reaction to try to find someone

13   to blame.  And the government has leaned on Dr. Szyman.

14   Dr. Szyman's putting the drugs on the street.

15        No, he was not.  Dr. Szyman was giving them to

16   patients who told them they were using them and admit they were

17   lying and manipulating him.  They chose to put them on the

18   street.  Dr. Szyman is not the person -- if they choose to put

19   them on the street, they choose to sell them, they choose to

20   lie, they choose to manipulate him, they choose to take

21   advantage of his compassion, take advantage of his decency, then

22   they are ones, the blame lies with them.  Blame the people who

23   decided to do the wrong thing, don't blame the doctor who

24   decided to trust them.  That blame would be misplaced.

25        You cannot transfer the blame of someone who does

1   something wrong and lies to someone else causing them to have a

2   wrong impression.  You cannot transfer the blame to that other

3   person.  It doesn't make sense logically, not in life and not

4   with doctors.

5           I have said earlier, this is a could-have or

6   should-have situation.  Could he have been more [Indiscernible]?

7   Yes.  Could he have tried things differently?  Yes.  So says

8   Dr. King and obviously it's true.  Yes.  But Dr. King has

9   something that Dr. Szyman didn't have.  Dr. King has the grand

10  benefit of hindsight.  And hindsight, as you know, is always

11  20/20.

12          So it's easy for Dr. King to sit back in the cheap

13  seats and pick apart the places where Dr. Szyman didn't do

14  everything as perfectly as one would like.  But that doesn't

15  mean he acted in bad faith.  If King's philosophy were applied

16  to these patients, any of them, any of them, all of them, none

17  of them would have ever had that increased time, that increased

18  period where their lives actually were better.  They would have

19  been denied that if Dr. King was in charge.

20          Doctors can disagree about philosophy.  Dr. Szyman

21  disagrees with Dr. King.  Dr. King disagrees with Dr. Passik.

22  Doctors can disagree.  But having a different treatment

23  philosophy, which is really what this case is about, trusting

24  too much and having a different treatment philosophy, it doesn't

25  make you guilty of a crime.

 1        Acknowledging that there are financial difficulties

 2   that absolutely in the real world impact what treatment is,

 3   acknowledging that's real and you have to live with, you have to

 4   deal with, you have to do your best, that doesn't make you

 5   guilty of a crime.  And as I said before, trusting too much and

 6   believing too much in people doesn't make you guilty of a crime.

 7        Could-haves and should-haves don't make you guilty in

 8   a criminal offense.  And that's all the government has,

 9   could-haves and should-haves.  Should have responded better than

10   this.  Could have asked more questions on that.  But actual

11   proof that he had a bad intention, they can't find one.

12        Now, ladies and gentlemen, I submit to you when you go

13   back to think about this case and you're thinking about some of

14   the things we've heard and some of the difficult problems that

15   these patients had, remember, Dr. Szyman was dealing with the

16   most difficult category of patients anybody could imagine.

17   People whose treatment had failed through all kinds of other

18   doctors and those doctors picked him to try to find a way.

19        And when you're in that situation, when someone's in

20   the situation of a terrible illness, whether it's a cancer

21   patient who has limited options or whether it's a patient with

22   debilitating pain who has no life because the pain has taken it

23   away, ladies and gentlemen, when you think about that I submit

24   to you that those patients do not need their doctors to be

25   detectives.

69

1    They do not want their doctor to be detectives who are

2    going around and looking for reasons to disbelieve them about

3    their pain and their suffering rather than focusing on what we

4    might do to fix it.  We don't need doctors as detectives for

5    this category of patients, and this category of patients is the

6    only one we're talking about in this case.

7    Everybody else tried and failed.  As I said earlier,

8    ladies and gentlemen, patients should have a choice.  Dr. King

9    admitted to me that, yes, if it's a terminal cancer patient and

10   there's an option of very high-risk surgery, it might kill you

11   now, or there's chemotherapy with who knows what the chances

12   are.  The patient should have the choice to say high-risk

13   surgery, I'll take it.  And we shouldn't turn around and say,

14   well, the doctor who performs that is a criminal.

15   And when it's high, when it's pain, when it's

16   crippling pain that no other treatment works for, high-dose

17   opiates can work.  We saw that.  We heard that.  It can work.

18   Patients should have that same choice.  Just

19   because -- what Dr. Szyman said is true, the ability to live and

20   improve your quality of life shouldn't be limited to a situation

21   where it's cancer.  Pain can be just as debilitating.

22   And every one of these people got to make that choice.

23   And this doctor gave them that choice.  And that's something

24   that he should be lauded for doing, rather than throwing them

25   away.

1          Ladies and gentlemen, at the end I know that you think

2     back on what Dr. King says, Dr. King said that we need doctors

3     who will be --

4          Well, let me say that a different way.

5          No matter what Dr. King says, when you think about

6     this case and everything you've heard, the truth of the matter

7     is that we need doctors out there who will take on the patients

8     that have the most problems and give them a try on a therapy

9     that might work so they have some chance.  We need those

10    doctors.

11         When you have a terrible illness, when you have a pain

12    that's taking away your life, you do not need a gatekeeper to

13    limit the treatments, you need a doctor who will say everybody

14    deserves a good quality of life if it is possible and will open

15    the doors to every avenue of treatment that might work.  That is

16    what we need.  And for these very difficult patients, for all

17    the trouble that caused him, that is what Dr. Szyman did.

18         He was very literally for these patients, like Dabien

19    Peterson, like these others, he was very literally their last

20    chance after all these failed treatments at an improved life.

21    And you heard his testimony, you heard his sincerity.  He took

22    that role very, very seriously.  He devoted his life to that

23    practice.

24         And ladies and gentlemen, that does not make him a

25    drug dealer.  That does not make him a criminal.  That makes him

1    a doctor, a doctor who did his best.  It makes him not guilty.

2              THE COURT:  Thank you, Mr. Brindley.

3                              *     *     *

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified December 11, 2017.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM

