```
              UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF WISCONSIN
--------------------------------------------------------------
 UNITED STATES OF AMERICA,        )
                                  )
                     Plaintiff,   )   Case No. CR 16-00095-WCG-1
                                  )   Milwaukee, Wisconsin
      vs.                         )
                                  )   November 13, 2017
 CHARLES R. SZYMAN,               )   11:06 a.m.
                                  )
                     Defendant.   )

--------------------------------------------------------------
```

**TRANSCRIPT OF JURY TRIAL EXCERPT**
**OPENING STATEMENTS**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

 For the Plaintiff
 UNITED STATES OF AMERICA:    Office of the US Attorney
                              By: MATTHEW L. JACOBS
                                  LAURA SCHULTEIS KWATERSKI
                              517 E Wisconsin Ave - Rm 530
                              Milwaukee, WI 53202
                              Ph: 414-297-4106
                              Fax: 414-297-1738
                              matthew.jacobs2@usdoj.gov
                              laura_kwaterski@usdoj.gov
 For the Defendant
 CHARLES R. SZYMAN:           Law Offices of Beau B Brindley
 (Present)                    By: BEAU B. BRINDLEY
                                  MICHAEL J. THOMPSON
                              53 W Jackson Blvd - Ste 1410
                              Chicago, IL 60604
                              Ph: 312-765-8878
                              Fax: 312-765-8040
                              bbbrindley@gmail.com
                              mthompson@brindleylaw.com


 U.S. Official Transcriber:   JOHN T. SCHINDHELM, RMR, CRR,
 Transcript Orders:           WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



1

1    TRANSCRIPT OF JURY TRIAL EXCERPT

2    **OPENING STATEMENTS**

3    Transcribed From Audio Recording

4                    *    *    *

5    THE COURT:  Okay.  Ladies and gentlemen, if you would

6    raise your right hand, the clerk will administer the oath then

7    so you can try the case.

8    THE CLERK:  Do you solemnly swear that you will well

9    and truly try this cause between the parties and a true verdict

10   give according to the law and the evidence, so help you God?

11   IN UNISON:  I do.

12   THE COURT:  Please be seated.

13   At this time then we'll hear from the attorneys giving

14   their opening statements and the government will go first.

15   Mr. Jacobs, you may proceed.  Or Ms. Kwaterski.

16                GOVERNMENT OPENING STATEMENT

17   MS. KWATERSKI:  Thank you, Your Honor.

18   "No pain."

19   Quality of life:  "Not affected by pain."

20   Rate your pain on a scale of 0 to 10:  "Zero."

21   "Can lift heavy objects without pain."

22   That's how Dr. Szyman's patients described their lack

23   of pain to him.  And based upon those descriptions Dr. Szyman,

24   the defendant in this case, prescribes those patients oxycodone,

25   a Schedule II controlled substance.

2

1     Dr. Szyman also increased both the strength and the

2 quantity of oxycodone pain -- excuse me, oxycodone pills again,

3 and again, and again, without the patient exhibiting any pain,

4 complaining of any pain, and stating he had no pain.

5     You'll hear during this trial that Dr. Charles Szyman

6 is a doctor of osteopathic medicine.  During the time period

7 charged in the indictment he was a licensed physician in

8 Wisconsin, a licensed doctor of osteopathic medicine in

9 Wisconsin.  He practiced at Holy Family Medical in Manitowoc.

10 He was licensed and he had a Drug Enforcement Administration

11 registration number that authorized him to distribute controlled

12 substances, including oxycodone, OxyContin, morphine, and

13 hydrocodone.  And he did so by writing prescriptions for these

14 drugs to his patients.

15     In this case, as charged in the indictment, Dr. Szyman

16 is charged with unlawfully distributing controlled substances in

17 19 counts by writing prescriptions for large quantities of

18 oxycodone, OxyContin, morphine, hydrocodone, as well as various

19 other controlled substances, and that those prescriptions as

20 charged were illegal, they were unlawful, because those

21 prescriptions were issued outside of the usual course of

22 professional practice and not for a legitimate medical purpose.

23     During this trial you'll hear from many of

24 Dr. Szyman's former patients.  You'll hear from Ms. Tanya

25 Pivonka Dewane.  She was a patient of Dr. Szyman's for seven

3

1  years for back pain.  And she was prescribed large quantities of

2  oxycodone.

3          She'll tell you that she got prescriptions for

4  oxycodone on each appointment with Dr. Szyman.

5          And she'll tell you over the course of seven years of

6  seeing Dr. Szyman she only recalls him performing a physical

7  exam on her on one occasion.

8          She'll tell you that Dr. Szyman never did any x-rays.

9  He never did any MRIs.  He never discussed with her physical

10  therapy for her back pain.  He never discussed any alternatives

11  to opioids or narcotics for her back pain.

12          And you'll hear that her prescriptions for oxycodone

13  went up and up and up, until she was prescribed 1200 oxycodone

14  pills a month.  That's 40 oxycodone pills per day.

15          And you'll hear from Ms. Pivonka-Dewane that she did

16  not need all of those oxycodone pills for her back pain.  And so

17  she'll tell you that she decided to sell them.  She sold those

18  oxycodone pills on the street.  She became a drug dealer.  And

19  she'll tell you that she made a lot of money doing it.  But

20  eventually she got caught.  She sold to an undercover officer.

21          She was convicted and -- she was charged and convicted

22  of being a drug dealer.  And when she got caught she cooperated

23  with the Manitowoc metro drug unit.  They asked her, who is your

24  source of drugs?  Where did you get all of these oxycodone pills

25  you're selling on the street?  And she told them, Manitowoc

4

1    metro drug unit, that her source was Dr. Szyman.

2         You'll also hear from Ramona Wolf.  She was a patient

3    of Dr. Szyman's for years for shoulder pain and back pain.  And

4    you'll hear that he prescribed her large quantities of Vicodin

5    and morphine.

6         She will also tell you that in the years that she saw

7    Dr. Szyman he never performed a physical exam for her.  He never

8    performed any x-rays or an MRI for her pain.  He never suggested

9    any physical therapy or any other type of therapy for her pain.

10   He never discussed any alternatives to narcotic medication for

11   her pain.

12        And she'll tell you that she also started selling her

13   pills.  The morphine pills he was prescribing her made her sick,

14   but she found out that morphine pills are also very popular on

15   the street and so she gave the vast majority of the pills she

16   was getting from Dr. Szyman to her friend and her friend sold

17   them on the street.

18        You will also hear about how the Manitowoc metro drug

19   unit executed a search warrant at her house, and the target of

20   that search warrant was her son at the time.  But the Manitowoc

21   County drug unit recovered evidence of various prescriptions

22   from Dr. Charles Szyman, and they also obtained information that

23   Ms. Ramona Wolf was also selling her morphine pills on the

24   street and that she was making $4,000 a month selling those

25   pills.

1       And the Manitowoc County drug unit called Dr. Szyman.

2   They called Dr. Szyman's office and they reported that Ms. Wolf

3   was selling her prescription medication on the street for $4,000

4   a month.  You'll hear that from Ms. Ramona Wolf and you will see

5   that in the medical records, in Dr. Szyman's medical records,

6   showing that the Manitowoc drug unit called him alerting him

7   that she was selling her pills.

8       And you will see and you will hear that Dr. Szyman

9   continued to prescribe large quantities of morphine and Vicodin

10  to Ms. Wolf after he was alerted that she was selling those

11  pills on the street.

12      You'll also hear from Ms. Nancy Walt.  And she was a

13  patient of Dr. Szyman's for years for severe knee pain.  And

14  she'll tell you she has severe knee pain.  She's had it for most

15  of her life.  And she was prescribed large quantities of

16  OxyContin over the years.  She'll tell you that she became

17  addicted to OxyContin and that she went through withdrawals.

18  She'll tell you that those withdrawals was going through hell.

19      You will see from the medical records that at one

20  point Dr. Szyman prescribed her 49 pills a day and at one point

21  she was prescribed 27 OxyContin a day.  She'll tell you that she

22  wasn't taking all of the OxyContin.  And so she accumulated a

23  stash.  She was saving them up.  And she'll tell you how her son

24  stole from her OxyContin stash.

25      You'll also hear from her husband, Mr. Terry Walt.

6

1   And he'll tell you how he attended appointments with Dr. Szyman

2   early on in the course of treatment, four or five years in.  He

3   attended appointments with his wife.  And he complained to

4   Dr. Szyman that he thought that his wife was overmedicated.

5         You'll hear from Mr. Terry Walt that when his wife was

6   taking all of the medication as prescribed by Dr. Szyman that

7   she was in a trance; she was either sleeping or she was out of

8   it.  He'll tell you that she was seeing things that weren't

9   there.  He'll tell you that she was like a zombie.

10        He'll tell you that she could not take all of the

11  medication as prescribed by Dr. Szyman if they were to attend a

12  special event like a wedding.  He'll tell you that he would not

13  allow his wife to watch their grandchildren when she was taking

14  the pills as prescribed by Dr. Szyman because she was so out of

15  it.

16        You will also hear from Todd Orth.  He was a patient

17  of Dr. Szyman's for five years.  He had a back injury.  And he

18  went to Dr. Szyman for short-term care before he could get the

19  back surgery that he needed.  He needed help with his pain.

20        He'll tell you that Dr. Szyman prescribed him large

21  quantities of OxyContin.

22        He'll also tell you that he never would have started

23  taking OxyContin if he knew that he couldn't stop.  Mr. Orth

24  will tell you that he became addicted to OxyContin and that when

25  he tried to stop by himself he went through severe withdrawal.

1    He'll tell you about the hallucinations he had and

2    about how scared he was when he went through withdrawal.  He'll

3    tell you that over time Dr. Szyman's prescriptions to him for

4    OxyContin went up and up and up.  And that after he tried to

5    stop himself, he'll tell you that it was him, Todd Orth, the

6    patient, went to Dr. Szyman and he asked to stop the medication.

7    He asked to decrease the amount of OxyContin he was on.

8    And he'll tell you how he eventually did get his back

9    surgery that he needed and that did eliminate his back pain.

10   But by that time he was addicted to OxyContin.  He couldn't

11   stop.  And he spent years of his life addicted to OxyContin and

12   weaning himself off of it.  Years after his pain was gone.

13   He'll also tell you how he trusted Dr. Szyman.  He

14   trusted Dr. Szyman to take care of him.

15   You'll also hear about Ms. Heidi Buretta.  She was a

16   patient of Dr. Szyman for years.  She was prescribed large

17   quantities of morphine by Dr. Szyman.

18   You'll hear that on November 13th, 2014, Dr. Szyman

19   wrote Ms. Buretta a prescription for a total of 1200 morphine

20   sulfate 200-milligram tablets, 1,080 morphine sulfate

21   30-milligram IR tablets -- that's immediate-release tablets --

22   60 Adderall 20-milligram tablets, and 270 hydrocodone with

23   acetaminophen, 10 325 Lowden tablets.  That's 40 200-milligram

24   tablets, morphine tablets a day.  That's 36 30-milligram IR

25   morphine tablets each day for Ms. Heidi Buretta, who was 4 feet

1  6 inches and 130 pounds when she died of a drug overdose on

2  December 5th, 2014.  That's 76 morphine pills each day for

3  Ms. Heidi Buretta.

4       You will hear from an expert witness in this case that

5  a daily morphine equivalency of 100 milligrams, an MEQ of 100 is

6  risky.  It places a patient at a 10 times higher risk of

7  overdose.

8       You'll hear that Ms. Heidi Buretta at 4 foot 6, 130

9  pounds, prescribed 76 morphine pills each day by Dr. Charles

10 Szyman, the defendant in this case, that her MEQ was 11,000 when

11 she died of that drug overdose.

12      And you'll hear from the Manitowoc County coroner who

13 responded to the scene of Ms. Heidi's death -- Ms. Heidi

14 Buretta's death, excuse me.  And the coroner and the deputy

15 coroner recovered numerous unopened and opened pill bottles from

16 her home when she died.  There was a safe identified.  And this

17 picture reveals only a portion of the approximately 50 pill

18 bottles that were recovered at the scene of Ms. Buretta's death.

19      You'll also hear from DEA Special Agent Greg Connor.

20 He'll tell you at the request of the Manitowoc drug unit, the

21 DEA got involved in the investigation of Dr. Charles Szyman.

22 And at the request of the Manitowoc County drug unit, the DEA

23 decided to send in undercover agents posing as patients to

24 determine whether it was true that Dr. Szyman would issue

25 prescriptions to individuals who were not exhibiting pain, not

9

1    complaining about pain, and stated that he had no pain.

2              And you'll hear from Special Agent Connor that he

3    posed as Richard Russo.  He met with Dr. Szyman as a new

4    patient.  He had no medical records.  He told Dr. Szyman that he

5    was new to the area and that he worked in construction.  He told

6    Dr. Szyman that he had pain between his shoulder blades; that it

7    came and went, but that he had had no pain that day.

8              You'll hear from Special Agent Connor, posing as

9    Richard Russo, that Dr. Szyman never did an x-ray.  He never did

10   an MRI.  He never -- well, Special Agent Connor never talked

11   about having chronic pain.  He said that his pain comes and goes

12   and that he was looking to establish himself with a physician in

13   the event that he had pain at some later point.

14             Dr. Szyman made no diagnosis for Richard Russo's pain.

15   He didn't discuss any alternatives to narcotics.  He did perform

16   a limited physical exam.  And you'll hear that Special Agent

17   Connor was asked to bend over as if to touch his toes and

18   Dr. Szyman asked him to point to where the pain was between his

19   shoulder blades.  And that's what he did.

20             You'll see from the medical records and you'll hear in

21   the audio recordings of this visit that he said he had no pain.

22   And he rated his pain as zero on a 0 to 10 scale.

23             You'll see the records.  Current pain scale, zero.

24   Quality of life, not affected.

25             Are you having pain today?  No.

1    Rate your pain scale 0 to 10.  Zero.

2    Functional assessment for Mr. Richard Russo:  "No pain

3 at the moment.  Normal routine without extra pain.  Can lift

4 heavy objects without pain.  Able to walk any distance without

5 pain.  Sit in a chair without pain.  Stand without pain.  Sleep

6 is never disturbed by pain.  And social life is normal.  No

7 extra pain."

8    And you'll see and hear these visits with Dr. Szyman

9 because Special Agent Connor was wearing a wire.  He was audio

10 and video recording these appointments.  And you'll see and

11 you'll hear that it was Special Agent Connor who suggested that

12 Dr. Szyman prescribed him Percocets on that first visit after he

13 told him he had no pain.  And Dr. Szyman did just that.

14    And you'll see and you'll hear that Special Agent

15 Connor, posing as Richard Russo, went back and had five

16 appointments with Dr. Szyman.  On each appointment he said

17 again, no pain.  Zero on a 0 to 10 scale.

18    And you'll see and hear during each of the five

19 appointments that Dr. Szyman steadily increases the quantity and

20 the strength of the oxycodone pills that he's prescribing.  And

21 in his last appointment he receives three prescriptions from 90

22 30-milligram oxycodone per month.  That's 3 30-milligram

23 oxycodone pills per day for no pain.

24    And you'll see and hear that Special Agent Connor also

25 introduced his girlfriend, Anna Kingston.  And Anna Kingston was

11

1   actually Deputy Sheriff Kelsey Knaup.  She was also working

2   undercover.  And she told Dr. Szyman that she had no medical

3   records; that she was also new to the area.

4          She'll testify that Dr. Szyman never did an x-ray or

5   an MRI, or discussed physical therapy or discussed any

6   alternatives to opiate narcotics.

7          You'll hear again that she said that her pain was zero

8   on a 0 to 10 scale.  That should say 0 to 10, not 1 to 10.

9          And you'll hear that Dr. Szyman provided Ms. Kingston,

10  Deputy Sheriff Kelsey Knaup, with a prescription for 90

11  30-milligram oxycodone IR tablets at her very first appointment

12  when she said that she had no pain that day.

13         She said she had a softball injury and her pain comes

14  and goes.  And you'll see that she obtained multiple refills of

15  that prescription without ever seeing Dr. Szyman.

16         And you'll see and hear again, because Deputy Sheriff

17  Knaup was also wearing a wire and these visits with Dr. Szyman

18  were audio and video recorded, that in her second visit she was

19  issued two prescriptions for 90 oxycodone immediate release

20  30-milligram tablets when she said that she had no pain.

21         You'll also hear from a witness who's been qualified

22  as an expert, Dr. Timothy King.  He's a pain management and

23  anesthesiologist physician.  He's been practicing medicine for

24  over 40 years.  Dr. King reviewed the patient files and

25  prescription records for each of the 19 charged prescriptions in

1   this case that were issued by Dr. Charles Szyman.

2           He'll testify about the four tenets of pain management

3   medicine — examination, diagnosis, treatment, and monitoring.

4           And he'll testify that the treatment of chronic pain

5   may include the use of opiates.  It may include the use of

6   prescriptions for oxycodone, OxyContin, morphine, hydrocodone.

7           But you'll hear from Dr. King that there must be a

8   risk assessment before prescribing large quantities of opiates;

9   that there must be monitoring and there must be an exit

10  strategy.

11          You'll hear him talk about the dangers of prescribing

12  such large quantities of opiates; the side effects, dependency,

13  addiction, abuse, and overdose.

14          He'll also testify about the red flags, about

15  diversion or selling, not using these large quantities of

16  opiates that are being prescribed.  Failed urine drug screens.

17  Not having those medications that you're prescribed showing up

18  in your urine.  That's a red flag.  Failed pill counts.  You

19  don't have the pills that you're supposed to have in your

20  prescription bottle, another red flag of diversion or abuse.

21  Pharmacy shopping, doctor shopping, calls for early refills,

22  these are all red flags that he'll testify about, about how

23  physicians must look for and address these red flags when

24  prescribing large quantities of oxycodone, OxyContin, and other

25  controlled substances.

1    Finally, he'll discuss how a daily morphine

2   equivalency of 100 milligrams is risky.  A daily MEQ of 100 is

3   risky.  It increases the risk of overdose death 10 times.

4    And you'll hear and you'll see throughout this trial

5   that Dr. Szyman's patients had MEQs -- Ms. Heidi Buretta's of

6   11,000, Mr. Sean Conway, another one of his former patients, of

7   7,000.  And you'll hear from Dr. King that in his expert

8   opinion --

9    MR. THOMPSON:  Objection, Judge.  The doctor hasn't

10   been qualified yet in our -- in this case.

11    THE COURT:  Sustained.  Let's hold off on that.

12    MS. KWATERSKI:  You'll hear from Dr. King that after

13   his review of all the medical records and prescription records

14   that the 19 charged prescriptions in this case were issued

15   outside of the usual course of professional practice and not for

16   legitimate medical purpose.

17    Ladies and gentlemen, throughout this trial I ask that

18   you listen to the witnesses carefully.  Use your common sense

19   and experience to assess the credibility of all of the

20   witnesses, of the former patients of Dr. Szyman, of the

21   undercover officers, and of Dr. King.  And at the end of this

22   trial I am confident that after you've heard and seen all of the

23   evidence in this case, that you will conclude that the United

24   States has met its burden of proving beyond a reasonable doubt

25   that Dr. Charles Szyman is guilty of unlawfully distributing

1    controlled substances and that you will return a verdict of

2    guilty on all 19 counts.

3            Thank you.

4            THE COURT:  Thanks, Ms. Kwaterski.

5            Mr. Thompson?

6            MR. THOMPSON:  Thank you, Your Honor.

7                    DEFENDANT OPENING STATEMENT

8            MR. THOMPSON:  Ladies and gentlemen, two things are

9    true.  First, Charles Szyman is a physician who has worked to

10   treat and manage the pain of patients in his community for

11   decades.

12           And second, Charles Szyman did his job.  That's what

13   the evidence is going to show in this case.  And despite

14   patients who sometimes lied to him, patients who sometimes

15   deceived and manipulated him, despite government agents who

16   worked undercover to intentionally lie to him while he was

17   attempting to just treat his patients, in all of these cases

18   Dr. Szyman was only trying to do one thing, his job as a

19   physician.

20           That's what this case is about, ladies and gentlemen.

21   In this trial you're ultimately going to be asked one question.

22   Was Charles Szyman a doctor who was attempting to treat his

23   patients and do his job?  Or was he issuing prescriptions

24   knowing that they had no legitimate medical purpose?

25           The evidence in this trial is going to show that

15

1   that's an easy question for you to answer.  And the evidence

2   will show that Dr. Szyman's a medical professional who only ever

3   acted in the best interests of his patients as he saw them.

4           There's not going to be any evidence that he was

5   receiving some sort of cash payments or kickbacks from drug

6   companies or pharmaceutical representatives in exchange for

7   prescribing these medications.  There won't be any evidence that

8   he was receiving any sort of personal benefit at all from the

9   medications he was prescribing.  And so the evidence will show

10  that there would be no reason, no explanation for why he would

11  ever intentionally prescribe medications that he did not believe

12  had a legitimate medical purpose.

13          The evidence will show that Dr. Szyman cared about his

14  patients.  He cared about the pain that they described to him,

15  the pain that they said they were experiencing in their

16  day-to-day lives.  He cared about helping them manage that pain,

17  helping them to live their lives with as little pain as

18  possible.  And he tried to help all of his patients, no matter

19  who they were and no matter how little income they had.

20  Dr. Szyman didn't turn people away because they lacked medical

21  insurance, he helped them work within their budget to treat

22  their pain as best he could.  He helped his patients try to live

23  their lives successfully, to function in society, and to manage

24  their pain.

25          In all cases Dr. Szyman only ever tried to do his job.

16

1  And you're gonna learn about Dr. Szyman throughout the course of

2  this trial.  You'll learn that he graduated medical school in

3  1984; that he became board certified in anesthesiology for the

4  highest degree of aptitude that a physician could obtain in that

5  field.  This isn't some sort of quack we're talking about in

6  this trial.  This is a well-educated, well-respected doctor who

7  is highly skilled and seen as an expert by his peers.  That's

8  Charles Szyman.  That's the doctor that's on trial in this case.

9          And you'll learn that Dr. Szyman engaged in

10  substantial study in the field of pain management.  He attended

11  dozens of seminars.  He spent hundreds of hours studying and

12  training.  In doing so, Dr. Szyman came to understand that

13  chronic pain was an often undertreated medical problem that

14  causes real problems for patients.  Prevents them from

15  functioning in society.  He learned that chronic pain can lead

16  to loss of income, lead to depression, other medical problems.

17  It prevents people from living successful and happy lives.

18          Dr. Szyman decided to devote his career, his entire

19  life to helping people with these chronic pain problems, to

20  treating them and helping them to be successful in society as

21  best he could.

22          You're gonna find out that Dr. Szyman began to run the

23  Holy Family Pain Management Clinic in Manitowoc.  And he

24  continued to attend seminars, continued to study in the field of

25  pain management.  You'll find out that he consulted with experts

1    in the field, did his best to determine how best to treat

2    patients with chronic pain and what dosages of medications to be

3    given to them, what dosages might have to be changed over time

4    for these patients.

5         He did everything he could to treat his patients in

6    the appropriate way with the means that were available to him.

7    And through his studies he learned to provide the amount of

8    treatment that is necessary to keep his patients functioning and

9    to keep their pain managed.  That's what Dr. Szyman did because

10   that was his job.

11        And you're gonna learn that at the time of this

12   investigation Dr. Szyman was treating between 350 and 400 pain

13   management patients at his practice.  And of those 350 to 400

14   patients, the government here is only focusing on a small

15   handful of them.  And you're gonna learn that this handful of

16   patients they focus on here in this trial, they have a few

17   things in common.

18        First, these patients were referred to Dr. Szyman by

19   other physicians, other surgeons.  Dr. Szyman didn't decide that

20   these people had a pain problem, other doctors had seen them

21   first, had identified chronic conditions, identified effects of

22   lingering -- lingering effects of surgeries or injuries or

23   accidents, things they could identify as a source for the pain

24   that these patients were describing.  And these physicians began

25   treating these patients before Dr. Szyman ever saw them.  Some

18

1   of them were already on opiate medications when they came to

2   Dr. Szyman's clinic.  All of them were describing long-lasting

3   and debilitating pain.

4          And you're gonna learn that Dr. Szyman, in treating

5   these patients, ultimately did what every doctor should do in

6   that scenario, he took the steps necessary to help them manage

7   the pain that they were describing.  He tried to lessen their

8   pain, to get them to be able to function in their day-to-day

9   lives.

10         And you're gonna learn that these patients all had

11  legitimate and identifiable sources for the pain that they were

12  describing.  Some of them had amputated limbs, damaged joints,

13  osteoarthritis, lingering effects of significant surgeries.

14         And you'll learn that, whether by Dr. Szyman or these

15  other physicians, x-rays were done, MRIs were done.  It was

16  undisputed that there were legitimate reasons for the patients

17  to be experiencing the pain that needed this kind of treatment.

18         And so you'll learn that Dr. Szyman did treat them.

19  But you're also going to learn that Dr. Szyman did repeatedly

20  attempt alternative forms of treatment other than opiates.

21         You'll hear about how in patient after patient

22  Dr. Szyman did attempt physical therapy.  He attempted

23  alternatives like intrathecal pump therapy or spinal cord

24  stimulation therapy, cognitive and psychiatric therapy.

25         And you'll hear about how he often learned to attempt

1    other forms of therapy that simply were not covered by patients'

2    insurance and so could not be performed.  And you're gonna find

3    out that Dr. Szyman did his best in every scenario to treat his

4    patients as best he could.  But when some of these other forms

5    of treatment were unavailable, unaffordable or simply

6    ineffective, Dr. Szyman was left with few options but to

7    prescribe the amount of opiates that could enable these patients

8    to successfully function in their daily lives.  And that's what

9    Dr. Szyman did, because that's what he believed his job was.

10        And you're gonna find out that to determine how much

11   of these medications he should be prescribing, Dr. Szyman had to

12   rely on one thing above all else, the patient's own accounts of

13   the pain that they were experiencing.  And that's what a doctor

14   ultimately must do.  That's what Dr. Szyman did.  He trusted his

15   patients.  He had faith in them to truthfully describe the pain

16   they were experiencing, the symptoms they had, how they were

17   responding to the medications he was prescribing to them.  The

18   only source of information he had about those facts were the

19   patients' words themselves.  So he had to take their word for

20   it.

21        That's what he did and that's what was reasonable for

22   him to do.  When he prescribed the opiates to them he expected

23   them to take them as was directed.  And he had to rely on them

24   to do so.

25        But he didn't just rely on them blindly.  And you're

20

1   gonna find out that there were steps he took as precautions to

2   ensure that the drugs were taken in an appropriate fashion.

3           And you're gonna find out that Dr. Szyman would

4   consult with the doctors -- the other doctors who had referred

5   the patients to him.

6           And you'll find out that he would conduct urine drug

7   screens to analyze the levels of the drugs in their urine screen

8   to make sure they were taking the appropriate dosages.

9           And you'll find out that he conducted pill counts at

10   his clinic to make sure the right numbers of pills were being

11   taken and patients weren't either taking too many or selling

12   excess pills.

13           You're gonna find out that he utilized contracts in

14   his practice that went over the risks and responsibilities of

15   taking these types of medications with his patients.  And he

16   went over all this with his patients and had them sign off to

17   indicate that they understood.

18           And you're gonna learn that sometimes he had patients

19   come into the clinic to take the medications in the presence of

20   nurses or other medical professionals to ensure that they were

21   taking them appropriately, to ensure that they were reacting in

22   the ways that people taking the prescribed amount of medications

23   would react, and to make sure that these patients were being

24   safe and honest.

25           This is a man who took repeated steps to ensure not

1    only that he was treating his patients' pain, but that his

2    patients were acting in a responsible and appropriate manner.

3    And you're gonna find out that if there was a problem with a

4    pill count or some other report of improper use by a patient, he

5    would bring the patients in, he would sit them down, consult

6    with the patient and other medical professionals, and determine

7    if there was really a problem.  And when there was, you'll find

8    out that Dr. Szyman stopped treating the patients.  He didn't

9    prescribe them any more of these opiate medications.  Again and

10    again, you're gonna learn that he took steps to ensure that his

11    patients' pain was treated and that they were taking the drugs

12    appropriately.  Again and again you'll find out that Dr. Szyman

13    simply did his job.

14            But the evidence will also show that there was a small

15    number of patients who chose to actively lie to him and they

16    chose to misrepresent their pain and they chose to misrepresent

17    the number of pills they were taking or how they were responding

18    to the treatment.  They chose to hide these facts from their own

19    doctor.

20            You'll learn these patients that I'm talking about

21    here, this small handful of them, were chronic liars.  They did

22    have a condition that gave rise to pain, one that Dr. Szyman

23    could see, one that other doctors had already seen and

24    identified.  But they misrepresented how that condition was

25    actually affecting them and they misrepresented what was

1   actually necessary for them to treat that condition and behave

2   effectually in their lives.

3          And they lied about what they were doing with their

4   medicine.  They lied about how functional they were when they

5   were taking the medicine and when they were not taking it.

6   Again and again, they did all they could to mislead the doctor

7   who was only trying to treat them and help them manage their

8   pain.

9          And you're gonna find out that in some of these cases,

10  for certain of these patients for certain periods of time they

11  got away with it.  These were people who were chronic

12  manipulators, people who were purveyors of dishonesty and that

13  pattern of dishonesty might continue here in this courtroom

14  during this trial.

15         But make no mistake, the evidence is going to show you

16  that this is a doctor who was only trying to treat them, a

17  doctor who had trust and faith in his own patients to accurately

18  and truthfully describe the pain that they themselves were

19  experiencing so that he could give them the appropriate

20  treatment.

21         Faced with that doctor, some of these patients chose

22  to mislead him instead.  Over and over again they made the

23  decision to do that, not Dr. Szyman.  When they made the

24  decision to lie, the evidence is going to show that he only made

25  the decision to treat them to the best of his ability to attempt

1    to manage their pain.

2            In every instance, based upon what the patients were

3    telling him, Dr. Szyman provided them with the medications that

4    he thought was appropriate, that he thought would be effective

5    and keeping them at a functioning level in their daily lives.

6            And the evidence will show you that the treatment of

7    this type of pain is a legitimate medical purpose.  And the

8    evidence will show you that Dr. Szyman was always in search of

9    that purpose, always seeking to treat his patients' pain and do

10   his job.

11           You're also going to learn that during the course of

12   the investigation the government also employed some of these

13   same tactics that these other patients dishonestly employed.

14   They sent undercover individuals to Dr. Szyman to attempt to

15   receive prescriptions for some of these medications.  And these

16   undercover individuals lied about suffering from pain.  And

17   sure, some of them said that they were not in pain on that day,

18   but they all described being in pain on other days, pain that

19   was recurring and intermittent.

20           Just because pain isn't constant, the evidence will

21   show that doesn't mean it doesn't need to be treated.  And this

22   first undercover officer that came to Dr. Szyman, you're gonna

23   find out that he actually lied about his past history with

24   another doctor about a medical condition that he made up that he

25   did not actually suffer from.  You're gonna find out that

1    Dr. Szyman's office attempted to contact this other prior

2    physician and instead of being able to reach the physician,

3    instead they reached somebody who was posing as a doctor,

4    another government agent who was not actually a doctor,

5    pretended to be one in order to tell Dr. Szyman's office this

6    was a patient who did have a chronic pain condition and did need

7    treatment for it.

8            And you're gonna find out that the other individual,

9    the other government agent who went undercover to Dr. Szyman's

10   office, actually did go to a legitimate doctor first, but she

11   lied to that doctor about her own condition in order to get a

12   referral to Dr. Szyman.

13           Dr. Szyman, the evidence will show, wasn't just

14   relying blindly on what these individuals were telling him when

15   they requested to be prescribed pain medication.  He actually

16   consulted with people he believed to be medical professionals

17   that had already evaluated them.

18           So in order to get Dr. Szyman to prescribe these

19   medications they had to lie to him.  They had to lie and pretend

20   to be doctors.  They had to lie to other doctors in order to get

21   referrals.  They had to misrepresent that there were conditions

22   that Dr. Szyman thought needed to be treated when there actually

23   were none.  And all Dr. Szyman could do was rely on their word

24   and the word of the other people he believed to be medical

25   professionals who had actually evaluated these patients.

1    Once again, Dr. Szyman did his job.  He performed drug

2  screens on these patients.  He told them there would be pill

3  counts.  And when they didn't show for a pill count Dr. Szyman

4  ceased his treatment of them.  He threw them out of the clinic

5  and didn't prescribe them any more medication.

6    Once again, the patients were the one who were

7  choosing to lie and to manipulate Dr. Szyman, and Dr. Szyman was

8  only choosing to do his best to treat them and do his job.

9    And that's all this case is, ladies and gentlemen.

10  It's a case where a small handful of patients lied, tried to

11  manipulate their doctor, and that doctor only tried to treat

12  them.  And now he sits before you charged with a crime in this

13  courtroom.

14    And you're also going to hear from another doctor in

15  this case, Dr. King.  And you're gonna find out that Dr. King

16  has a certain opinion about opioid medication.  But you're gonna

17  learn that Dr. King is only one doctor.  There are other doctors

18  who disagree with Dr. King's opinion.  Dr. Szyman might disagree

19  with that opinion.

20    But Dr. Szyman isn't charged with having a different

21  viewpoint or a different treatment philosophy from Dr. King.

22  The question before you isn't going to be whether Dr. King would

23  run a medical practice the same way that Dr. Szyman ran his.

24  The question is going to be whether the government can prove to

25  you that Dr. Szyman intentionally prescribed these medications

1    knowing that there was no legitimate medical purpose for them.

2         But when you see all the evidence in this case what

3    you're going to learn what's really going to be undeniable is

4    that in every instance Dr. Szyman believed that his patients did

5    have a legitimate medical need for all of the prescriptions that

6    he issued.

7         And because of that, at the end of this trial when

8    you've heard all the evidence, and we expect it's going to end

9    just as it begins, with two things being true:  That Charles

10   Szyman is a doctor, and that Charles Szyman did his job.  That's

11   why we're going to ask that you find Charles Szyman not guilty

12   of all of the charges against him.

13        Thank you.

14        THE COURT:  Thank you, Mr. Thompson.

15        How about if we take our noon recess.  Ladies and

16   gentlemen, it's almost noon, please be back in the jury room

17   right at 1:00, and we'll start promptly after that.  We're in

18   recess.  And don't forget not to discuss the case with anyone,

19   even amongst yourselves until you hear all the evidence.

20        Have a good lunch.

21        (Jury out for lunch recess at 11:52 a.m.)

22        THE COURT:  Anything to put on the record?

23        MR. JACOBS:  Not for the government, Judge.

24        MR. BRINDLEY:  No, Your Honor.

25        THE COURT:  Do we have a Daubert challenge here,

1    Mr. Brindley?

2         MR. BRINDLEY:  I don't know, Judge.  I don't know if

3    we will.  I think we won't necessarily.  But I don't want them

4    to call him an expert until he's been qualified in court.  That

5    was the only thing.  I mean, there may be a voir dire of the

6    witness after he testifies.  But I mean I don't have any

7    preliminary Daubert challenge that I'd be able to identify

8    before I hear him.

9         THE COURT:  Anything further?

10        MS. KWATERSKI:  At the final pretrial Mr. Thompson

11   represented that there was no challenge to the designation of

12   Dr. King as an expert and he stated that they were not retaining

13   an expert.  So that was the basis for my statements.

14        THE COURT:  Sure.  And it wasn't improper argument.  I

15   just didn't want to get into it if there was --

16        It does seem to me, though, that -- I'm always

17   interested in learning new things and I know the custom is to

18   ask the court to pronounce a person an expert.  I've never been

19   comfortable doing that.  That seems to me -- I can say he's

20   qualified to answer opinion questions.  I think that's all that

21   Rule 702 requires.

22        So unless there's an objection his answer -- once the

23   foundation is laid, don't ask me to pronounce him an expert.

24   Simply proceed to answer the questions.  If you wish to object

25   you can make an objection at that point.

1          MR. BRINDLEY:  Yes, Your Honor.

2          THE COURT:  But all I'm ruling in 702 is that he has

3     the qualifications to render an opinion as to the issues that

4     are -- that he's asked about which I take it to be within the

5     practice of medicine and for a medical reason.

6          All right.  If I'm incorrect or if you think I should

7     make something else let me know.  Otherwise I'll move in that

8     direction.

9          All right, have a good lunch everyone.  We'll see you

10    promptly at 1:00.  I'd like to start right away.

11          (Lunch recess taken at 11:55 a.m.)

12                         *     *     *

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified January 20, 2018.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM

1                         I N D E X

2      OPENING STATEMENT

3            BY MS. KWATERSKI................................  2

4      OPENING STATEMENT

5            BY MR. THOMPSON................................  15

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25